REDACTED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

FILED

AUG 1 9 2022

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| Jane Doe, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. |
| ABA Accredited University, | ) |
| American Bar Association, | ) |
| Department of Education | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S VERIFIED COMPLAINT**

The plaintiff, Jane Doe, brings this civil action[1], *pro se* and under pseudonym, to obtain a

temporary restraining order, preliminary injunction, and equitable and other relief against

defendants ABA Accredited University, the American Bar Association (ABA), and the United

States Department of Education (DOE), and the plaintiff alleges as follows:

---

[1] Plaintiff expects this case may garner national attention as there are non-profits with interest in access to justice, which includes the public's right to reasonable access to a legal education, as well as law schools trying to protect their turf, and lawyers advocating for greater representation of disabled persons in the profession, all implicated by this case. Plaintiff does not pretend to have the skills or experience necessary to properly litigate this case (yet), but given the last-minute decision by the university to discontinue the distance education program, and the seemingly unavailability of any attorney to assist, plaintiff has done the best job possible to state the need for the TRO.  Unless plaintiff obtains the TRO, continuation in law school this semester will not be possible.  Plaintiff welcomes any help from lawyers or law firms who have an interest in assisting, who would presumably value their duty to represent all citizens with valid cases and controversies even if success of the plaintiff's ultimate position means (1) students will have an easier time getting access to a proper legal education,  and (2) there may naturally be more competition in the legal profession as more potential law students would have access to an ABA accredited legal education unrestrained by arbitrary geography limits. If interested in helping, please contact plaintiff at hazel9876@outlook.com.

## I.  NATURE OF ACTION

1.      This lawsuit is brought to seek relief from the Defendant ABA Accredited University's fraudulent, discriminatory, and retaliatory conduct against plaintiff, which occurred during the admissions process, throughout the administration and provisioning of the J.D. program in which plaintiff is enrolled, and most critically, now, as that defendant threatens to discontinue the distance learning format of classes even days before the start of the fall semester without offering any reasonable solutions for the plaintiff to continue in the program.  The threatened and actual conduct by the university defendant towards plaintiff has violated its duty of good faith and fair dealing and duty of cooperation to the plaintiff, and breached and threatens to breach terms and conditions of the implied contract between those parties.  The plaintiff seeks protections under the [Redacted] Act, Virginia Consumer Protection Act, Sherman Act, and through common law fraud, breach of contract, illegal restraint of trade, conversion, and unjust enrichment causes of action.

2.      As against the defendants ABA Accredited University, ABA and DOE, the plaintiff alleges that in contract, combination, or conspiracy between these organizations, the defendants unreasonably restrain interstate commerce. Plaintiff further alleges that the DOE's failure to properly regulate the ABA to which it has granted the authority to accredit law programs in the United States, and the ABA, by adopting standards limiting the number of "distance learning" credits that can be earned by students in its accredited programs - a limitation not rationally related to any present-day mission of the ABA -  and in conspiracy with ABA Accredited University and all other ABA accredited law schools, work in conjunction with one another to thwart competition, unfairly deprive plaintiff of options for legal education, and unlawfully deny them their right to an education and to practice in a profession of their choosing. Where defendants conspire with the other ABA law schools to unfairly limit students'

2

opportunities to obtain a legal education sufficient for the practice of law in any state, to only those schools geographically collocated with the student, and to unfairly limit students' ability to transfer between law schools, as they have all do and conspired to do, plaintiff, as a student, sustains an injury in-fact, as they have.

## II. JURISDICTION, VENUE, AND PARTIES TO THE CASE

3. This Court has subject matter jurisdiction over this action and over the defendants pursuant and 28 U.S.C. §§ 1331, 1332, 1337(a), 1346, and 1367.

4. Defendant ABA Accredited University's deliberate and extensive contacts with the plaintiff in Virginia as described herein gave it ample notice that it could be sued here and more than satisfy the test for personal jurisdiction.

5. Plaintiff admits that they were solicited extensively by ABA Accredited University via electronic communications to induce them to apply for admission, and upon acceptance, and they enrolled into the J.D. program. (Doe Decl. at ¶1).

6. Plaintiff received distance learning education in Virginia based on ABA Accredited University's intended use of the zoom meeting technology to reach plaintiff and other students around the world (including as far as Canada and China) and in the Country (students in Miami, Fl, inter alia. (Doe Decl. at ¶1).

7. A search of plaintiff's email records system revealed that Defendant ABA Accredited University authored more than 200 communications that were sent to plaintiff in Virginia to induce plaintiff's enrollment and to facilitate administration and provisioning of the J.D. program in which plaintiff was enrolled. (Doe Decl. at ¶1).

8. Defendant ABA Accredited University issued business cards to plaintiff at their residence in Virginia. (Doe Decl. at ¶1).

9.     Courts in this district have repeatedly found personal jurisdiction where the defendant established a relationship with a Virginia resident and where the defendant had communications plaintiff in Virginia, just as ABA Accredited University did here. (Doe Decl. at ¶1);

### III.   FACTS GENERALLY

10.    Doe is a resident of Alexandria, VA. (Doe Decl. at ¶1)

11.    Doe is a law student at ABA Accredited University's ABA Accredited University School of Law and has completed 39 of 87 required credits for the J.D. program. (Doe Decl. at ¶2)

12.    To date, each of those credits has been earned via "distance learning," which, in other words means that the classes have been taught over zoom video conference technology for any remote students. (Doe Decl. at ¶3)

13.    Depending on the law class, and when it was offered, some or all the students have been remote, and the delivery of content has been nearly flawless, allowing for synchronous learning, and extensive interactions between students and the professors, using the traditional Socratic methods of legal education. (Doe Decl. at ¶4)

14.    Plaintiff received distance learning education in Virginia based on ABA Accredited University's use of the zoom meeting technology to reach plaintiff and other students around the world (including as far as Canada and China) and in the United States (students in Miami, Florida), inter alia. (Doe Decl. at ¶5)

15.    The law school announced a new final policy to discontinue the distance learning option on July 21, 2022, which will render it impossible for me to continue in the program for the fall semester absent the law school changing its policy or granting me a policy exception. (Doe Decl. at ¶6)

4

16.     Doe has a [Redacted] for which the university provides certain [Redacted]. (Doe Decl. at ¶7)

17.     The [Redacted] causes challenges in Doe's day-to-day life, and those challenges would be exacerbated if the university discontinues the distance learning option to take law classes remotely, which would force Doe to attend class in-person in New York. (Doe Decl. at ¶8)

18.     One such tool that Doe uses to minimize the impact of their [Redacted] is a special workstation that is set-up at their residence.  (Doe Decl. at ¶9)

19.     It would not be feasible to set-up the workstation at the university in each classroom, as the university would not be able to do so while protecting Doe's [Redacted] and [Redacted], or in other words, without drawing undue attention to Doe's [Redacted]. (Doe Decl. at ¶10)

20.     The American Bar Association Standards 306 and 311(e) which pertain to distance learning limits, and Standard 207, allow the law school to provide Doe the distance learning option as an [Redacted] without impacting their accreditation.  (Doe Decl. at ¶11)

21.     Standards 306 and 311(e) are also unconstitutional in that they are not rationally related to any proper governmental need, and to the extent that ABA has enacted these standards, they also violate Sherman Act and state statutes restricting trade due to the anti-competitive effects of these standards on legal education. (Doe Decl. at ¶12)

22.     Doe wishes to have the right to sit for the NY State and Virginia State bar examinations. (Doe Decl. at ¶13)

23.     VA State Bar examination, with few exceptions, requires applicants to have a degree from an ABA accredited university, and Doe would not likely be deemed to satisfy any of

the exceptions if the J.D. degree were somehow denotes as having been received without compliance with the ABA standards 306 and 311(e). (Doe Decl. at ¶14)

24.      NY State has a different rule.  (Doe Decl. at ¶15)

25.      Doe petitioned the New York State Court of Appeals for a waiver of § 520.3(c)(6)(i) of the Rules of the Court of Appeals, for the Admission of Attorneys and Counselors at Law which prescribes distance learning credit limits, and which states, in pertinent part (see Doe Decl. at ¶16):

> *§ 520.3 Study of Law in Law School*
>
> *(6) Distance education. Distance education is an educational process in which more than one-third of the course instruction is characterized by the separation, in time or place, or both, between instructor and student, and the instruction involves the use of technology to support regular and substantive interaction among students and between students and the faculty member, either synchronously or asynchronously.*
>
> *(i) Up to 15 credit hours for distance education courses may be counted toward both the 83 credit hours required for graduation and the 64 classroom credit hours required by paragraph (1)(ii) of this subdivision, provided that:*
>
> *(a) there is opportunity for regular and substantive interaction between the faculty member and student and among students; and*
>
> *(b) there is regular monitoring of student effort and accomplishment by the faculty member as the course progresses, and the opportunity for communication regarding the student's work.*

26.     The Rules allow for a waiver, as stated below, (see Doe Decl. at ¶17), pursuant to:

*§ 520.14 Application for Waiver of Rules*

*The Court of Appeals, upon application, may in its discretion vary the application of or waive any provision of these rules where strict compliance will cause undue hardship to the applicant. Such application shall be in the form of a verified petition setting forth the applicant's name, age and residence address, the facts relied upon and a prayer for relief.*

27.     The waiver sought from the New York State Court of Appeals would prospectively allow Doe to continue enrollment in the J.D. law program and complete the remaining forty-eight (48) credits required for the J.D., while having confidence that Doe will remain eligible to sit for the New York Bar Examination. (Doe Decl. at ¶18)

28.     The university is aware that the ABA standards can be waived to accommodate a [Redacted], and also that the New York State Court of Appeals may grant a waiver to the distance learning standards, upon Petition, yet, they have refused to discuss either of those topics with Doe. (Doe Decl. at ¶19)

29.     At the same time, Doe is entitled by law to have other [Redacted], many of which have been denied by the university without any explanation, and contrary to its own policies. (Doe Decl. at ¶20)

30.     Doe has a shared custody of a minor child who resides between my house and their other parent's house in a roughly fifty-fifty custody arrangement by agreement which has been incorporated into a court order. (Doe Decl. at ¶21)

31.     My child's other parent works fulltime, and the child is involved in numerous school and sports activities, including a U.S. National Soccer affiliated soccer academy which makes it extremely important that Doe is local to help. (Doe Decl. at ¶22)

32.     Doe's son also has a learning [Redacted] which makes Doe's presence in Virginia and Doe's involvement in their day-to-day life of paramount importance. (Doe Decl. at ¶23)

33.     It causes Doe great dread to consider the possibility that Doe would need to trigger child custody litigation to modify a child custody order, by relocating to New York, just so Doe may complete my J.D. program. (Doe Decl. at ¶24)

34.     Doe's young son needs Doe present here in Virginia, so without the waiver, Doe's studies must be discontinued.  (Doe Decl. at ¶25)

35.     Even if relocation were possible, which it is not, the timing of the university's announcement regarding discontinuing the distance learning, makes it impossible to obtain a modified custody order from a Court before the fall semester begins, and ultimately, Doe's son's other parent will not consent to Doe's relocation. (Doe Decl. at ¶26)

36.     Therefore, it would be impossible for Doe to fulfill is family obligations from New York. (Doe Decl. at ¶27)

37.     Doe was solicited extensively by the university which contacted Doe via email communication sent into and which were received in Virginia. They applied and were promised a decision within 4 weeks, but they didn't receive one.  ABA Accredited University coerced plaintiff through inaction to renounce their [Redacted] [Redacted] entitlements, and only then did it make an offer, violating [Redacted] and [Redacted] laws. (Doe Decl. at ¶¶ 28-53).

38.     Doe was offered admission on July 7, 2022 and Doe accepted on July 12, 2022. (Doe Decl. at ¶¶ 54-56).

39.     Immediately after acceptance, ABA Accredited University began communicating its intent to cancel distance learning and force students back to campus. The university engaged in a campaign deigned to market the idea that "together again" is in the best interests of the university, supporting their desire to force students onto the campus to increase revenue and protect its business model. The university advertised "distance learning" as the method for education on which Doe relied, and it gave Doe no indication prior to contract formation and performance by Doe that they intended to discontinue, but at the same time concealing that material fact from Doe, they enticed Doe to enroll (Doe Decl. at ¶¶ 57-67).

40.     In order to further its objectives of getting all students to return to campus, the university implemented a policy whereby everyone needed to be vaccinated.  They provided very limited exceptions which would enable students to continue studying remotely, that is, only if they had what they would deem to be valid religious objection to the vaccine or medical reason. Doe applied for exemption and for permission to study remotely for medical and religious reasons, but also other reasons. The university coerced students into providing private religious and medical information, essentially as a condition of it fulfilling its contractual obligations to provide distance learning, and then used that information to discriminate and retaliate against Doe.  (Doe Decl. at ¶¶ 68-93)

41.     On August 16, classes began and continued throughout the semester without any issues. The university delivered content via zoom in both exclusive distance learning classes at times and also in hybrid, meaning some students were remote and others were not.  The professors used the Socratic method without issue.  All professors exercised control over their classrooms as they saw fit whether the class was in person, remote, or hybrid (both in person and remote). The entire experience was professional and effective. (Doe Decl. at ¶¶ 94-05).

42.     After Doe's first timed midterm, they realized that their [Redacted] would make it nearly impossible to complete the exams within the allotted amount of time, so Doe decided to request [Redacted] before the first set of finals.  Doe was not provided all of the [Redacted] requested and no reason was provided for the university denying the others. The final exams in the fall of 2021 were taken without incident from home. (Doe Decl. at ¶¶ 106-111)

43.     On October 18, Doe emailed Dean [Dean 1 Redacted] asking for a commitment from the school to allow Doe to continue remotely during the Spring Semester of 2022. The school refused to provide one. On November 5, Dean [Dean 1 Redacted] announced that each student who had received permission to attend all of their classes remotely during the Fall 2021 semester at the Law School as an [Redacted] from the University's vaccination would be allowed to maintain that [Redacted] during the Spring 2022 semester.  This means that unless you plan to become compliant with the University's vaccination policy, you may continue to stay enrolled at the Law School and attend all of your classes remotely during the spring semester. The ABA Accredited University sent an ambiguous email about whether it would continue distance learning after the spring semester. *"Please keep in mind that this [Redacted] will be provided during the Spring 2022 semester only. It is possible, and even likely, that it will not be extended past next semester,"* it stated, despite the universities' contractual obligations to do so.  This communication sowed further confusion and represents the type of confusing instructions coming from the school. Notably absent from the communication is any reason for their decision.   Dean [Dean 1 Redacted]'s message was inherently contradictory in that it states both that the "[Redacted]" was being provided for the Spring semester only, while at the same time he stated that it was possible, and even likely that it wouldn't extend past last semester. It is either "only" for the spring, or there

is a possibility, however slight, of it continuing after the Spring semester.  It cannot be both. Therefore, it is confusing and ambiguous. (Doe Decl. at ¶¶ 112-121)

44.     On April 6, the university announced that purportedly due to changing health conditions in the local area and on campus, the Law School had decided to administer exams for remote students in person at a special designated location and isolated from the rest of the campus, but they refused to specify how the accommodated student's [Redacted] and [Redacted] would be preserved.  Doe responded objecting that it was unreasonable to expect them to travel to NY for the finals, and expressed their disappointment that the school still refused to affirm its intent to allow Doe to finish the program via distance learning.  The exchange was contention and the school continued to conceal its intent to cancel the program. At one point Dean [Dean 1 Redacted] indicated that he thought he had addressed Doe's concern, but Doe found that be implausible given that Doe's biggest concern, continuation with distance learning was unresolved and Doe had a reasonable expectation that the university would act with good faith and fair dealing and give them a clear answer. They refused. Doe found the reasons provided by the school to be nonsense, and part of their ongoing campaign to coerce students to be on campus.  Given the extended history of this unresolved dispute, it simply was not genuine of the university to use a notional distinction between computer or paper exams as justification to order a Virginia based student, namely Doe, to NY.  They knew or should have known that doing so would cause unnecessary stress and [Redacted], forcing Doe and the school back into contentious discussions.  Implied in their preposterous assertion, is that a remote student could not simply choose to take the exam on the computer and waive any preference for paper copies of the exam.  Dean [Dean 1 Redacted] misstated in his email of April 18 that: "This semester, we are asking our remote students to take their exams using the paper format (with live proctors) that is being required of our in-person

students." In fact, all students had the option to take the exam on the computer. The university was so committed to this false notion that the "paper" exams would necessitate "live proctoring" and "in person" exams, that the university absurdly used scantrons even though the Examplify brand software that they used the previous semester to proctor and monitor exams, has an option to answer multiple choice questions right in the application. In other words they made it more difficult for themselves to grade exams simply to support this narrative. To Doe's knowledge, no students opt for paper copies of the exam. Therefore, this entire ploy by the school should be seen for what it is, part of its larger campaign to simply to get the students back on campus. Distributing the exams on paper was not only a waste of paper, but was done so as part of the school "pretending" that the "paper exams" were what required the students to be "in person" for the exam. It is a preposterous assertion by the school and violates its duty of good faith and fair dealing. Doe replied the same day regarding the school not operating transparently and in good faith. (Doe Decl. at ¶¶ 122-140)

45. Doe replied to Dean [Dean 1 Redacted]'s email of April 18 on the same day, (see Doe Decl. at ¶¶134), and stated:

> *Dear Dean [Dean 1 Redacted]:*
>
> *Thank you for your email and for offering the school's rationale for the change in exam procedures. I understand that ABA Accredited University, as a private organization, does not need to share the reasons for each and every decision. However, I find that common among the best organizations are their attributes of transparency and fairness in dealing with their customers (in this case, students, among other important stakeholders). While I appreciate that ABA Accredited University has business objectives, I believe forcing students back onto campus is a short-sighted strategy which will eventually end up backfiring. Instead, the school should be looking to extend the reach of the law program by recruiting worldwide into a remote program, and scaling the operation. At minimum, I would ask the students the correct questions about what they prefer and why, before setting a direction for the school.*

*I applied for a program which was offering remote learning options to its students at that time, it was advertised as such on its website, and I believe that a reasonable person would assume that those options would continue throughout the program as long as the student is performing and prepared to make the enormous investment in time and money. Afterall, the school invested in the technology and in training the professors and students, and to pull back these capabilities warrants full and open examination as the reasons and costs and the benefits. The school has not provided any compelling reason and this can only lead me to guess. I know you can appreciate that one year of a law program - which provides no realistic opportunities for some students to finish the degree, pass the bar, and gain admittance to a state bar - is of little to no value to those students. You mentioned with reference to the school's decision to allow my remote learning, that "[i]t was not a promise that [I] would be permitted to attend remotely under any and all circumstances and indefinitely." Again, I believed it would be for the duration of the program, however, I recognize that the ultimate decision rests with the school.*

*Unfortunately, there is slim to no chance that I can move to NY to complete the degree program so it is a reasonable question: under what circumstances and duration will the school allow me to continue remote learning? (emphasis added). That is the question which has gone unaddressed and is the source of stress and frustration. The change in exam procedures, despite the annoyance, is really a secondary matter.*

*As for the exams, I do not understand what compelling reasons would support a contention that the security and fairness of the exams will be furthered in any material way with the new procedures, particularly given the academic honesty policies in place and the dire consequences for violations. Also, I'd have to believe that the school sufficiently examined everyone last semester. My difficulty in accepting the rational provided is that it seems that this decision is consistent with the school's unwillingness, thus far, to commit to allowing remote education in that it forces students to be in person for exams, only in the name of "fairness and security".*

*I encountered challenges during the last exam cycle with open book exams because several of the books which I purchased for the kindle required internet access and it was suddenly unavailable from within exemplify (despite working during the test run). How would partnering with a local law school to proctor the exam, given the changes to exam procedures, and using a personal computer, address that important matter? Will I be permitted access to my files on my iMac Pro? Are there proctors willing to sit and proctor an exam with unvaccinated people? I have a [Redacted] [Redacted] for the exams which would increase the burden on any other law school to provide in-person proctors. Alternatively, the school could send a proctor to my house, but again, I really don't understand how the locked down exemplify program for remote administration of the exam is any less fair or secure? None-the-less, if you must,*

13

*you can reach out to [Redacted] Law School in Arlington, VA to see if they will accommodate your proctoring needs if that is still a viable approach. I look forward to working with you to find a solution to the remote learning situation and the exams.*

46.     Dean [Dean 1 Redacted] sent another email to all law students on April 21, (Doe Decl. at 135), stating:

> *Dear Students,*
>
> *As I indicated in my April 12 email (see below), all exams during the Spring 2022 semester will be administered in-person and exam questions will be distributed in paper form. I am writing this email to respond to some further questions raised by students about this policy.*
>
> *1.     Students can still use your own computers to type your exam answers using the same Examplify software used in prior semesters (although fully handwritten exams are also an option). The only difference this semester is that the exam questions will not be on the computer, but instead will be distributed on paper.  Please take the "mock exams" that will be sent to you by Law School IT to make sure your computer is compatible with the Examplify software and so you can familiarize yourself with the version that will be used this semester.*
>
> *2.     If your exam is open book, you may use any outside materials. Additionally, if your exam is open book, you will have access to your hard drive. However, you will not have access to the internet even if your exam is open book. If you have documents on your hard drive that require internet access for use, please either print or reformat those documents before the exam. (Again, I recommend you test this by using the "mock exams" that are being sent to you.)*
>
> *3.     If your exam is closed book, you may not use any outside materials, and you will not have any access to your hard drive for the duration of the exam.*
>
> *4.     If your exam has a multiple-choice section, you will be enter your answers on a paper Scan-Tron sheet.  Because exams will no longer be divided into independent parts, you will be able to have access to your computer while you are answering the multiple-choice portion of your exam. If your exam is open-book, you will therefore also have access to your hard drive while you are answering the multiple choice questions.*
>
> *Best,*
>
> *Julian [Dean 1 Redacted]*

47.    Dean [Dean 1 Redacted] sent another email on April 27, (Doe Decl. at 136), stating:

*Dear Students Who Have Been Fully Remote This Semester,*

*This email contains important logistical information for your in-person exams during the May 3 to May 16 exam period.*

*LOCATION:*

*All students who have been taking their classes remotely this semester due to the exemption from the vaccination requirement must take your exams at the days and times they are scheduled, but in the ABA Accredited University Oak Street Center (a link to its location and directions can be found here and directions are below). Exams will take place in Room 122 unless you have been otherwise instructed (in which case it will be in Room 123 or 125). A proctor will be in the room to administer the exams. IT support will also be available at the beginning of the exam period to troubleshoot any problems. (Any students who have received [Redacted] will receive separate instructions in a separate email.)*

*Parking is also available immediately adjacent to the Oak Street Center building. You should not enter any other buildings during your time on campus. We recommend you arrive at least a half hour earlier than your exam time to orient yourself to the room and building.*

*COVID PROTOCOLS:*

*All students must wear masks for the duration of the exam session while inside the Oak Street Center.*

*All students must submit a negative COVID19 test result to the ABA Accredited University MEDICAT site https://ABA Accredited University.medicatconnect.com/ taken within 72 hours of your exam date if it is a PCR test or 24 hours of your exam date if it is rapid antigen test.*

*So, if your exam is on Tuesday, May 3, you will need to report a negative PCR COVID test result from a test taken no earlier than Saturday, April 30 or a negative rapid antigen test taken no earlier than Monday, May 2. The COVID test cannot be an at home test.*

*If your next exam occurs more than 72 hours from the time of your first exam, you must submit a second COVID test result before coming onto campus for the next exam. For instance, if you submitted a negative COVID result on May 1, and your next exam occurs on May 2 or May 3, you do not need to submit another negative test result. But if your next exam is May 6, you must submit a*

*second negative COVID test result before coming onto campus to take that exam.*

*If you have a positive test result, you should immediately notify Student Health Services (516-463-6745) and enter into the recommended COVID isolation protocols (typically five days). Your exam will be rescheduled for a different time. You should not come onto campus during that quarantine period. You should also inform the Office of Student Affairs ( lawstudentaffairs@ABA Accredited University.edu ) so they can reschedule your exam time.*

*You may use an off campus COVID test provider, or you may schedule a free COVID test (PCR) at ABA Accredited University Student Health Services here. Their hours are M-F 9 a.m to 7 p.m and 10A – 6 P on the weekends.  They also have walk-in testing without appointments on Mondays and Wednesdays, 10-1:30 and Thursdays from 2-5:30 p.m at the ABA Accredited University USA center.  PCR test results from Student Health Services takes about 1 hour.*

*---*

*If you have any questions about this process, please feel free to contact me directly.*

*Best,*

*Julian [Dean 1 Redacted]*

48.     As of April 30, I had not received any further information about taking the finals at a local law school.  I did receive another email from Dean Kaspar indicating that I had been scheduled for exams on campus at ABA Accredited University.  The communication made no reference to the ongoing discussion regarding taking exams at [Redacted], and added further confusion, stress, [Redacted], and frustration.  Dean Kaspar wrote 3 separate emails, one for each class with a final exam, (Doe Decl. at 138), essentially as follows:

*[Jane Doe]*

*According to our records, you are scheduled to take this final exam at the Oak Street Center building on the North Campus.*

*Here are the details for your exam:*
*Course:          CONTRACTS*

16

> *Professor:      [Omitted]*
> *Day and Time:      5/10/2022        8:00:00 AM*
> *Oak Street Center Room:        125*
> *Please report to the above listed room, 30 minutes prior to the start time*
> *indicated above.*
> *Best of luck on your final exams!*
> *Thank you.*
> *Brian T. Kaspar*
> *Associate Dean for Academic Records and Registrar - Law*

49.     I replied to Dean Kaspar and Dean [Dean 1 Redacted] on April 30, (Doe Decl. at 139), as follows:

> *Dean Kaspar:*
>
> *I received today's email below regarding the Contract Law final and two similar emails regarding the Constitutional Law and Property Law finals and don't believe I am expected onsite for these exams.*
>
> *I am awaiting feedback from Dean [Dean 1 Redacted], who I understand was to be looking into alternative locations for me to take the exam, starting with [Redacted] University Law Center in Arlington, VA, the law school nearest to my residence here in Virginia.*
>
> *Dean [Dean 1 Redacted]:*
> *Do you have any updates on availability at [Redacted] and regarding the other questions I had posed in my email of Apr 18? Thanks.*

50.     I did not hear any reply by May 3, so I emailed Dean [Dean 1 Redacted] again, (Doe Decl. at 140):

> *Dear Dean [Dean 1 Redacted]:*
>
> *Have any arrangements been made for me to take the finals at a nearby locale? If you could, please let me as soon as possible to allow me to plan accordingly.*

51.     Doe took the spring exams as scheduled without incident. (Doe Decl. at 141)

52.     On Tuesday, May 24, Doe started classes for Summer Session I and completed the classes remotely along with all of the other students without incident. Doe noted at the time that it was interesting that when it is convenient for the university, any and all classes can be offered in

the distance learning format. Summer, was apparently an acceptable time for distance learning classes, for reasons undisclosed. (Doe Decl. at 142)

53.     On June 28, Dean Kaspar sent an email with the exam schedule, indicating room assignments (on campus). (Doe Decl. at 143)

54.     On July 6, I had not heard anything about scheduling finals from Dean [Dean 1 Redacted], and Doe emailed him to address that and other unresolved concerns.  (Doe Decl. at 144). Doe stated:

> Dear Dean [Dean 1 Redacted]:
>
> I am writing to request your feedback on a few important topics.
>
> I would like to revisit my request seeking confirmation that the university will allow me to finish the law program from my home in Virginia using the zoom technology.  I am incurring additional expenses associated with this uncertainty.  Specifically, I am unable to make a decision as to whether to purchase my next house or continue renting on a premium month-to-month basis.  As I have a family, others are dependent on this decision.
>
> It remains nearly impossible for me to take classes from NY due to my other responsibilities, and we are approaching a critical juncture whereby if I continue in the ABA Accredited University Law program, I will have obtained more credits than I am able to transfer to another law program.  Approval on a semester by semester basis has created a hardship. This means I need to transfer now or not at all.   I believe it is reasonable to expect that I will be allowed to complete the program under the same conditions in which I started, i.e. remotely, but it seems the school has a different view. I would  like to explore any compromises that may be available. If you are unable or unwilling to commit to allowing me to continue remotely for the duration of the program or offer some reasonable compromise, **I would like to have a meeting with Dean [Redacted] and/or the President [Redacted] to discuss the options.** (emphasis added).
>
> I am preparing comments to the A.B.A. on the proposed revisions to A.B.A. Standard 306 which addresses remote learning.  I understand the resolution has passed the standards committee and it is to be voted upon in August 2022.  My view is that this standard is entirely antiquated given the precedents set by the law schools during COVID, and the overall advances in technology, and I believe those advocating for limits on remote learning are solely motivated by protectionist principles. None-the-less, I may qualify for an exemption under the

18

*proposed new wording of the standard, for an [Redacted] for a [Redacted] or exceptional circumstances. However, this would require the university to agree.*

*In the mean time, I have submitted several applications for transfer, as I must, given the uncertainty about the terms under which I may complete the program at ABA Accredited University program.*

*This brings me to another point of feedback.  Prof. White has refused to provide a recommendation, for nonsensical (or maybe yet undisclosed reasons). I sought her recommendation because her writing classes allowed for multiple one-on-one conferences and I had the most interaction with her compared to other professors. I could not have foreseen that she would refuse and now I am left without options. I'd like to understand why, and whether the administration had any influence in this decision. She has chosen not to reply to my last communication, which was critical of her decision and the absurd reason she provided.*

*Lastly, Prof. [Omitted] is proposing a grade change in Constitutional Law I, which I understand is, for some reason, awaiting your approval. Perhaps recommendations require your approval as well. I plan to submit other applications, but would like the grade change to be on the transcript, and need a recommendation to attest to my abilities as a law student.*

*Lastly, I require a letter indicating that I am in good standing from the Dean in support of the transfer applications. Are you able to provide this?*

*I would appreciate any feedback you can provide on each of these time sensitive matters, as well as your ideas on any compromises which may be available for me to finish the program remotely.*

*Best regards,*
*[Jane Doe]*

55.   Dean [Dean 1 Redacted] replied, (Doe Decl. at 145):

*[Dear Ms. Doe]*

*Let me try to address your key points in as succinct a manner as possible.*

*1)     We cannot commit to allowing you, or other ABA Accredited University Law students next semester, to take all of their classes remotely in the same way you did during this past year.  There are a variety of reasons for this, but the lack of a NY Court of Appeals waiver for distance learning is a key factor since the lack of a waiver will make a fully remote student ineligible to sit for the NY Bar if they exceed the NY Court of Appeals' cap (15 credits) on the number of allowable distance learning credits. I realize that this issue does not apply to all*

*of our students, but it does apply to a majority of our students, and has guided us in our planning for remote learning this fall. The ABA Standard might or might not change, but it would not have an effect next year and it is doubtful it would be in effect the following year. In any event, the ABA Standard is not the sole standard governing our distance learning policy. We of course have to comply with it, but we have so far been free to follow stricter rules on distance learning than is permitted under the ABA Standard.*

*2)     As for Prof. White, we have not in any way discussed or influenced her decision. This is a matter left purely to discretion of individual professors, but as a matter of policy, the Law School never discourage faculty from writing recommendations for students, even when those recommendations are for students seeking to transfer and leave the Law School.*

*3)     I approved your grade change in Constitutional Law earlier today.*

*4)     Dean Kaspar should be able to provide a letter of good standing if you need one.*

*Best,*

*Julian [Dean 1 Redacted]*

56.     I replied to Dean [Dean 1 Redacted] on July 6, as follows, (Doe Decl. at 146):

*Dear Dean [Dean 1 Redacted]:*

*Thank you for your succinct response.*

*I would like a meeting with you and Prof. White to discuss the recommendation.*

*I would also like a meeting with Dean [Redacted] to discuss the ways in which the school will support me to obtain the law degree consistent with the policies in place at the time I started the program. It is my position that the school has a [contractual] obligation to continue offering the legal education, which has come at significant cost, to me in essentially the same form it has offered the program to date.*

*On your point about waivers, it seems that there must be a waiver from the NYS Court of Appeals regarding the 15 hours since EVERYONE exceeded that during COVID.*

*It's concerning to me to hear you suggest that the absence of this waiver has guided the school's planning for the upcoming school year, even though you have students attending remotely from other states which have different licensing requirements. Your hint that the lack of waiver from NYS Court of Appeals has "guided" your planning, suggests that the school will discontinue remote services, without simply saying so, even though the technology is available and imposes no burden on the school to continue to use it. If you have*

*made that decision, when was it made and why have I not been informed until now?*

*I would have hoped to hear in your response that the school is advocating for the needs of its students by indicating support for the elimination of the distance learning restrictions (which are not even rational) and inquiring about waivers from both NYS Court of Appeals and A.B.A.  Missing from your email are any ideas on how to accommodate my reasonable  request, or any indication that the school is interested in working with me to find a way to graduate. That is very disappointing, especially given the enormous financial investment that your program requires. A good business prioritizes the needs of its customers.*

*As you've noted, the school is not bound by A.B.A., nor must it be inflexible in how it delivers the education, and I think it is fair for the school to honor the terms and conditions in place at the time of my application and acceptance to the program.*

*Perhaps the school can take the lead on challenging:*
*520.3(a)(6)(i)*

> *(6) Distance education. Distance education is an educational process in which more than one-third of the course instruction is characterized by the separation, in time or place, or both, between instructor and student, and the instruction involves the use of technology to support regular and substantive interaction among students and between students and the faculty member, either synchronously or asynchronously.*
>> *(i) Up to 15 credit hours for distance education courses may be counted toward both the 83 credit hours required for graduation and the 64 classroom credit hours required by paragraph (1)(ii) of this subdivision, provided that:*
>> *(a) there is opportunity for regular and substantive interaction between the faculty member and student and among students; and*
>> *(b) there is regular monitoring of student effort and accomplishment by the faculty member as the course progresses, and the opportunity for communication regarding the student's work.*
>> *(ii) No credit shall be allowed for correspondence courses.*
>> *(iii) No credit shall be allowed for distance education courses until the student has completed the equivalent of 28 credit hours toward the first degree in law.*

*As it seems the courts make their own rules with regard to the training of lawyers without any real oversight from the legislature, it seems someone must challenge these outdated policies in the legal system. I suppose if the school won't advocate on behalf of its students to the NYS Court of Appeals and to the A.B.A., then I'm as good of a candidate as any to challenge that.*

*I would like a survey to go out from the student body president or from the administration to the law students asking for their opinion as to the*

21

*effectiveness of the remote learning. I'd also like to hear from anyone in the administration offering up a good faith argument as to why they believe offering 100% remote classes to everyone would not satisfy the need for producing sufficient attorneys, and to what extent these ideas are shared among the faculty.   We should have an open forum to debate and test the views on this important topic.*

*In the absence of a solution from the school, if I am unable to secure a transfer to local university and retain the value of my investment in our contract, I suppose I must ask the courts to change the rules.*

*As I've previously mentioned, in that case, I will need, at least to try, to seek an order enjoining the school from discontinuing the service it has thus far offered without issue. I am very disappointed that I'll need to begin the research on these legal positions.*

*I respectfully ask you to consider this a legal demand for a commitment to continue offering the remote learning experience and escalate my concerns within the school's chain of command.*

57.     On July 7, Doe emailed Dean Kaspar to inquire about any efforts the university put forth to secure a local location for me to take the exams. I stated: "Are we able to ask [Redacted] to host the summer final exams for me again?" (Doe Decl. at 147)

58.     On July 9, Dean Kaspar replied: "I don't know.  That would be a question for Dean [Dean 1 Redacted], whom I have copied on this message. (Doe Decl. at 148)

59.     Dean [Dean 1 Redacted] had not replied by July 12, so I emailed again.  "Can you please confirm that a request has been sent to [Redacted] to proctor my finals next week, and if they have consented?" (Doe Decl. at 149)

60.     Finals were scheduled to start in less than a week, July 18-20, and no [Redacted] have been arranged. Doe was taking 10 credits over the summer enrolled in 3 classes, about 4000 reading pages of law to learn, and a week before the finals, the school is displaying a minimal interest in accommodating Doe forcing their attention from their studies to this administrative matter.  (Doe Decl. at 150)

61.     Dean [Dean 1 Redacted] replied on July 12, (Doe Decl. at 151):

> *Hi [Jane],*
>
> *Dean Kaspar made the request yesterday and we just heard this morning that [Redacted] is unable to accommodate this request this time.*
>
> *Best, Julian [Dean 1 Redacted]*

62.     Dean [Dean 1 Redacted] invites more conflict with his matter-of-fact, indifferent response, providing no further ideas, and displaying not a care in the world that his nonchalant attitude towards my finals would naturally be expected to cause tremendous stress and [Redacted] in addition to the normal high level of stress and [Redacted] associated with the law program, and especially during the shortened summer schedule. (Doe Decl. at 152)

63.     Doe replied on the same day, (Doe Decl. at 153):

> *They are all open book tests.*
>
> *What are the other options? How about one of the following?*
>
> *UVA (Arlington Campus)*
> *GW*
> *[Redacted]*
> *American*
> *DC (Clarke)*

64.     Dean [Dean 1 Redacted] replied the same day, (Doe Decl. at 154):

> *We will reach out to as many of these law schools as possible, but during the summer, it is quite difficult to coordinate exam administration. I would advise you, as a back up, to plan to take the exam in-person at ABA Accredited University next week. We will let you know if any of these schools are able to accommodate this request.*
>
> *Best,*
>
> *Julian [Dean 1 Redacted]*

65.    Doe replied to Dean [Dean 1 Redacted] on July 12 at 5:13 p.m. as follows, (Doe Decl. at 155):

> Dean [Dean 1 Redacted],
>
> *I made no plans to come to campus and the requirement that I do so, levied at this late hour, is unfair. Similarly, the expectation that I spend time coordinating directly with other law schools, now, at this late hour, because you have arbitrarily decided that taking open book exams remotely using proven proctoring software is somehow insufficient. I need to be fully focused on preparing for the exams.*
>
> *I'd like, once again, to ask that you be mindful of the covenant of good faith and fair dealings which governs our contractual relationship as we work to find a solution.*
>
> *Do you plan to address the other issues raised or should I schedule a meeting directly with Dean [Redacted]/President Posner? If you are unwilling or unable to find an [Redacted] at this late hour for next weeks exams, then I suggest we plan to use the remote proctoring software. If you refuse over my objection, the school should pay my expenses to fly to NY, stay at a hotel and provide reliable transportation for as long as I need to be in town.*

66.    Doe was in the middle of studying around the clock and Dean [Dean 1 Redacted] did not reply to this urgent matter.  At 10:24 p.m., Doe emailed him again, (Doe Decl. at 156):

> Dean [Dean 1 Redacted]:
>
> *As it appears you are content to deliberately cause chaos in my life and in my preparations for my final exams, I will be reaching out in the morning to seek an urgent meeting with President Posner to lodge a complaint about your handling of my situation. If she is unavailable, I will reach out to the board of trustees. If no solution arises, then I will be walking across the street to the Federal Court House to file a suit against the University and YOU.  In that scenario, I will be missing the final exams on Monday and we'll need to reschedule or seek a court order.*
>
> *It is unacceptable to me that you feel it appropriate to selectively chose to reply to the issues I have raised for a year, and even then, only when you feel like it. By allowing the issues to linger on and on, without any concern over the hardship you are causing, demonstrates complete disrespect to me as a student. It appears to be a personal decision to handle the issue in this way as though I*

*have somehow annoyed you with my reasonable requests for certainty over the relationship and our mutual obligations. Otherwise, how can you explain your lack of diligence and willful evasiveness.  It is clear that you are again deploying the tactic of ignoring issues, as you've done repeatedly to induce me to escalate matters in an attempt to make me appear unreasonable.  But these efforts will fail, as we have a documented history dating back to the beginning of the program. It has progressed to this point only because of the way you chose to handle the matters by abusing your authority. This approach reflects terribly on the university and they should reconsider having you in this position given your propensity to abuse your authority.*

*In this latest saga, your posture to force me to come to the university with 4 days notice, with full knowledge that I am in Virginia and have been for the entire program, is intentional to harrass and cause stress.*

*It is abhorrent that you feel entitled under our contractual relationship to tell me when and where I need to be, regardless of how unreasonable your demands are, knowing I have so much to lose.*

*Your nonchalant decision to order me to come to the University next week at risk of me losing or significantly diminishing the value of my $100,000 investment thus far, is tortious, especially after you have failed to exercise any care in the handling of my situation.*

*I think I have effectively voiced my concern and made clear in my demand that you and the University treat me fairly. Ordering me to campus because you neglected to make other reasonable arrangements for me to take the final exams, and then attempting to pawn the obligation off on me at the last minute, reflects a calculus which warrants examination by your leadership.  The fact that you have knowledge of my [Redacted] and you chose to conduct yourself this way is most disturbing. I am left to wonder whether if I did [choose] to show up on campus, how you plan [to]protect my confidential medical information [from] other classmate[s], including [such information as] that I have an [Redacted].*

*If you want to fix this relationship, I'm happy to discuss. If not, I will ask President Posner to implement a solution whereby we have no further interaction.*

67.     I had not heard any reply from Dean [Dean 1 Redacted] by Wed., July 13 at 3:10 p.m., and I escalated the matter with a letter to the President of ABA Accredited University (Exhibit J). I stated in the email as follows (Doe Decl. at 157):

*Dear President [Redacted],*

*Please find an attached letter regarding ongoing issues with Dean [Dean 1 Redacted] and my educational experience at the Law School.*

*I look forward to an opportunity to bring the matters raised to a prompt and fair resolution.*

68.     Dean [Dean 1 Redacted] finally replied at 3:14 p.m. as follows, (Doe Decl. at 158):

*I obviously strongly disagree with everything in your letter, but as I have stated, I have tried to work with you to facilitate practical solutions to your specific concerns. The issues you raise in this letter are largely irrelevant to the particular issues you are facing for next week.*

*In this case, I have arranged for your exams to be taken at [Redacted] University next week. If this is not satisfactory to you, please let me know. Otherwise, I will assume you will take the exam next week at [Redacted] and will work with them and you to facilitate that process. If you choose not to work with me on this, I will assume you will take your exam in person at ABA Accredited University next week.*

69.     I replied to Dean [Dean 1 Redacted], and added the Dean [Dean 3 Redacted], Dean for Diversity and Inclusion, on Wed, July 14 at 10:22 a.m. as follows, (Doe Decl. at 159):

*Dean [Dean 1 Redacted],*

*Again, your communications lack any display of empathy towards my situation which was one of the reasons for the communication to President [Redacted]. Your blanket statement that you "disagree with [E]verything in my letter," is just the latest example of you obfuscating the issue and worse yet, showing no interest in resolving it.*

*Perhaps Dean [Dean 3 Redacted] as the Dean for Diversity and Inclusion can offer you insight into the ways in which your communications lack any sensitivity towards my particular situation. If the university offers to educate students with disabilities, it should fully understand the obligations it incurs before accepting tuition money from those students.*

*I've lost about 6-8 hours of study for my finals while addressing these issues and it is quite frustrating. The credits I am taking now exceed the limits of credits that I am able to transfer to other law programs, so this uncertainty has already caused me to sustain unnecessary financial risk and the stress associated with it. I would not have needed to have applied for transfers if you would have provided assurances that the school intends to perform on your side of the contract (as I have sought for a year). Incrementally changing the terms under which the school is providing the education is rapidly approaching a*

*material breach of our implied contract. Stop professing your expectation for me randomly and arbitrarily show up at campus in NY, knowing that I live in Virginia, as it is borderline harassment.*

*To the extent that your communications continue to fail to address that main issue, remote learning, I'd appreciate it if you'd stop feigning an attitude of wanting to "work with me" after causing the problem about the finals by ignoring it until the last minute. Finding a solution to the problem you caused is not considered "working with me."*

*Of course, taking the exams at [Redacted] is better than going to NY, it is not as good as taking the open book exam using the setup at my house which is designed to accommodate me for my [Redacted]. As you know, I'm sure there isn't a real risk of cheating on a timed open book exam which could be monitored using the remote monitoring and proctoring software which, incidentally, was sufficient for years prior. I'm sure you can appreciate my position that it's absurd for anyone to think I might have a collection of people in my residence,  who would effectively be committing felonies to help me to somehow cheat on an open book timed lawschool.  Simply absurd.*

*You've not responded at all to my request for a meeting about Prof. White's refusal to write a recommendation, or for a meeting with Dean [Redacted].*

*On the topic of Prof. White, now that she has demonstrated an undisclosed biased against me as a student, by lying to me about the reason she refused to write a recommendation, and since the grading process in her writing classes were not anonymous like in the other classes, I'd like my grades in the two writing classes changed to "A+'s."[2] Or,  provide me with copies of all other*

---

[2] Doe requested a letter of recommendation from Prof. White, Doe's legal analysis and writing classes (2 semesters, since she was the only professor with whom I met), with the understanding that for all transfer applications, a letter of recommendation is required to be from a law professor.  Prof. White replied, absurdly, "Thank you for the kind words in your email but I am currently only writing letters of recommendation for students seeking scholarships or employment."  Doe appealed to her again with a heartfelt request, and she declined more acerbically: "Hi {Jane Doe] - As I stated in my previous email, I **must** politely decline. (emphasis added). Also, as you know, I am not the only professor who taught you this past academic year so if you feel a faculty recommendation is critical, please feel free to reach out to one of your other professors. Again, I wish you all of the best in your future legal endeavors." There were nothing but positive interactions between her and Doe all semester and Doe performed well in her class, and she denied his request offering an absurd reason, as if those students seeking employment or scholarship are somehow more deserving of letters of recommendation than a transferring student.  The true reason for Prof. White declining to write a recommendation to support that I have demonstrated sufficient educational performance to continue the study of law at another university has yet to be disclosed.  Perhaps the Dean has

*students' graded work with their names redacted for my review, and have them all regraded in the blind by other professors to demonstrate that the assignment of the grades was not arbitrary, and that her bias had no effect on the grades she assigned to me in her classes.*

*If your office does not immediately provide me with assurances that the law program will continue providing remote learning services that were in place when we started and that, furthermore, the law school has requested from the ABA and the New York Court of Appeals any necessary waivers you need from them in order to deliver on your contract with me, then you will continue to incur liability for the damages you've forced me to sustain. Some of those damages include, premium charges on my month to month rent arrangement, loss of value of my degree from lower grades caused by your refusal to confirm you will perform on our contract, diverting my time and energy from my studies to address this nonsense, etc. Of course, if I am forced to transfer schools, some credit may not transfer, some grades may not count towards my GPA, and I may be excluded from competing for certain GPA based accolades at any new school. You will be liable for the loss in value of my degree under those circumstances. That loss in economic opportunity would be substantially greater than any tuition that I've paid to date. If I am unable to transfer and complete the J.D., the damages will be astronomically higher.*

*I'll plan to take the exams at [Redacted] if you refuse to allow me to use my home workstation configuration with the appropriate proctoring software for these open book exams. We should postpone the exams for a week to address the loss in preparation time which I've incurred when you forced me to deal with these issues. But also so that I may address any mental health related issues associated with the stress you've caused.*

70.     Plaintiff ran out of time for filing this complaint in support of the emergency TRO.

Plaintiff incorporates the statements. From the remaining portions from Doe Decl. ¶¶159-246 into

the complaint as if fully set forth therein. Plaintiff will bring them directly into an First Amended

Complaint in due time. .

---

shared details about this ongoing dispute.  Perhaps she opposes my religious views which I was forced to disclose to the university as part of its vaccination campaign. Undoubtedly, these communications are made part of a student file, and all professors have access to it.

## I.   FIRST CAUSE OF ACTION – FRAUD
### (AS TO DEFENDANT ABA ACCREDITED
### UNIVERSITY)

71.     Plaintiff repeats and realleges all the allegations in the foregoing paragraphs as if fully set forth herein.

72.     Defendant ABA Accredited University stated that all students were "distance learning" in its published literature.

73.     ABA Accredited University then removed from its website to conceal its fraudfully misrepresentation.

74.     The statement was sufficient to create upon the mind a distinct impression of fact conducive to action, it knew plaintiff and other students would rely on this representation of fact.

75.     The representation of fact was made both with words, the published literature, and also, in action, when the school provided exclusive distance learning to the plaintiff and other students, without any specific statement confirming that it would discontinue that program, both before the parties' contract formed, and up until July 21, 2022 when it made its final announcement.

76.     The representations were made by ABA Accredited University to the plaintiff and general public, and plaintiff read and relied upon the representation, both the universities' words and conduct. Plaintiff did not speculate or merely express hope for the future, as defendant ABA Accredited University made the representation, and prior to the contract formation, gave plaintiff no reason to believe that it would discontinue the program which it created from the investment of students' financial resources, and the investment of those resources into equipment and training of the professors, and to support the implementation and operation of the necessary technology upon which the distance learning service relied.

77.    ABA Accredited University universities' failure to disclose to plaintiff prior to the contract formation that it had no intent to allow plaintiff to finish the program using distance learning is a representation by omission upon which the plaintiff reasonably relied.

78.    It was reasonable for plaintiff to believe this because, equity principles demand that if the university can benefit from the revenue raised in attracting plaintiff during a pandemic under a certain mode of educational content delivery, as it did, then it is also reasonable to expect that the university would continue to offer that mode to plaintiff, who relied on it, if for no other reason than it is fair and just.

79.    When ABA Accredited University concealed its true intent, it made a false representation by omission, that it would: continue to provide the distance learning option; would continue to require students to be vaccinated to be on campus per its stated policy, would grant the exemptions to the policy as it previously had to specific students including plaintiff; would offer other options such as "visiting student" option to plaintiff, or opportunities to take classes at ABA Accredited University which are only offered remotely.

80.    Despite the general rule in the law of deceit that a representation consisting of a promise or a statement as to a future event will not serve as basis for fraud, even though it was made under circumstances as to knowledge and belief which would give rise to an action for fraud had it related to an existing or past fact, exceptions apply to ABA Accredited University's conduct.

81.    ABA Accredited University's fraud is predicated upon the nonperformance of a promise, to offer distance education, because that false promise was the device to accomplish the fraud.

82.    ABA Accredited University's future promise was blended or associated with misrepresentations by omissions of fact, specifically, *inter alia*, the fact that ABA Accredited

University did not intend to allow plaintiff to complete the program by distance learning and failed to state that unequivocally during the time prior to plaintiff's enrollment, and even when plaintiff was taking classes and investing additional money.

83.   One critical misrepresentation by omission which bolsters the assertion that ABA Accredited University did not intend to allow plaintiff to complete the degree program is the fact that the university failed and even refused to provide plaintiff any reasons for it wanting to discontinue distance learning until after it did at the last minute on July 21, 2022.

84.   Then, ABA Accredited University offered only one reason, ABA standards, among apparently many reasons, despite plaintiff's excessive efforts to obtain assurances from the university throughout the year.

85.   ABA Accredited University, by concealing this information until after plaintiff invested $118,000 is a material misrepresentation upon which the fraud was perpetrated.

86.   Without ABA Accredited University providing the plaintiff with information as to "Why" it would consider discontinuing distance learning, plaintiff was without necessary information to evaluate the strength of ABA Accredited University's intent or merits of any reasons.

87.   When viewed in conjunction with the fact that the university would go on to conceal any available options for plaintiff to complete the program, including details as to how its published "visiting student" program could be used by plaintiff to complete the degree program, the intent to misrepresent by ABA Accredited University is evident.

88.   The misrepresentations include but are not limited to ABA Accredited University stating things such as "we've provided all [Redacted] which can be provided," and also its silence in response to requests for information as to how plaintiff might finish the degree, including the

published visiting student option,  and by cancelling the vaccine exemption for no stated reason whatsoever, and concealing the reason, inter alia. (Doe Decl. at ¶¶ 199, 205, 213, 215, 219, 272, 234, 237, *inter alia*).

89.    ABA Accredited University knew that its representation to educate plaintiff via distance learning to entice plaintiff to enroll was false, and also to cause plaintiff to continue in the program, even beyond the total number of transferrable credit hours, both before the contract was formed, and up until it finally revealed its intent to cancel distance learning on July 21, 2022.

90.    It also knew that its representation that students, which include plaintiff, can obtain credits at a visiting university was false when it decided to conceal options for plaintiff to rely upon the visiting student representation.

91.    Each of plaintiff's communications with the university which sought information about this option, and assurances from the university about this option, to which the university was silent and unresponsive, representation by omission, of a fact it knew to be false, that plaintiff, like other students in extraordinary circumstances, could obtain credits visiting other universities. (Doe Decl. at ¶¶ 199, 205, 213, 215, 219, 272, 234, 237, 239, 245, *inter alia*).

92.    ABA Accredited University's advertisement to plaintiff and the general public that all students were taking classes via "distance learning" and its general representations that it would educate students in a cooperative and reasonable manner were material to induce plaintiff into enrolling in ABA Accredited University and continuing at ABA Accredited University, and to make considerable investment of time and money. (Doe Decl. at ¶¶ 1-246).

93.    ABA Accredited University knew that it would never allow plaintiff to complete the J.D. program by taking classes remotely when it made its representation via statements and omissions.

94.     ABA Accredited University also knew that it would not allow plaintiff to rely on the "visiting student" representations when it withheld assurances sought by plaintiff about the same.

95.     ABA Accredited University knew that it would not act in good faith and fair dealing or with cooperation, when it breached those duties.

96.     ABA Accredited University knew that it would not fulfil its material obligations under the contract.

97.     ABA Accredited University's fraudulent intent and knowledge of the falsity of its representation can be inferred by examining its conduct through its agent officers. Dean [Redacted], by cancelling distance learning, by cancelling the waiver for the vaccine, by refusing to allow plaintiff to take open book exams using, by failing to timely schedule local exams in Virginia, by claiming that [ABA Accredited University] had done "all that can be done."

98.     Despite claiming that they had done "all that can be done," at the same time, ABA Accredited University acted to the contrary, by refusing to cooperate or offer any alternative means, by refusing to provide reasonable [Redacted], by falsely implying without explicitly stating that providing the sought [Redacted] would somehow change the nature of the program without specifying how, are all examples from which a fact finder can infer the knowledge of the false representations by statement and omission, and the overall fraudulent intent. (Doe Decl. at ¶¶ 1-246).

99.     ABA Accredited University, in falsely representing that the students were engaging in distance learning, and inferring that this would continue, and by advertising to markets outside of the New York area, and accepting enrollment from students, like plaintiff, who resides in

Virginia, and like other would-be students in China and Canada, it sought to induce enrollment in the university.

100.    By falsely concealing its intent to cancel the distance learning, it sought to continue to induce the existing students to register for subsequent semesters, until they exceeded the number of credits which they can transfer to other ABA accredited law schools.

101.    ABA Accredited University, in falsely representing that it is now necessary for it to cancel its waiver to its vaccine policy, and using that mechanism to coerce students into getting vaccines, which it cares nothing about except to the extent that it wishes to use it as a tool to drive all students back to campus for primarily revenue motives, seeks to induce plaintiff to disenroll or transfer, before plaintiff can receive the full expected value, the J.D. degree, from the pursuit. (Doe Decl. at ¶¶ 1-246).

102.    Plaintiff did not know that ABA Accredited University would refuse to cooperate and exercise good faith and fair dealing in its interactions with plaintiff before and during the course of their contract, including denying plaintiff the opportunity to finish the classroom work at a local university based on its advertised "distance learning" program, among other things.

103.    If ABA Accredited University disclosed to plaintiff prior to the parties entering into their contract that it would not educate  plaintiff via distance learning, or would cease to do so before plaintiff could earn the J.D., or would not cooperate with plaintiff in alternative methods of earning the necessary credits, such as learning at another university as a visiting student, or via independent studies, etc, plaintiff would not have entered into the program and invested approximately $118,000. (Doe Decl. at ¶¶ 1-246).

104.    Plaintiff lacked knowledge of the legal education industry.

105.    Plaintiff had a right to rely on ABA Accredited University's representation that it would provide distance learning education because plaintiff had no reason to believe the aforementioned representations were false, including its website advertisement which was deceptively removed, indicating that all students were learning via distance learning; that plaintiff had an option to finish the degree as a visiting student; that ABA Accredited University would support plaintiff's efforts to transfer; that ABA Accredited University would act in good faith and fair dealings, and cooperate as required by their contract, that ABA Accredited University would fail to follow its anti-[Redacted] and other policies, etc. (Doe Decl. at ¶¶ 1-246).

106.    The plaintiff has suffered extensive damage from the fraud, in what will be the loss of $118,00 tuition, the loss of professional opportunities reasonably expected from the J.D., the lost opportunities from time diverted from other professional endeavors to studying and preparing to pass the exams required to have earned the 39 credit hours in the program, to date.

107.    ABA Accredited University has intentionally engaged in conduct which caused phycological injury which has manifested in physical symptoms such as [Redacted], [Redacted], sleepless nights, PTSD-like symptoms, heart palpitations, and pressure in the chest.

108.    ABA Accredited University's intentional conduct is the direct and proximate cause of these injuries, because "but for" their conduct, the harm by plaintiff would not have been sustained. (Doe Decl. at ¶¶ 1-246).

109.    ABA Accredited University has negligently engaged in conduct which caused phycological injury which has manifested in physical symptoms such as [Redacted], [Redacted], sleepless nights, PTSD-like symptoms, heart palpitations, and pressure in the chest.

110.    ABA Accredited University's negligent is the direct and proximate cause of these injuries, because "but for" their conduct, the harm by plaintiff would not have been sustained. (Doe Decl. at  1-246).

111.    The facts asserted in Doe Decl. and herein singularly and collectively indicate an intent by ABA Accredited University to defraud plaintiff of a reasonable opportunity to complete their J.D. while receiving considerable tuition and fees.

## II.    SECOND CAUSE OF ACTION - BREACH OF CONTRACT
### (as to Defendant ABA Accredited University)

112.    Plaintiff repeats and realleges all the allegations in the foregoing paragraphs as if fully set forth herein.

113.    ABA Accredited University recruited plaintiff to apply to the J.D. program by sending communications to plaintiff 's email which was received at plaintiff's residence in Alexandria, Virginia.

114.    Plaintiff applied to the J.D. program, and ABA Accredited University extended to plaintiff an offer of enrollment into the J.D. program on July 7, 2021.

115.    ABA Accredited University had advertised on its public website as of July 7, that all students were taking classes via "distance learning," among other material promises and representations meant to induce plaintiff into applying and enrolling.

116.    Plaintiff relied on this and the belief that ABA Accredited University would act in good faith, with care, and cooperation, in delivering the educational services intended to result in the award of a J.D. degree sufficient to sit for the bar exam in any state within the United States.

117.    Plaintiff accepted the offer and performed by placing the deposit on July 12, 2021 thereby creating a binding contract.

118.    On July 13, plaintiff sought to confirm that the distance learning would remain available, and Dean [Dean 2 Redacted], indicated, on behalf of ABA Accredited University, essentially, that it would not, representing the university's intent to breach the contract.

119.    Only after entering into the binding contract did ABA Accredited University reveal a new policy requiring all students to get vaccinated in order to come on campus.

120.    Only after entering into the binding contract did ABA Accredited University reveal a new policy which would require all students to be on campus.

121.    These two policies, when read together, imply that all students must get vaccinated.

122.    The plaintiff engaged in communications with the university to explain several reasons why they expected the distance learning to be necessary for their obtaining the J.D. degree and was told that they could apply for a vaccine waiver or exemption to the new policy.

123.    A breach was avoided when the university offered plaintiff an opportunity to apply for an exemption to the COVID vaccine policy.

124.    The exemption would only be granted for one of three categories of circumstances: religious reasons, medical reasons, or extenuating or extraordinary circumstances.

125.    Plaintiff requested the exemption under all of the reasons, and submitted supporting documentation, as well as either objecting to the requirement or believing, based on the university's communications, that the university would not budge.

126.    The university initially refused to except the religious exemption request requiring plaintiff to obtain a letter from a religious leader who would somehow confirm the beliefs of the plaintiff.

127.    Plaintiff objected to, and ultimately complied with, the absurd, invasive and potentially discriminatory requirement, believing the university would not perform under its contractual obligations otherwise (i.e. breach the contract).

128.    The university, after requiring the plaintiff to disclose religious beliefs and jump through significant hoops to obtain a supporting letter,  as a condition of its performing under the contract, denied the request anyway.

129.    Then, surprisingly, the law school approved the vaccine exemption request which allowed plaintiff to study remotely, after the university gave conflicting answers as to whether the request for a religious exemption to the vaccine policy was denied for substantive or procedural reasons, or possibly both.

130.    The law school refused to address any other reasons provided by plaintiff for needing to study remotely.

131.    By providing the vaccine exemption request without addressing the other requests, and without disclosing the reason for which it was provided, ABA Accredited University represented that one of the reasons provided by the plaintiff was sufficient to allow plaintiff to receive learning.

132.    This action by the University, with its knowledge that the plaintiff had a requirement to study remotely from Virginia, served as an assurance to plaintiff of its intent to perform under the contract, i.e. provide distance learning.

133.    ABA Accredited University knew that this assurance was sufficient to induce plaintiff to continue in the program and made the assurance with that intent.

134.    Plaintiff performed well in the program during fall, spring and summer, and continuously sought assurances from the university that it would continue to provide the distance

learning services; however, the university provided no such assurances, nor did it say that plaintiff would be unable to finish the program remotely.

135.    ABA Accredited University knew that by withholding the information sought by plaintiff, and concealing its decision as to whether it would allow plaintiff to complete the entire program, such concealment would induce plaintiff to continue, and avoid or postpone a breach of contract and legal action by plaintiff to enforce the contract.

136.    Separately, plaintiff sought [Redacted] for their [Redacted] and provided medical documentation in support, and in response, ABA Accredited University provided some but not all the medically documented [Redacted] recommendations, without explanation as to why.

137.    ABA Accredited University literature indicates that they educate persons with disabilities and have a policy to provide [Redacted], and in not providing the reasonable [Redacted] to plaintiff, they breached the contract.

138.    The university allowed finals to be taken remotely the first semester which allowed plaintiff to experience the exemplify software, the remote monitoring and proctoring solution.

139.    ABA Accredited University changed the rules the second semester under pretext of "Exam security" when really it was intended to drive all students onto campus.

140.    Plaintiff sought additional reasonable [Redacted] which were related to the configuration of the "Exemplify" software, which had a specific detrimental effect due to plaintiff's specific [Redacted], and plaintiff also requested to be allowed to use multiple monitors; however, the request was denied without any interactive dialogue and without any reason being provided to plaintiff.

141.   By concealing the real reasons for discontinuing the distance learning and for withholding reasonable [Redacted] and changing the requirements for taking the exams, among other conduct, ABA Accredited University acted in breach of its duty of good faith and fair dealing.

142.   ABA Accredited University routines engages in evasive communications through its agents, which has caused the relationship between plaintiff and it to deteriorate in breach of its duties to cooperate.

143.   The university sought to force students back to campus, and intentionally made it extremely difficult for plaintiff to continue studying remotely.

144.   At the end of every class, students completed reviews which contained questions about the remote learning experience, but ABA Accredited University refused to share the results, even at times suggesting that students preferred in person learning (contrary to the obvious split in opinions among students gathered via discussions).

145.   On July 21, 2022, ABA Accredited University announced that it would no longer continue distance learning, and referenced other options for completing the degree which were ambiguous as it pertains to plaintiff's situation.

146.   ABA Accredited University breached and expressed its intention to breach the contract by cancelling the distance education and by refusing to provide clarification to plaintiff as to how plaintiff could complete the degree remotely, or even with minimal time on campus, despite their many requests for such clarification; therefore, it breached its duty of good faith and fair dealing and to cooperate.

147.   ABA Accredited University was informed by plaintiff that its actions in breach were causing specific harm to plaintiff, including physical symptoms, which were reasonably

foreseeable during in the circumstances, and ABA Accredited University refused to change its course of conduct.

148.    By cancelling distance learning knowing that plaintiff could not attend in person, and refusing to clarify the options for plaintiff to complete the degree, ABA Accredited University sought to induce plaintiff to transfer or dropout of the J.D. program.

149.    ABA Accredited University gave no indication that it would provide any refund of any tuition or fees, should plaintiff be forced to discontinue the program.

150.    ABA Accredited University has several published options which could benefit plaintiff, but without assurances for a specific graduation plan from ABA Accredited University, plaintiff is effectively coerced into applying for transfer.

151.    As if that is not enough, ABA Accredited University intentionally sabotaged plaintiff's efforts to transfer, by failing to provide transcripts in a timely manner to the other universities which resulted in plaintiff's applications not being considered properly or even at all, in some instances.

152.    Additionally, ABA Accredited University sabotaged plaintiff's attempt to transfer by withholding and delaying the writing of the required professor transfer recommendations, which, given the collusion among ABA accredited law schools to require professor recommendations in support of transfer applications, amounts to a breach of the duty of good faith and fair dealing, and to cooperate.

153.    The announcement of the cancellation of distance education at the proverbial "eleventh hour," by ABA Accredited University, on July 21, 2022, after many of the transfer deadlines have passes, and after plaintiff had earned more credits that plaintiff could transfer between universities (also because of collusion between them),  was intentional and malicious, as

a stand-alone instance of conduct, and especially when viewed in the context of its other conduct towards plaintiff, and the only remedy in equity is specific performance. For the foregoing reasons, a court order prohibiting the university from discontinuing the distance learning is the only immediate remedy available.

### III.  THIRD CAUSE OF ACTION - UNLAWFUL [REDACTED]
### (as to Defendant ABA Accredited University)



### IV. FOURTH CAUSE OF ACTION-
### UNLAWFUL [REDACTED]
#### (as to Defendant ABA Accredited University)

██████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████████████

### V.   FIFTH CAUSE OF ACTION - VIOLATION
### OF NEW YORK AND VIRGINIA
### CONSUMER PROTECTION ACTS
#### (as to Defendant ABA Accredited University)

162.   Plaintiff repeats and realleges all the allegations in the foregoing paragraphs as if fully set forth herein.

163.   Here, plaintiff satisfies claims under both New York and Virginia law.  Under the Virginia Consumer Protection Act (VCPA), plaintiff alleges (1) fraud (as described herein), (2) by a supplier (ABA Accredited University), (3) in a consumer transaction (educational services). *Brown v. Transurban* USA, Inc., 2015, 144 F.Supp.3d 809.

164.   Also, under New York's deceptive acts and practices statutes, plaintiff alleges that a defendant ABA Accredited University has engaged in consumer-oriented conduct of selling education services to students, that was (2) materially misleading in that it advertised distance learning without caveat, and other program details including anti-harassment, anti-[Redacted], and visiting student options, which it had no intent to deliver to plaintiff, and (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice. N.Y. General Business Law §§ 349(a), 350. *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414 (S.D.N.Y. 2021).

165.   Injury is loss of value of the $118,000 investment in legal education which will come from discontinuing the distance education program, an opportunity to transfer without break in the education, and other harm described herein.

## VI.    SIXTH CAUSE OF ACTIO - UNLAWFUL REGULATION OF UNCONSTITUTIONAL CONDUCT BY AMERICAN BAR ASSOCIATION
### (as Against Defendant Department of Education (DOE))

166.    Plaintiff repeats and realleges all the allegations in the foregoing paragraphs as if fully set forth herein.

167.    The DOE fails to regulate the ABA which it anointed as the accreditation authority for American law schools.

168.    DOE fails by  not prohibiting ABA from implementing irrational distance learning standards, and violates the equal protection clause of the Fourteenth Amendment.

169.    The government action that discriminates against a fundamental right by placing a burden or a penalty on the exercise of that right is subject to strict scrutiny; it violates the equal protection unless found to be necessary to a compelling state interest.

170.    Plaintiff avers that there is a fundamental right to receive an education and to enter a profession of ones choosing, and there is not a compelling state interest to limit distance learning.

171.    Restrictions on the freedom of association shall be judged by strict scrutiny, and these standards cannot withstand that test, even if the DOE or ABA were to disclose the reasons.

172.    The government action to prevent a law student from associating with a university not collated with their residence violates their right to associate with organizations of their choosing, to wit, plaintiff's desire to associate with law schools remotely, in meaningful way.

173.    By not prohibiting an arbitrary and unnecessary restriction on the distance learning credit hours which can be earned as part of an ABA accredited degree program, the DOE fails to regulate the ABA allowing for a violation of plaintiff's fundament of freedom to associate.

174. Plaintiff has written to DOE to complain and no response has been received, therefore, any administrative remedy can be deemed exhausted.

175. Therefore, plaintiff has standing to challenge the unconstitutionality of the DOE's failure to prohibit an unlawful ABA accreditation standard.

176. The fifth and fourteenth amendments protect against deprivation of life, liberty, or property without due process of law.

177. Due process can be classified as substantial and procedural.

178. Substantive due process is applied to economic and social regulations.

179. Procedural due process protects liberty and property interests from being burdened without some form of notice from an unbiased decision-maker.

180. To the extent that the ABA standard is considered permissive under legislative judgement as pertaining to social or economic regulations, they are arbitrary and irrational and shall not be upheld because they are not rationally related to a legitimate state interest.

181. The ABA, in discontinuing the standard during COVID, shall be estopped from now declaring that it is rationally related to a governmental interest, as such a declaration would be effectively an admission that it has been allowing lawyers to be produced during COVID of insufficient quality.

182. Notwithstanding that absurdity, changes in technology allow law schools to sufficiently train lawyers over zoom.

183. Doe plans to present expert testimony that will demonstrate that the distance learning restriction results in no substantial benefit in training lawyers.

184.    Plaintiff has suffered as a result of these unconstitutional standards because ABA Accredited University is purportedly, relying, in part, on the distance learning standards as justification for discontinuing distance learning.

### VII.    SEVENTH CAUSE OF ACTION - UNLAWFUL ADOPTION AND ENFORCEMENT OF UNCONSTITUTIONAL ACCREDITATION STANDARDS BY AMERICAN BAR ASSOCIATION (as against Defendant American Bar Association)

185.    Plaintiff repeats and realleges all the allegations in the foregoing paragraphs as if fully set forth herein.

186.    The same arguments apply as in the section above, as related to ABA adoption of the standards.

187.    To the extent that ABA is required to enforce its standards, and has the authority to require ABA Accredited University to continue providing the distance learning program, as an [Redacted] for plaintiff's [Redacted], plaintiff is harmed by ABA when it chooses not to compel the university to do so under threat of losing its accreditation.

188.    Plaintiff has appealed to ABA for action, and they have not intervened.

189.    To the extent that ABA chooses not to act, plaintiff has exhausted their administrative remedies, and has standing to bring this action in this Court.

190.    Doe plans to present expert testimony that will demonstrate that the distance learning restriction results in no substantial benefit in training lawyers.

191.    Plaintiff has suffered as a result of these unconstitutional standards because ABA Accredited University is purportedly, relying, in part, on the distance learning standards as justification for discontinuing distance learning.

## VIII.   EIGHTH CAUSE OF ACTION - UNLAWFUL RESTRICTION OF TRADE IN CONTRAVENTION OF SHERMAN ACT
### (as to All Defendants)

192.   Plaintiff repeats and realleges all the allegations in the foregoing paragraphs as if fully set forth herein.

193.   [Plaintiff is pressed for time, due to the intentional delay of ABA Accredited University in announcing its intent to discontinue the distance learning program.  If the TRO and preliminary Injunction is not granted, plaintiff intends to file amended complaints to include more thorough allegations that the defendants conspire to unlawfully restrain trade.]

## IX.   NINETH CAUSE OF ACTION – UNJUST ENRICHMENT
### (as to defendant ABA Accredited University)

194.   Plaintiff repeats and realleges all the allegations in the foregoing paragraphs as if fully set forth herein.

195.   To state a claim for unjust enrichment under New York law, a plaintiff must allege (1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.

196.   Under New York law, the theory of unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties.

197.   Unjust enrichment claims are available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff, such as when the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled.

198.    Here, to the extent that there is not a breach of contract, ABA Accredited University has unjustly enriched itself at the plaintiff's expense by accepting tuition money and refusing to the promised distance education services.

## X.    TENTH CAUSE OF ACTION – CONVERSION (as to defendant ABA Accredited University)

199.    Plaintiff repeats and realleges all the allegations in the foregoing paragraphs as if fully set forth herein.

200.    To state a claim for conversion under New York law, a plaintiff must allege that someone, intentionally and without authority, assumed or exercised control over personal property belonging to someone else, interfering with that person's right of possession.

201.    Money may be the subject of a conversion action under New York law only if it is specifically identifiable and segregated and there exists an obligation to return or otherwise treat in a particular manner the specific fund in question.

202.    Here, the university would be obligated to return the plaintiff's money if it refuses to provide the distance learning.  Plaintiff supports their claim for conversion with the fact that ABA Accredited University indicated its intent not to continue distance education on July 21, and has not even returned the tuition or fee money, or any portion which may be allocated and returned pro rata based on its refusal to grant plaintiff a reasonable opportunity to earn the J.D. degree.

## REQUESTED RELIEF

The plaintiff requests that this Court:

Adjudge and decree ABA Accredited University to have violated [Redacted], Virginia Consumer Protection act and to have breached the parties' implied contract for legal education.

Adjudge and Decree that DOE must regulate ABA and prohibit it from implanting or enforcing any arbitrary and capricious standards not rationally related to its mission, or governmental function, specifically, any constraints on distance learning.

Adjudge and Decree that ABA must delete or rescind the distance learning standards as they are arbitrary and capricious standards not rationally related to its mission, specifically, any constraints on distance learning.

Award such temporary and preliminary injunctive and ancillary relief as may be necessary to avert the likelihood that Defendant ABA Accredited University continues to illegally retaliate, discriminate, breach the parties' contract, and move forward with its plan to discontinue distance education for plaintiff, during the pendency of this action and to preserve the possibility of effective final relief;

Award the plaintiff damages to which plaintiff is found to be entitled including the cost of this action (directly or in the alternate); and

Grant the plaintiff such other and further relief as the case requires and the Court deems just and proper.

I declare under penalty of perjury that all statements contained in this verified complaint are true and accurate to the best of my knowledge.

Respectfully submitted,

/s/ Jane Doe
DATE: August 18, 2022

## *PRO SE* LITIGANT CERTIFICATION

**PURSUANT TO LOCAL RULE 83.1(M)**

**Each document filed with the court by a *pro se* litigant shall bear the following certification:**
**CERTIFICATION**

I declare under penalty of perjury that, notwithstanding my objection to the requirement, that no attorney has prepared, or assisted in the preparation of this pleading.

## CERTIFICATE OF SERVICE

I certify that on August 18th, 2021, I have filed the foregoing document, **PLAINTIFF'S VERIFIED COMPLAINT** with the clerk of the U.S. District Court, Eastern District of Virginia, for filing and for preparation of the summons to be picked up and served on Defendants via private process server.

Additionally, I certify that on August 18th, 2022, I have served a true copy of this Complaint via email on defendant's agents, officers or counsel as follows:

To ABA Accredited University, President Susan [Redacted] at Susan.[Redacted]@ABA Accredited University.edu, and Dean of the ABA Accredited University, ABA Accredited University School of Law, Dean [First Name Redacted] [Redacted], at [First Name Redacted].[Redacted]@ABA Accredited University.edu., and/or to their address at ABA Accredited University, ABA Accredited University School of Law, 1000 [City Redacted] Tpke, [City Redacted], NY 11549.

To Defendant American Bar Association, Accreditation Counsel, Section of Legal Education and Admissions to the Bar, Ms. Kirsten M. Winek, J.D., Ph.D. at kirsten.winek@americanbar.org, and/or to her mailing address, American Bar Association, 321 North Clark Street, Chicago, IL 60654

To Defendant, United States Department of Education, Office of Higher Education, Mr. Herman Bounds at herman.bounds@ed.gov, and/or at the main mailing address, US Department of Education, Office of General Counsel, 400 Maryland Avenue, S.W. Room 6E300, Washington, DC 20202-2111, and/or also to the United States Attorney General, Main Justice Building, 10th & Constitution Ave, NW Washington, DC 20530, and the local US Attorneys Office, United States Attorney for the Eastern District of Virginia, 2100 Jamieson Avenue, Alexandria VA 22314.

Service will be made to or at the addresses once a stamped copy is received from the court with the summons.

By: /s/ Jane Doe