# Exhibit A

REDACTED

July 21, 2021

Dear President Rabinowitz and Dean ███████

     I am very excited about the opportunity to study law at ██████ University's ████████ ██████ School of Law and I am extremely grateful to the admissions board for accepting me into the program.

     I have some concerns about the mandatory COVID-19 vaccination policy, which I just learned about on July 16th, including the sudden discontinuation of "remote learning" for all but a very limited set students who qualify for narrowly defined exemptions. I'm hoping the school will consider concerns and extraordinary circumstances in addition to my request for a religious exemption. These concerns relate to safety, privacy, good public policy, and fairness, but admittedly, would become moot for me if the university approved the religious exemption. Acknowledging the university's statement that it does not plan to allow for appeals from the initial determination, I've attempted to convey all of my concerns which include safety concerns from and related to my family members as well.

## A. Extraordinary Circumstances

     Judge ████████ email stated that law school students can apply to attend classes remotely for next semester for "extraordinary circumstances" not related to medical or religious reasons, and its wording seems to suggest that it would entertain requests for extraordinary circumstances beyond those directly related to the vaccine. Yet, the internet waiver request form itself simply inquires as to whether or not the student received the COVID-19 vaccine. My review of the form and Judge ████████ email leave some uncertainty which I am hoping any forthcoming reply will clarify as necessary.

     While I believe I may qualify for the religious exemption, and don't yet know if I would qualify for any medical exemption, and given that there are no appeals, and the forms provided by the university include strict requirements, I want to make sure my request for the exemption is comprehensive in addressing all reasons which are both applicable to me and within the scope of the policy; either as currently written, or in any contemplated future state of the policy. Among the restrictions in the religious exemption form, which appear inflexible, include a statement that: "Requests for exemption are subject to University review; exemptions are not granted upon submission. Changes to any of the [set of predefined] statements [in the form] will not be accepted." It is my hope that the university is open to hearing rational arguments for modifying its policy.

     There are more compelling safety reasons beyond whether a student is vaccinated and I am hoping the school will consider those reasons and the implications of the policy as currently stated. The scientific community does not yet know whether or not a vaccinated person can contract and transmit the virus. This is evidenced by the CDC guidance regarding international

travel, which requires a COVID test to return to the country even if the passenger is vaccinated. The CDC guidance to Higher Education Institutions, which seems to have been relied upon by most colleges and universities in crafting the "return to campus" policies, is inconsistent with the CDC's own travel and testing guidelines and those implemented testing requirements for international travel here in the United States.

It is possible for a fully vaccinated student body to contract and transmit the virus to other students and to members of the community which has been the basis for the sound policies like the travel testing policy mentioned. If the university requires the students to choose between attending classes in person, which comes with potentially placing themselves family members, and other members of the community at higher risk of exposure to COVID-19, it would be unnecessarily adding to the risks of the pandemic.  Conversely, the established remote learning capabilities would seem to be suitable (and even preferred) to mitigate this risk, in the same way it been used for the last 18 months.  In my case, I am an older student with health risks, my parents are in their 70's and my brother is actively battling Leukemia. The notion of allowing students to attend classes without masks, and without social distancing, simply because everyone is vaccinated, is wrought with risk, especially when considering students and their family members who have compromised immunities

## B. Privacy Rights Supports Expanding the Remote Learning

I respectfully submit that the school might also recognize and address the students' privacy interests in keeping any medical or religious reasons for seeking an exemption private. It is unclear how the university would protect those interests if it plans to only allow those who qualify for one of these two very narrowly defined exemptions to participate in "remote learning". Unlike the traditional vaccine policies which allow for exemptions, such as, for example, to allow students with medical or religious concerns to avoid vaccination mandates and still attend public schools, where a notional school would be able to protect a student's privacy choice by keeping such information private, by coupling the exemption with a highly sought after privilege of "remote learning", the university has established a scenario which will undoubtedly implicate these privacy interests and potentially even subject those students who receive this privilege to scrutiny and ostracism from colleagues and faculty.

## C. Public Policy Supports Expanding the Remote Learning

I live in Arlington, VA and share custody of my 10 year-old son with his mother.  If I am forced to attend classes in N.Y. without any time to consider other options and negotiate compromised solutions, this will render me incapable of sharing parenting responsibilities, and may subject me to changes in child custody and child support.  Those changes in child support may make my dream of attending law school financially impossible. Public policy promotes a parent being involved in their child's life, and I ask that the school not make me chose between these two important pursuits when both are possible.

There are also students such as myself who have relied upon statements from the

school regarding the availability of remote learning when choosing to invest significant time and money to apply, to reserve the seat, and in my case, to pass up considerable income opportunities to pursue the law program. I would hope that the school would consider adopting a more flexible policy and continue to offer the distance learning for at least the next year to any student who expresses any health concern so as not to violate an implied privacy right. I submit that such policy would be better for the safety of the students and community and would minimize risk to the school. Public policy encourages adherence to sound contract principals.

Public policy also supports greater use of remote learning capabilities, particularly where it has proven sufficient. A.B.A. deleted Standard 306 which addressed distance learning, and because schools chose to continue educating law students remotely for the last 18 months, it is fair to conclude that the education was sufficient. I do not wish to challenge what appears to be college and university's strong preference to transition back to in-person learning, and the motivations for that, but I submit that flexibility with your students would perhaps keep those motives out of the public limelight. To the extent that they are profit oriented more than for concern for the quality of a "remote learning" education, greater flexibility from the universities would minimize dissent and scrutiny.

## D. Request Religious Exemption to ▇▇▇▇ COVID-19 with Objections

Notwithstanding my right to practice religion freely and privately, in a manner which I believe would render me free from persecution or scrutiny for privileges which might be bestowed to me and some select students who fit the narrowly scoped exemption policy, and with great concern for how the school plans to protect the privacy interests of those students who may be afforded an exemption to the vaccine for religious or medical reasons, I submit to you that I am a baptized Catholic seeking a religious exemption from an immunization requirement. This section of my letter explains how the Catholic Church's teachings may lead individual Catholics to decline certain vaccines.

The Roman Catholic Church teaches that a person may be required to refuse a medical intervention, including a vaccination, if his or her informed conscience comes to this sure judgment. While the Catholic Church does not prohibit the use of any vaccine, and generally encourages the use of safe and effective vaccines as a way ofsafeguarding personal and public health, the following authoritative Church teachings demonstrate the principled religious basis on which a Catholic may determine, as I have, that he or she ought to refuse certain vaccines:

- • Vaccination is not morally obligatory in principle and so must be voluntary.[1]
- • There is a general moral duty to refuse the use of medical products,

---

[1] Congregation for the Doctrine of the Faith (CDF), "Note on the Morality of Using Some Anti-COVID-19 Vaccines," December 17, 2020, n. 5: "At the same time, practical reason makes evident that vaccination is not,as a rule, a moral obligation and that, therefore, it must be voluntary."

including certain vaccines, that are produced using human cells lines derived from direct abortions. It is permissible to use such vaccines only under certain case-specific conditions, based on a judgment of conscience.[2]

- A person's informed judgments about the proportionality of medical interventions are to be respected unless they contradict authoritative Catholic moral teachings.[3]
- A person is morally required to obey his or her sure conscience, even if it errs.[4]
- Each of the 3 approved vaccines, manufactured by Pfeizer, Moderna or Johnson & Johnson, are manufactured by companies which regularly conduct testing on animals and develop products using human cells lines derived from direct abortions.  Those manufacturers develop products and offer products to the marketplace which result in financial enrichment to those organizations which allows them to continue objectionable conduct.  It is within my first amendment right to choose not to support these types of companies, when possible, through financial purchases, which allow them to profit from conduct which my conscience finds objectionable, including controversial testing of medications on animals and manufacturing products derived from human abortions.

A Catholic may judge it wrong to receive certain vaccines for a variety of reasons consistent with these teachings, and there is no authoritative Church teaching universally obliging Catholics to receive any vaccine. An individual Catholic may invoke Church teaching to refuse a vaccine developed or produced using abortion-derived cell lines. More generally, a Catholic might refuse a vaccine based on the Church's teachings concerning therapeutic proportionality. Therapeutic proportionality is an assessment of whether the  benefits of a medical intervention outweigh the undesirable side-effects and burdens in light of the integral good of the person, including spiritual, psychological,

---

[2] See Pontifical Academy for Life, "Moral Reflections on Vaccines Prepared from Cells Derived from Aborted Human Foetuses," June 9, 2005; Congregation for the Doctrine of the Faith, Instruction *Dignitas personae*, 2008, nn. 34-35; Congregation for the Doctrine of the Faith, "Note on the Morality of Using Some Anti-COVID- 19 Vaccines," nn. 1-3. When there is a sufficiently serious reason to use the product and there is no reasonable alternative available, the Catholic Church teaches that it may be permissible to use the immorally sourced product under protest. In any case, whether the product is used or not, the Catholic Church teaches that all must make their disagreement known and request the development of equal or better products using biological material that does not come from abortions.

[3] See United States Conference of Catholic Bishops (USCCB), *Ethical and Religious Directives for CatholicHealth Care Services*, 6th ed. (Washington, DC: USCCB Publishing, 2018), n. 28. Hereafter "*ERDs.*"

[4] "A human being must always obey the certain judgment of his conscience. If he were deliberately to act against it, he would condemn himself. Yet it can happen that moral conscience remains in ignorance and makes erroneous judgments about acts to be performed or already committed." *Catechism of the Catholic Church* (Vatican City: Libreria Editrice Vaticana, 1993), www.vatican.va, n. 1790. Hereafter "*CCC.*"

and bodily goods.[5] It can also extend to the good of others and the common good, which likewise entail spiritual and moral dimensions and are not reducible to public health. The judgment of therapeutic proportionality must be made by the person who is the potential recipient of the intervention in the concrete circumstances,[6] not by public health authorities or by other individuals who might judge differently in their own situations.

At the core of the Church's teaching are the first and last points listed above: vaccination is not a universal obligation and a person must obey the judgment of his or her own informed and certain conscience. In fact, the *Catechism of the Catholic Church* instructs that following one's conscience is following Christ Himself:

> *In all he says and does, man is obliged to follow faithfully what he knows to be just and right. It is by the judgment of his conscience that man perceives and recognizes the prescriptions of the divine law: "Conscience is a law of the mind; yet [Christians] would not grant that it is nothing more; . . . [Conscience] is a messenger of him, who, both in nature and in grace, speaks to us behind a veil, and teaches and rules us by his representatives. Conscience is the aboriginal Vicar of Christ."[7]*

Therefore, a Catholic who has come to an informed and sure judgment in conscience that he or she should not receive a vaccine, then the Catholic Church requires that the person follow this certain judgment of conscience and refuse the vaccine. The *Catechism* is clear: "Man has the right to act in conscience and in freedom so as personally to make moral decisions. 'He must not be forced to act contrary to his conscience. Nor must he be prevented from acting according to his conscience, especially in religious matters.'"[8]

With regard to the specific form requested of ▮▮▮ University, without waiving my objection that the inquiry impacts my right to privacy in the context of how the university plans to use this information or the logical conclusions which would be derived from granting a waiver from the narrowly defined policy, I certify that this constitutes a statement signed and written by me which states that I hold religious beliefs contrary to vaccination; demonstrating that my religious beliefs are genuinely and sincerely contrary to vaccination; and detailing the religious principles that form the basis of the objection to vaccination. Specifically, I cannot be compelled to support an organization which harms living animals and uses products from abortions to manufacturers products

---

[5] See *ERDs*, nn. 32-33; nn. 56-57; Part Three, Introduction, para. 2; Part Five, Introduction, para. 3.
[6] See *ERDs*, nn. 56-57. Both of these directives state that the proportionality of medical interventions is established "in the patient's judgment."
[7] *CCC*, n. 1777, citing John Henry Cardinal Newman, "Letter to the Duke of Norfolk," V, in *Certain Difficulties felt by Anglicans in Catholic Teaching II* (London: Longmans Green, 1885), 248.
[8] *CCC*, n. 1782, citing Second Vatican Council, *Dignitatis humanae*, December 7, 1965, n. 3.

and profits from the sales of such products. Even if one vaccine isn't directly created from the objectional conduct, the organization and its leaders find it acceptable and I may chose not to support them.

I recognize and respect that the university is a private institution and is within its rights to require vacations of all students and the reasons (both stated and unstated), but hope that the school will be willing to give me and other students (in the interest of fairness) an exemption for at least a year, and allow me to keep myself and my fellow students safe, while honoring my religious objections, and considering my other concerns.

It is my intent to have constructive dialogue with the University on these topics and to determine if there is a solution that meets all of the concerns. If the university does not feel as though I qualify for the religious or extraordinary circumstances exemption, and does not wish to expand the scope of the exemption requirements for the reasons described herein, I would ask for its support in leading an interest group of faculty, students and other stakeholders, to fully uncover and address the range of concerns like those expressed in this letter, and by granting the exemption until at least all of the viewpoints are heard, considered, and weighted, or at least through Aug of 2022.

Sincerely,



ps I received the communications from Dean ████████ and President ████████ on July 16th from the account of <u>adonza.s.█████@████a.edu</u> announcing the vaccine requirement and the intention of the university to transition away from remote learning only after receiving a reply from Dean Harrison and Dean Ku regarding my initial inquiry about this very topic. This has not left much time to consider alternatives if an exemption were not available.

pps I would need additional time to obtain a personalized letter to meet the requirement: "A document from the religious organization to which the student belongs supporting the basis of the religious beliefs which are contrary to vaccination, which must be signed by a religious leader of the religion, and which must include the name, address, and phone number/email of the religious leader." I object to the need as the references listed herein are indisputably authentic and the school can take a form of "Judicial Notice" to recognize that the catholic faith provides that "Man has the right to act in conscience and in freedom so as personally to make moral decisions. 'He must not be forced to act contrary to his conscience. Nor must he be prevented from acting according to his conscience, especially in religious matters".



## Request and Certification –
## Religious Exemption from COVID-19 Vaccine Requirement

Name: ▮▮▮▮▮▮▮▮▮

Hof ID: ▮▮▮▮▮▮

▮▮▮▮ Email: (no ▮▮▮▮ email yet)          Phone: ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ policy requires that all students, other than those who are in entirely online programs or are taking all classes remotely, must be vaccinated before returning to campus for the fall. A student may be exempted from the University's vaccination requirement if, in the opinion of the University, that student holds genuine and sincere religious beliefs which are contrary to the practice of immunization.

Objections based on personal beliefs, sociological grounds, morals or philosophy fall outside the scope of religious exemption.

### Instructions

For consideration of a religious exemption, students must provide all of the following:

1. **A statement signed and written by the student:**
   o **Stating that the student holds religious beliefs contrary to vaccination;**
   o **Demonstrating that the student's religious beliefs are genuinely and sincerely contrary to vaccination; and**
   o **Detailing the religious principles that form the basis of the objection to vaccination.**
2. **A document from the religious organization to which the student belongs supporting the basis of the religious beliefs which are contrary to vaccination, which must be signed by a religious leader of the religion, and which must include the name, address, and phone number/email of the religious leader.**

▮▮▮▮ University will not accept or consider letters or signatures from parents or legal guardians for religious exemption requests, unless student is under 18 years of age. In such a case, both the student and parent/guardian must review and sign the applicable documentation and this form as indicated below.

The University reserves the right at any time up until a decision has been made to request additional supporting documentation.

**Please complete this entire form, attach the required documents listed above, sign and certify as indicated below and email to** ExemptionRequest@████████.edu.

Requests for exemption are subject to University review; exemptions are not granted upon submission. Changes to any of the statements below will not be accepted. You will be notified in writing to your University email address if the exemption has been granted or denied.  Appeals will not be considered.  If approved, the exemption will remain in effect for the duration of the current academic year.

**By signing and submitting this form, you are:**

- Requesting exemption from the University's COVID-19 vaccination requirement due to your genuine and sincere religious beliefs objecting to vaccination;

- Acknowledging your understanding of the risks of non-vaccination and that you have been informed of the value of immunization (including the CDC COVID-19 vaccine information) and knowingly and voluntarily decline to have such immunization;

- Accepting full responsibility for your health, and holding ████ University harmless with respect to your requested exemption from the required vaccination;

- Acknowledging and agreeing that if exempted you may be subject to additional preventive measures such as screening, testing, social distancing, quarantining, isolation, mask wearing and other health and safety protocols by virtue of your unvaccinated status that may not apply to vaccinated students and that this treatment is based solely on your unvaccinated status;

- Acknowledging and agreeing that if exempted, then solely due to your unvaccinated status, you may be excluded from certain campus activities/residence halls, and that any such exclusion does not entitle you to any reduction in tuition or other associated charges or University fees;

- Acknowledging and agreeing to comply with any such restrictions;

- Acknowledging your understanding that any such action is to protect your health and the health of the University community; and

- Certifying that the information and supplemental documents that you have submitted in connection with this Exemption Request are accurate and complete.

**Student**

Printed Name: ████████████

Signature: ████████████████   Date: ____ July 21, 2021 ____

*If student is under 18, parent or guardian must also sign below:*

**Parent/Guardian's Printed Name:** _____

Signature: _____   Date: _____

Parent/Guardian's Phone and Email: _____

# Exhibit B

### Religious Organization Support this View

I have read the statement of beliefs of ██████████ above derived from his membership in the Catholic religion and confirm, as a leader of a religious organization, that his views are in keeping with those views of the Catholic faith, particularly with regard to the Catholic religion's moral opposition to abortion, and the church's absolute position that it is an individual's moral right to make a decision based upon one's own informed conscientious beliefs. If a Catholic refuses a vaccine on the grounds that the companies who manufacture them have a history of conducting research and development, and even vaccine development, using material from aborted fetuses,  than the believer holds a sound position that taking the vaccination would be an elicit condonation of the actions of those organizations their decision makers. While the church does allow for individuals to take the vaccine, it is clear in that it is an individual choice of conscience.  It is my view that ██████████ is a member of the organization and campaign, and has beliefs which are contrary to the available COVID-19 vaccines and that he is acting consistent with the beliefs of the church if he arrives at the decision, after conscientious deliberations, not to take the vaccine.

Name: ████████████

Organization: ████████████

Address: ██████████████

Telephone Number: ████████

Email: ████████ org

Signature: _____

# Exhibit C



**UNIVERSITY.**

OFFICE OF THE PROVOST AND
SENIOR VICE PRESIDENT FOR ACADEMIC AFFAIRS

August 2, 2021

█████████████████████████████████████

Dear ████,

We have received your request for religious exemption from ██████ University's COVID-19 Vaccine requirement for the Fall 2021 semester.

As you know a student may be exempted from the University's vaccination requirement if, in the opinion of the University, that student holds genuine and sincere religious beliefs which are contrary to the practice of immunization.

The guidelines for this request require that you provide:
1) A statement signed and written by you
   a. Stating that you hold religious beliefs contrary to vaccination
   b. Demonstrating the student's religious beliefs are genuinely and sincerely contrary to vaccination; and
   c. Detailing the religious principles that form the basis of the objection to vaccination
2) A document from the religious organization to which you belong supporting the basis of the religious beliefs which are contrary to vaccination, signed by a religious leader of the religion with appropriate contact information.

The University has determined that your submission failed to meet these guidelines. Therefore, your request for religious exemption from the COVID-19 vaccine requirement is denied. This is the final decision of the University.

Sincerely,

█████████████ Ph.D.
Vice Provost for Graduate and Undergraduate Studies

Exhibit D



# INFORMATION TECHNOLOGY SERVICES

# For Employees: Resources for Working Remotely

## ITS Support Services

**Service Desk Analysts are available by phone (⬛⬛⬛⬛) and email (help@⬛⬛⬛edu (mailto:help⬛⬛⬛du)).**

- On days when classes are in session: Monday through Thursday from 8 a.m. to 8 p.m., Friday from 8 a.m. to 5 p.m.
- On days When classes are not in session: Monday through Friday from 8 a.m. to 5 p.m.
- The ITS Service Desk is closed on designated University holidays.

**In-person support will be offered by appointment only.**

- To schedule an appointment, please visit the **ITS Service Portal (https://⬛⬛a.service-now.com/sp)**.
- The ITS Service Desk is adjacent to Hammer Lab, room 125 Axinn Library East.

## If You Have a ⬛⬛⬛ Laptop:

**You can connect your Hofstra laptop to your home Internet connection to access many Hofstra services when you're not on campus.**

These services include:

- Outlook Web App (e-mail), **https://outlook.office.com (https://outlook.office.com)**
- OneDrive (cloud-based file sharing and storage), **https://onedrive.live.com (https://onedrive.live.com)**
- Zoom (video/audioconferencing), **https://⬛⬛⬛⬛us (https://⬛⬛⬛.zoom.us)**

- My Hofstra Portal, **https://my.████.edu (https://my.████.edu)**

**You will need to request VPN access (https://████a.service-now.com/sp?
id=sc_cat_item&sys_id=ef95854a3707b200b5a6efb2b3990ee4), and install the** ████ **VPN
client on your** ████ **computer to access any of the following:**

- Jabber softphone (see **Telephone**, below)
- Certain encrypted folders on the S drive
- **Banner (https://www.████.edu/banner)** and related services
- Some departmental Access databases

# If You Don't Have a ████ Laptop

**You can use your home computer and Internet connection to access many** ████ **services
when you're not on campus.**

These services include:

- Outlook Web App (e-mail), **https://outlook.office.com (https://outlook.office.com)**
- OneDrive (cloud-based file sharing and storage), **https://onedrive.live.com
  (https://onedrive.live.com)**
- Zoom (video/audioconferencing), **https://████a.zoom.us (https://████a.zoom.us)**
- My ████ Portal, **htt**████████████████████

**You will need to request VPN access (https://████vice-now.com/sp?
id=sc_cat_item&sys_id=ef95854a3707b200b5a6efb2b3990ee4), and install the** ████ **VPN
client on your personal computer to access any of the following:**

- Jabber softphone (see **Telephone**, below)
- Microsoft Remote Desktop Connection, to connect to your Hofstra-owned desktop Windows
  computer. This is required to access services including:
  - Certain encrypted folders on the S drive
  - **Banner (https://www.████.edu/banner)** and related services
  - Some departmental Access databases

# Video and Audio Conferencing with Zoom

All ████ faculty, employees, and students have access to Zoom for on-demand video conferencing, screen sharing, and audio conferencing, including an option to dial in from a cell phone or landline.

- Access Zoom at **https://████.zoom.us (https://████.zoom.us)**
- For training materials designed specifically for ████ faculty, click **here (https://www.████.edu/about/it/it-remote-faculty.html)**.
- For a getting started guide for Zoom, click **here (https://support.zoom.us/hc/en-us/categories/200101697)**.

# Telephone (By Request)

Two options are available to receive calls from your ████ desk phone when you're not on campus.

1. **Forward calls from your ████ desk phone to your cell phone:**
   - "Set it and forget it" option for those who want to be able to answer Hofstra calls on their personal phone, and don't mind making outbound calls from their personal number.
   - Inbound calls to your ████ extension will ring to your cell phone at all times, until you disable forwarding.
   - Outbound calls from your cell phone will show your cell phone number as the caller ID.
2. **Use Jabber softphone via VPN to access a full-featured copy of your ████ desk phone:**
   - For those who need direct extension-to-extension dialing, and outbound calls that come from their ████ caller ID.
   - Jabber app can be installed alongside the Hofstra VPN client on Windows, MacOS, iPhone, or Android.
   - Inbound calls to your ████ extension will ring to your Jabber app, as long as the app is open and you are connected to VPN.
   - Outbound calls made via Jabber will show your ████ caller ID.
   - For best results, we recommend that you use a USB headset when you use Jabber on Windows or MacOS, but speakerphone is available if you don't have a headset.

**Note:** If you normally answer calls from a call queue, you must use Jabber on Windows or MacOS. Forwarding and Jabber mobile apps will not work with call queues. This note applies to you if you normally log in to Cisco Finesse before calls ring to your Hofstra desk phone.

To request one of the above telephone services, please e-mail **help@n_____.edu (mailto:help@_____.edu)**. Chargebacks for these services are suspended at this time.

# Exhibit E

**Vaccinations**                                                                 ›

**Health & Safety**                                                              ›

Testing                                                                          ›

**Employee Protocols**                                                           ›

**HOME**

The University continues to monitor the prevalence of COVID in our community and the CDC and New York State guidelines  As always  we depend on the advice of our partners at Northwell Health  Thanks to all of you and your consideration and respect for our community  we have weathered this pandemic together

Members of the ▮▮▮▮ community need to be vaccinated against COVID-19  Visit the Vaccination page for more information

Mask-wearing will be optional in all indoor spaces on the ▮▮▮▮ campus  including classrooms  The only exceptions will be in the Student Health Services Office and on the campus shuttle

Some members of our community will continue to wear a mask  Masks will remain available in buildings around campus  Those who have small office spaces may ask guests to wear a mask  while others may request physical distance in some circumstances  We ask that everyone heed such requests as a matter of respect and civility

Visitors to campus must wear a mask if they are not vaccinated

We are now in the midst of a dynamic endemic  As conditions continue to change  we will continue to reassess the need for masks and other public health protocols

The University will continue to require that all students and employees be vaccinated against COVID-19. We encourage all those eligible to get a booster shot.

VACCINE/BOOSTER FINDER

VACCINATION INFO

Upload your vaccination status:

STUDENTS                    EMPLOYEES

# Get the Facts and Get Vaxxed

Exhibit F

## MEMORANDUM

**TO:**       All Law Students

**FROM:**    Julian███ Senior Associate Dean for Academic Affairs

**DATE:**    November 10, 2021

**RE:**       Examination Policies and Procedures During Fall 2021 Semester

This memo explains the policies for administering exams during the Fall 2021 semester for all law students. While most of the policies are the same as from the Spring 2021 semesteer, there are a few important changes. Please read this memo carefully and retain it in your files for reference.

1. *All Fall 2021 Semester COVID19-Related health protocols remain in place.*

The same health and safety protocols that were in place during classes this semester will apply during exams as well. **Thus, only students who have been fully vaccinated will be permitted on campus, appropriate masks must be worn at all times during the exam, and no water or food is permitted during exams.** If a student scheduled to take an in-person exam test positive for COVID19 or shows symptoms consistent with COVID19, that student should immediately contact the Dean of Student Affairs who will allow an accommodation if appropriate (lawstudentaffairs@████edu or 516-463-5771).

2. *Unless your exam is a designated "take home exam", all exams (including in-person exams) will be administered on the Examplify software without any paper version available.*

As was the case during our last three semesters, all exams will be administered on computer via the Examplify software. **This is true whether you are taking your exam in-person or remotely.** You must therefore follow all instructions from Law School IT to ensure your computer is prepared to use the software to take your exams.

3. *All exams will be administered in person at the times indicated on the exam schedule.*

All exams will be administered in person and on campus at the times indicated on the Fall 2021 Exam Schedule.

Students who have already received permission from the Law School to take *all* of their classes remotely for the entire semester will take these exams remotely at the exact same times under additional proctoring procedures.

If a student has a positive COVID19 test or symptoms consistent with COVID19 that prevents them from coming onto campus during their scheduled exam time, such a student must first immediately report their situation to the Office of Student Affairs (lawstudentaffairs@████edu or 516-463-5771) **at least 12 hours** before their scheduled exam. Students in this circumstance must take their exam at the same scheduled time remotely under the same additional proctoring procedures governing fully remote students.

4.  *All students taking exams remotely will be required to install and use remote proctoring software.*

All students taking exams remotely for any reason will be subject to remote-proctoring software (ExamMonitor) and may be subject to additional live proctoring through Zoom.

5)  *Limited "Bathroom Breaks"*

In a change from last semester, **all students (whether in-person or remote) will be limited to one bathroom break during an exam session.** Students taking an exam remotely will only be able to take that break AFTER they have submitted the first Part of their exam and BEFORE they begin the second Part of their exam. Students taking their exams in-person can take their single bathroom break at any time during their exam session.

If you have a medical condition that will affect your ability to comply with this requirement, you must notify the Office of Student Affairs prior to the exam period to seek an accommodation.

6)  *All students taking exams, whether remotely or in-person, will be subject to the following limitations due to exam security concerns.*

a)  Examplify Lock Down

For both in-person and remote exams, once you login to Examplify and start your exam, your computer will be "locked down" meaning it cannot access the internet. If you are taking an open book exam, you will have access to your computer files while taking your exam so that notes, outlines, and other materials can be used. If your exam is closed book, no such access is permitted.

Please note that Examplify will disable the "cut and paste" function on your computer during the exam whether it is open or closed book.

b)  All exams, whether in person or remote and whether open or closed book, will be divided into two independent Parts with specific times allocated for each Part.

All exams will have two Parts which will have specific time limits for that Part. Once that Part of the exam is submitted, students CANNOT go back to that Part, even if they have extra time later in the exam. The amount of time allocated for each Part is set by your instructor.

c)  Timing

The Examplify software will inform you of how much time you have left to complete the examination or the Part of the examination you are working on.

Once that time runs out on a part of the exam or the exam as a whole, the exam screen will close and you will not be able to input any more information on your answer, and all of your computer functions will return (including internet access). Your exam or part of your exam will then be submitted to the Law School at that time. If you have a second part, you will have to re-login to Examplify and you cannot go back to the first part of the exam.

All students, including those taking their exams in-person on campus, will have to submit their exams via Examplify. Students will be responsible for managing their time, and no extensions of time will be granted during the exam.

d) Scrap Paper

If your exam is open book, students may use as much physical scrap paper as they wish. However, if the exam is closed book, all students, whether in-person or remote, will be limited to a single piece of scrap paper which is blank on both the front and back. All remote exam students must show this piece of physical scrap paper to their remote proctors prior to the start of their exams.

6) No questions during the exam

Other than technical questions relating to your ability to input your answers (e.g. a computer failure), no questions will be accepted during an exam this semester. This "no questions" rule applies both to in-person and remote exam takers. This includes any questions about ambiguities, typos, or mistakes in the exam questions. Please do not stop answering the exam questions because of a perceived or actual mistake in the exam questions. Rather, please indicate within your answer that you believe there is a mistake and complete your answer.

7) Code of Academic Conduct Still Applies

Please note that the Law School's Code of Academic Conduct (beginning on p. 30 of the Student Handbook) applies to all students this semester whether they are taking the exam in-person or remotely. This includes, but is not limited to, the following prohibited conduct:

a) To give to a student any unauthorized information concerning the characteristics or content of an examination prior to the time the student who receives the information has taken the examination.
b) To obtain or to receive any unauthorized information concerning the characteristics or content of an examination prior to taking the examination.
c) To communicate (1) with anyone in any manner during an examination that the student is taking, except the Dean in charge of examinations, the persons involved in administering the examination... or (2) at any time with another student who is taking an examination. **There shall be no communication between students until the final exam period is over and no communication with faculty until after grades are posted.**

In addition to certain security features in Examplify, the Law School will also be using software such as Turnitin (which can verify the authenticity of someone's writing) to ensure that exam answers are not copied between students or from outside sources.

Any violations will be subject to the same penalties and procedures outlined in the Student Handbook.

\*       \*       \*

We hope and expect exams to be administered as smoothly as possible given the unusual circumstances, but no doubt there will be issues and complications that are unexpected. I want to thank all of you in advance for your patience and cooperation as we continue to adjust our policies to navigate the impact of COVID19 on the Law School.

# Exhibit G



July 13, 2022

President ████████

Office of the President

144 ████ University

Hempstead, NY 11549-1440

Dear President ████

     Good afternoon.  I am writing to lodge a complaint regarding Dean ████████ and his handling of issues related to my status as a remote student and to seek clarification regarding our mutual obligations under our implied contract for educational services.

     Without recounting each interaction between Dean ██ and myself related to my status and as a law student and the logistics of my participating in the law program from my home in Virginia, I would like to take a moment to emphasize that the program was advertised as offering remote classes when I applied and accepted admission.[1]

     None-the-less, almost immediately after I committed to the university, I received notice from Dean ██ that the law school planned to discontinue distance learning. From that point on, communications between Dean ██ and me became progressively more contentious, because, in my view, he elected to communicate with vague and evasive replies in which he failed to resolve, or even attempt to resolve the main issues. By leaving the issues unaddressed, he deliberately provoked progressively more and more assertive communications from me causing stress in the relationship.

     My communications have been understandably assertive, particularly because I am a resident of Virginia.  I have communicated clearly and unequivocally with him that I have obligations here which involve shared custody of a minor child and another child at a nearby university. These obligations do not permit me to relocate to New York, as much as I would love to be there in person.  Nonetheless, at every turn, when seeking reasonable accommodations from the school to allow me to continue performing in the program, I was met with objection and resistance from Dean ████

     From the beginning, I was forced to state medical and religious objections to what I found to be an invasive (if not unconstitutional) vaccination policy implemented by the

---

[1] As of Jul 12, 2022, the law school still makes reference to distance learning sections on its website.

university, only to have those requests for accommodations blanketly denied without any explanation from the university. This led to my view that the school was asking for its students to reveal religious and medical information under pretext of good faith that it would review requests for exemptions, only to dismiss them then, categorically without reason. I was ultimately allowed to take classes remotely, but only after an invasive inquisition into my medical conditions and religious views. Not only was I required to state my views, but I was forced to jump through hoops of getting religious leaders to attest in writing to my views. It was an absurd and preposterous experience. On this matter, I invested hours of my time and energy drafting communications to have them categorically dismissed. This was my first major interaction with the university. The relationship could have been positive, but this is what ███ chose to put its students through.

I made clear to Dean ██ that I had a multitude of reasons for needing to continue taking classes remotely, and I listed them all. Because he was consistently not forthcoming, I was inclined to speculate as to the motivations for the university suddenly transitioning back to in-person learning. I believe those reasons are exclusively financial in nature without regard for the needs of the students. Nonetheless, I've been clear with the university from day one, and Dean ██ has been vague and evasive addressing the issues.

Every one of my requests for accommodations has been reasonable and I have been drawn into unnecessary conflict with Dean ██ because of the nature of his responses and general lack of any diligence or urgency in resolving the matters; matters which I clearly put forth to him over a year ago. The issues remain unresolved. A caring administrator would seek to resolve an important question of his student who simply seeks to understand how he might complete the program costing nearly $300,000.

While Dean ██ might have us focus on the fact that, to date, the law school had eventually (mostly) provided the accommodations I had requested, but what's important for me to emphasize is that those accommodations were only granted *after* I put forth the strongest of assertions that the way the school is treating me is unfair. This took considerable time and energy which would have been better spent on my studies.

At the end of the first semester, I was able to take my exams remotely, just as all students have been doing across the country, using perfectly functional remote exam proctoring and monitoring software. But for some inexplicable reason, Dean ██ decided that remote exams were no longer acceptable for the spring semester and we went through a round of negotiations during which he attempted to make me drive to New York, spend a week in hotels at my expense, just to sit on campus for the open-book

exams.[2] I urged him to let me take the exams from my home in Virginia using what had previously been sufficient security provisions. I even noted that each exam was, in fact, an open-book exam, but Dean ██ would not be persuaded.

At the end of this semester, again, Dean ██ nonchalantly attempted to order me to New York to take the exams in person, with less than a week notice, knowing full well that he had neglected to make any effort to implement an arrangement similar to last semester's arrangement. Specifically, last semester, he negotiated with George Mason University for me to take my exams there. This time, he asked them at the very last minute, and they declined. So, now, while I am trying to learn nearly 4000 pages of knowledge of Evidence, Business Associations, and Legal Ethics, in only about six weeks (I'm taking 10 credits over the summer), and after waiting until the last minute, the week prior to final exams, Dean ██ forces me to address this issue and potentially plan to travel to New York to take the exams knowing full well that it will involve major coordination and focus on my part. Mind you, Dean ██ is aware that I'm afflicted with a disability which impacts my attention. Nonetheless, he shows no regard for the fact that this will force my attention to travel plans away from preparing for my finals, which, of course, places my considerable investment in ██ University at risk (by potentially impacting my performance on the exams). Dean ██ either intentionally or negligently caused this distress and anxiety, and he should be counseled on his conduct or removed from this position, if this is a continuing trend, for his complete lack of sensitivity to the reasonable needs of the students.

On multiple occasions, I expressed to Dean ██ that he was causing stress and anxiety in his refusal to address my concerns about how I would complete the program, and ultimately obtain any value from my $100,000 (plus) investment (thus far) in the relationship with ██ University. He refused to even acknowledge the consequences of his actions.

Only after multiple evasive responses from Dean ██ did the most recent issue finally escalate, and once again his communications failed to address any of the issues regarding the communications or the ultimate issue of how I will complete the degree program.

I find his communications with me and his refusal to negotiate and implement a permanent solution, or offer any ideas for a compromise, despite my repeated invitation for them, to be deliberate, unprofessional, and unbecoming of a person in his position. Frankly, I find it to be an abuse of his authority.

---

[2] I believe it was only to further the objective of bringing students back to the university under the guise of "exam security."

I feel resentment that because the Dean ▮ has refused to allow me to peacefully participate in a program remotely (just as all students have successfully done since the beginning of COVID), I've been denied the enjoyment of a positive relationship between me and the law school. The professors are wonderful, the subjects are intriguing, yet the interaction with the Dean's office has been an abomination.  I have included Dean ▮ on some communications along the way, but she has not engaged directly with me on any of these issues. I believe she is currently out of the office.

Because of Dean ▮ refusal to negotiate a solution, I have been forced to engage with the American Bar Association and the Department of Education to address my concerns, focusing on their "distance learning" restriction upon which Dean ▮ seems to rely; at least in part (of course, the other reasons remain undisclosed by Dean ▮ In my communications with them, I focus on the antiquated distinction between distance learning and in-person learning. I welcome any thoughts you have about ways in which we can resolve these issues and I ask that you support me in any reasonable and appropriate ways so that the experience and our relationship can be positive. In my view, there are hundreds of ways the university can meet its obligations to its business model and standards, and at the same time meet its commitments to me.

Having logged my complaint regarding my interactions with Dean ▮ I'd like direct your attention to my interactions (below) with the American Bar Association and the Department of Education, and I invite you to offer any ideas about how we can ensure that studying law will be enjoyable so that I may rest with confidence that I will be afforded a reasonable opportunity to complete the program with any due accommodations in a peaceful and productive manner.

Thank you for your kind consideration.



cc: Dean ▮
    Dean ▮

**Attachment 1:**
**July 13, 2022 Email to ABA Standards Committee and**
**DOE, Accreditation Group, Office of Post Secondary Education**

**From:** ███████████ < ████████ live.com>
**Sent:** Wednesday, July 13, 2022 12:31 PM
**To:** Kirsten Winek; herman.bounds@ed.gov
**Cc:** Gail ████████ ; ███████
**Subject:** Re: Standard 306 and ABA's Position on Distance Learning

Dear Ms. Kristen Winek:

Thank you for your prompt reply.

Is there any law student representation on the standards committee? If not, I'd like to be elected or appointed, as the rules permit, as soon as possible. If you would please advise as to the process or procedure.

Please confirm my feedback will be considered by the committee and council prior to any vote on this in Aug and not pushed out to the next voting period.

I would like my correspondence to the ABA standards committee to be considered a legal demand for the immediate change of this unconstitutional standard, which I will similarly make to the Department of Education.

If you would be so kind as to give the reply to this demand the weight that would normally be accorded a legal demand. Please know that the urgency of this matter will warrant an immediate suit seeking a court ordered change if the demand is not met. I will plan to file the action in the US District Court for the Eastern District of Virginia the day after the Aug vote if the demand is not met by the council unless I am compelled to act sooner.

Are the meetings open to the public?
Thanks for your service!

Dear Mr. Herman Bounds, Jr:

If you would, please consider the correspondence below and above as a legal demand to the Department of Education that it order the ABA Council to abolish the portion of the Standards (306 and otherwise) which impose a distinction between distance and in-person learning and any related restrictions on distance learning requiring compliance for the accreditation of law schools. The reason that the Department of Education should find distance learning standards unconstitutional are stated herein (below).

Please provide a formal response to the demand. Once I receive a response to the demands from DoE and ABA, assuming they are not immediately met, I will seek a settlement conference with these organizations, and then initiate suit seeking declaratory and injunctive relief in Federal Court as necessary.

I have cc'd the Deans of ███████ University ████████████ School of Law with whom I have been attempting to address these unconstitutional standards, so they may continue to be aware of my invitation for them to act in support of this reform.

Thank you for your service!


Best regards,

████████████

Cc: Dean ██████
Dean ████████

Ps. Deans ████████ and ████ if at anytime you would like to seek an exception from the ABA Standards Committee and the NY Court of Appeals to allow for me to continue my legal education online, as you contracted to provide in exchange for tuition, either as an accommodation for a disability or because you know it is the moral and righteous thing to do, then we can all treat this matter as less urgent.

Pps. This communication should be treated as confidential to the extent that it references a disability.

Get Outlook for iOS

**Attachment 2:**
**July 13, 2022 Email Response from ABA Standards Committee**

**From:** Kirsten Winek <Kirsten.Winek@americanbar.org>
**Sent:** Wednesday, July 13, 2022 11:32 AM
**To:** ██████████live.com
**Subject:** Standard 306 and ABA's Position on Distance Learning

Dear Mr. ██████

Your email below was forwarded to me.  I will pass along your comments to the
Council's Standards Committee.  The Committee is considering further revisions to
Standard 306. When these revisions are proposed, there will notice and comment period
and you are welcome to submit comments on these revisions.  Notice and Comment
notices are posted here:
https://www.americanbar.org/groups/legal_education/resources/notice_and_comment/.

The US Department of Education contact is as follows:
Herman Bounds, Jr.
Director, Accreditation Group
Office of Postsecondary Education
herman.bounds@ed.gov

Sincerely,
Kirsten Winek

**Kirsten M. Winek, J.D., Ph.D.**
Accreditation Counsel
Section of Legal Education and Admissions to the Bar
American Bar Association
321 North Clark Street
Chicago, IL 60654
312.988.6714
kirsten.winek@americanbar.org
http://www.americanbar.org

**Attachment 3:**
**July 12, 2022 Email to ABA Standards Committee on Feedback Regarding**
**Standard 306**

**From:** ███████████  <███████████live.com>
**Sent:** Tuesday, July 12, 2022 10:32 AM
**To:** ABA Legal Education and Admissions to the Bar <legaled@americanbar.org>; Gail
███████ <███████████edu>; Julian G. ███ <███████████edu>
**Subject:** Standard 306 and ABA's Position on Distance Learning

Dear Ms. Holmes:

I am writing to ask if there is an opportunity to serve as a witness to present testimony to
the Standards Committee prior to any vote expected in August on the proposed changes
to Standard 306?

I would like to advocate as a law student for the position that the distance learning
requirement be eliminated entirely and immediately from ABA Standards as it is no
longer necessary to distinguish between in person and remote classes.

There are presumably many law students around the country, like myself, who live in
one geographic location and are enrolled in a law program in another location. This
scenario emerged as an unintended benefit of the COVID response.   As the schools
posture to protect their antiquated business models by nonsensically attempting to
transition  back to the antiquated days of in person learning (and make no doubt about it,
they are), students like myself are at risk of having our aspirations of obtaining a law
degree unjustly thwarted.

The distance learning restriction does not satisfy even the most lenient of constitutional
standards of review for governmental action in that it is not at all "rationally related" to
the objective of producing competent attorneys. To say that it is would be tantamount to
admitting that universities have been producing insufficient lawyers during the pandemic
due to their distance education.

The standard is unfairly discriminatory against people with nontraditional families. In my
case, I would need to abandon my parental obligations in a shared child custody
arrangement to move from VA to NY to complete the program which has thus far been
offered remotely without any issue.

The 306 standard acts as an unreasonable force against certain types of law students, is
contrary to the principles of the free market, and discourages diversity.  Students should
be free to attend universities in any part of the country without having to move to a
particular location, especially when, at times, doing so would cause substantial and

unnecessary hardships and conflicts between school and family obligations. Undoubtedly, minorities face the disproportionate burden of these discriminatory policies.

By limiting law students to programs in their geographic areas, you significantly diminish the opportunities of these law students to obtain diverse educational experiences, which especially negatively impacts those who have nontraditional family constraints.

The 306 standard is being relied upon by many law schools as pretext for protectionist policies which are designed to bring the students back onto campus only to serve the university's misguided belief that it is essential to their current business models. While I predict that these protectionist university policies will lead them to the organizational graveyards to join the likes of inflexible organizations America Online, Blockbuster Video, Yellow Cab, etc., I don't have the luxury of waiting for that inevitability.

The fact that all the law schools implemented the exact same policies during Covid, and are taking the exact same approach to terminating the distance learning, will likely be found as evidence of collusion implicating antitrust statutes.

The relationship between law students and law schools are primarily contractual, and law schools attempting to change the terms of their programs mid-program for irrational reasons certainly implicate contract law. Law schools will undoubtedly point to the ABA standards to justify changing their program terms. Although this will not relieve them of their contractual obligation, it does provide them with a false sense that they are doing the right thing, and can pass the buck to the ABA (or even the highest courts of jurisdiction). For this reason, law students are looking to ABA to provide  moral leadership on this topic.

The distance learning distinction also has a negative impact on students with disabilities, and although I note the proposed changes have a section to address disabilities, you should know that law schools are already taking refuge in the idea that the standards will not be implemented for years to come. Unless important topic, I would encourage ABA's leadership to promote immediate change.

I will prepare testimony if the board will support my appearance at the August meeting to give such testimony prior to a vote on this matter.

None-the-less, I urge the Standards Committee to IMMEDIATELY eliminate the unconstitutional distance learning restriction, as the distinction between in person and distant learning is no longer significant given the technology advances and the precedent established during COVID.

In the meantime, would you please provide the name of the office within The Department of Education which authorizes the ABA to enact standards for legal education, and any contact information you may have at that office.

I have little choice but to make a similar plea to that office to advocate for a timely resolution to this pressing issue which many law students around the country are facing. If necessary, I am prepared to bring these issues before a federal court to have them addressed.

I have cc'd ████████████ and Dean ██ of ██████ University, ██████████████ School of Law (the university I attend) and invite them to join in advocating to the Standards Board to eliminate the distance learning distinction from the standards on behalf of similarly disadvantaged students like myself who are negatively impacted by this unconstitutional policy.

**Thank you,**

████████████

Cc: Dean ██████████████
Dean ██████████████

# Exhibit H

FACULTY POLICY SERIES #43

# HARASSMENT POLICY

**DOWNLOAD HARASSMENT POLICY [PDF]**



## POLICY

- **Introduction**

  As an academic institution of higher learning ▓▓▓▓ University is dedicated to providing an environment conducive to intellectual and personal growth  with all members of the community encouraged to participate to the fullest extent of their abilities  For ▓▓▓ this means a firm institutional commitment to academic freedom as defined in Section II of the Faculty Statutes  It also involves a commitment to norms of professional and interpersonal respect ensuring that no individuals are subjected to harassment or discriminated against in any way on the basis of race  color  religion  sex  sexual orientation  gender identity or expression  age  national or ethnic origin  physical or mental disability  marital or veteran status or any other characteristic protected by state or federal laws  These protected traits are referred to as  protected characteristics or beliefs  elsewhere in this Policy

  Harassment based on any of these characteristics is a form of discrimination prohibited by law and by ▓▓▓▓ University  Whenever a violation of this policy is brought to the University s attention through appropriate channels or when the University otherwise becomes aware of a violation of this policy  prompt corrective action will be taken  All members of the ▓▓▓▓ community are encouraged to contact the appropriate University offices if infringements of this policy come to their attention  Retaliation against anyone who files a complaint under this policy or participates in an investigation is prohibited

- **Harassment Policy Statement**

  A  **Harassment Prohibited**

  ▓▓▓▓ University abides by the principle that its students  faculty  staff and administrators have a right to be free from unlawful harassment within the University community  Harassment is the creation of a hostile or intimidating environment in which verbal or physical conduct based on one s protected characteristics or beliefs  because of its severity and/or persistence  is likely to significantly interfere with an individual s work or education  or enjoyment of other University opportunities or activities  Harassment also includes coercive or threatening behavior based on one s protected characteristics or beliefs

  This policy covers the conduct of all University employees and students  as well as third parties such as vendors  contractors  and visitors to campus  This applies to all  areas of University programs and activities both on and off-campus  including overseas programs

  B  **Definition of Sexual Harassment**

  Generally  sexual harassment is conduct that exploits power or authority in order to elicit sexual submission  or inappropriate sexual conduct that creates an intimidating  hostile or abusive environment for working  learning  or enjoying other opportunities and activities  Sexual harassment can include a wide range of behaviors  from the actual coercing of sexual relations  to repeated or egregious sexual suggestions or comments  to the unwelcomed emphasizing of sexual identity  The definition of sexual harassment discussed more fully below  will be interpreted and applied consistent with current legal standards  as well as accepted standards of mature behavior  professional responsibility  academic freedom  and freedom of expression

  Sexual harassment in any situation is reprehensible  it is particularly damaging when it exploits the educational dependence and trust

between and among students faculty staff and administrators When the authority and power inherent in certain relationships whether overtly implicitly or through misinterpretation is abused in this way there is potentially great damage to all parties involved and to the educational climate of the institution

For the purposes of this policy sexual harassment may be defined as unwelcome sexual advances requests for sexual favors and other nonverbal expressive or physical conduct of a sexual nature when

- submission to such conduct is explicitly or implicitly made a term or condition of employment or status in a course program or activity or
- submission to or rejection of such conduct is used as a basis for an academic or employment decision affecting the individual or for a decision regarding an individual s status in a course program or activity or
- such conduct has the purpose or effect when judged from the perspective of a reasonable person in the position of the complaining individual of unreasonably interfering with an individual s academic or work performance or creating an intimidating hostile or offensive environment for working learning or enjoying other University opportunities programs and activities

Determining whether sexual conduct creates an intimidating hostile or offensive environment or substantially interferes with an individual s academic or work performance or enjoyment of other University opportunities depends on the specific facts and the context in which the conduct occurs To constitute sexual harassment the conduct must be severe or pervasive Thus a hostile environment may arise from a single incident if sufficiently egregious for example certain physical contact or from repeated actions such as repeated sexual comments suggestions or jokes Further if such conduct or remarks take place in the teaching context to conclude that they create an abusive environment it must be shown that they are not germane to the subject matter The academic setting is distinct from the workplace in that wide latitude is required for professional judgment in determining the appropriate content and presentation of academic material

Sexual harassment can involve conduct toward an individual of the opposite sex or of the same sex In addition sexual harassment may occur between peers or between individuals in a hierarchical relationship

Examples of conduct covered by this policy (subject to the above conditions) include but are not limited to

- unwanted flirtation advances or propositions of a sexual nature
- insults humor jokes or anecdotes (not legitimately related to the subject matter of a course if one is involved) that belittle or demean an individual s or a group s sexuality or sex
- unwelcomed comments of a sexual nature about an individual s body or clothing
- unwarranted displays of sexually suggestive objects or pictures
- unwelcomed touching such as patting pinching hugging or brushing against an individual s body
- explicit or implied suggestions that submission to or rejection of sexual advances will affect decisions regarding such matters as an individual s employment work assignments or status salary academic standing grades participation in programs or activities athletic opportunities receipt of financial aid grants leaves of absence letters of recommendation or other similar matters
- tangible action taken against an individual (e g a demotion lower grade) for refusing to submit to sexual advances or threatening to take such actions and
- sexual assault (For additional information about sexual assault involving students see the Sexual Assault Policy contained in the Guide to Pride)

C Definition of Other Forms of Harassment

Unlawful harassment other than sexual harassment is conduct that denigrates or shows hostility or aversion to a person on the basis of a protected characteristic or belief when such conduct has the purpose or effect of unreasonably interfering with an individual s work or academic performance or creating an intimidating hostile or offensive environment for working learning or enjoying other University opportunities programs and activities

Protected characteristics or beliefs are listed in Section I of this policy

Examples of other forms of harassment covered by this policy include but are not limited to

- verbal abuse ridicule slurs epithets stereotyping and offensive and unwelcome jokes and comments
- threatening intimidating or hostile acts and
- displaying or distributing offensive materials writings graffiti or pictures that denigrate or show hostility or aversion towards an individual or group based on any of the protected characteristics or beliefs set forth in this policy

- **Harassment Complaint Procedure**

  Any member of the University community including a student or employee who believes that he or she has been subjected to harassment in violation of this policy may pursue redress through the appropriate complaint procedure This complaint procedure is provided for the prompt and equitable resolution of complaints alleging harassment by members of the University community including faculty members staff members administrators and other persons However complaints of harassment against students arising out of their conduct as students shall be made to the Dean of Students Office and will be handled in accordance with the provisions set forth in the Student Judicial Code Members of the University community may also choose to pursue one of the informal options discussed below

  A  Confidentiality

  1  Generally it is the policy of ▆▆▆ University to protect the confidentiality of members of the University community who may be involved in harassment complaint procedures insofar as that is reasonably practicable Specifically the identity of the complaining party the identity of the accused offender (hereinafter referred to as the responding party ) and information relating to the harassment complaint will be disseminated only to those individuals who have a legitimate need to know or as reasonably necessary for the purpose of investigating or resolving the complaint

  Complaining parties should be informed and understand that upon their advising a Harassment Adviser or the Equal Rights and Opportunity Officer of a harassment complaint the University may be legally required to investigate that complaint Therefore complaining parties should understand that the complaint may be disclosed as necessary to persons other than the one(s) to whom the complaint is made including the party complained of (hereafter referred to as the responding party )

  Although the University will endeavor to maintain the confidentiality of harassment complaints and proceedings in accordance with this policy it cannot absolutely guarantee against the further dissemination of information by individuals to whom such information was reasonably disclosed by the University in the course of a harassment investigation

  2  Waiver of Confidentiality A complaining party or a responding party may be deemed to have waived directly or indirectly the confidentiality provisions of this policy by voluntarily disclosing information about the complaint or the complaint proceedings to parties within or outside the University community who are not directly involved in the investigation or complaint process The University retains the right to respond as it deems appropriate including the right to rebut or refute such allegations consistent with applicable law

  B  Retaliation

  No individual shall be penalized or retaliated against in any way by a member of the University community for his or her participation in this complaint procedure This protection includes both the complaining and responding parties and individuals who participate in an investigation of a harassment complaint Every effort should be made to protect members of the University community so they may use or participate in the harassment complaint procedure without fear of reprisal or retaliatory action Threats other forms of intimidation and retaliation against a complaining or responding party or any other party involved in implementing or utilizing the University s harassment complaint procedure are violations of this policy and thus may be grounds for disciplinary action including separation from the University consistent with appropriate procedures

  Individuals who believe they have been retaliated against in violation of ▆▆▆ harassment policy must follow the complaint procedures outlined herein and such complaints will be processed in accordance with those procedures

  C  Informal Procedure

  The goal of the informal options is to end quickly the offending behavior without utilizing disciplinary action or the formal complaint procedure However no one is required to pursue an informal resolution and a complaining party may proceed immediately to the formal complaint procedure If the informal options are not feasible or desired or do not result in a mutually agreeable solution or cessation of the offending conduct the formal complaint procedure is available as well Informal options include

  - Talking directly to the other party or writing a letter describing the unwelcome behavior and asking him or her to stop
  - Consulting with a University Harassment Adviser Harassment Advisers are individuals specially trained by the University who are available to anyone to discuss issues relating to harassment or the University s policy and procedures Harassment Advisers may assist the parties in resolving a complaint informally without the need to file a formal complaint A current list of Harassment Advisers is available from the Human Resources Office and the Equal Rights and Opportunity Officer
  - Speaking to members of the Student Counseling Center or campus Chaplains Such conversations may be confidential because of the legal protections held by the specific persons receiving the information

  D  Formal Procedure1

  1  Step One

a Whom to Contact  Individuals who believe they have been subjected to harassment in violation of this policy and seek to file a formal complaint should contact the Equal Rights and Opportunity Officer at 516-463- 6473 C/O Office of Human Resources  205 ▮▮▮▮  University  Hempstead NY 11549 2  The Equal Rights and Opportunity Officer is the designated official responsible for the investigation of harassment complaints made by members of the University community  as well as for coordinating the processing of such complaints under this policy  Individuals who believe they have been subjected to harassment by a student in violation of this policy should contact the Dean of Students  If such a complaint is made to the Equal Rights and Opportunity Officer  the complaint will be forwarded to the Dean of Students for handling in accordance with the provisions of the Student Judicial Code  Complaints by individuals who believe they have been subjected to harassment by a third party such as a vendor  contractor or visitor to campus will be handled by the Equal Rights and Opportunity Officer  even though not subject to this formal complaint procedure

b Timing of Complaint  An initial complaint of harassment to the Equal Rights and Opportunity Officer must be made within six months of the most recent occurrence of alleged harassment  The Equal Rights and Opportunity Officer is authorized to waive this timeliness requirement in extenuating circumstances  Even if the time to file a complaint has elapsed  any member of the University community who becomes aware of a potential violation of this policy is encouraged to report the violation to the Equal Rights and Opportunity Officer so that appropriate action may be taken  In order to facilitate investigation of a complaint  prompt reporting is encouraged

c Making a Written Complaint  If the complainant  after an initial discussion with the Equal Rights and Opportunity Officer decides to proceed  the complainant must make the complaint in writing by filing a Harassment Complaint Form (hereinafter referred to as  Formal Complaint )  Such forms may be obtained from the Equal Rights and Opportunity Officer

Investigation By the Equal Rights and Opportunity Officer  The Equal Rights and Opportunity Officer or a designee shall conduct an investigation of the Formal Complaint  which shall include discussing the nature of the complaint and its allegations with the responding party  reviewing any relevant documents or other materials  and interviewing potential witnesses to the alleged harassment  including administrators  faculty members  staff members  students or other persons who may have knowledge of the situation  If the responding party is a member of a union  the party will be advised before the date scheduled for his/her interview that s/he is entitled to request that a union representative be present during his or her interview  When the responding party is a bargaining unit member  the union will be notified in accordance with the relevant Appendix

Neither the complaining party nor the responding party is entitled to the participation of legal representatives during the course of the Equal Rights and Opportunity Officer s investigation of the complaint  The responding party shall have the right to submit a written response to the Formal Complaint  accompanied by any relevant documents or other materials he or she may wish to include (including any witnesses he or she may wish to suggest)  within ten (10) calendar days of receiving a copy of the Formal Complaint

d Informal Resolution  The Equal Rights and Opportunity Officer is authorized and encouraged to explore informal resolution of the complaint at any time after the complaint is received  The Equal Rights and Opportunity Officer shall advise both the complaining and responding parties that conciliation of the complaint is available should the parties so desire  Informal resolution is designed to obtain an expedient  mutually acceptable solution to a harassment problem without the necessity for conducting further investigation or hearings  The purpose of informal resolution is to attempt through discussion and inquiry to make an effort to resolve or  work out  the issue in a non-adversarial manner  Therefore  the Equal Rights and Opportunity Officer should be able to use a great degree of discretion and flexibility in deciding what kind of informal means would be most effective in accomplishing this end  provided that the result achieved is acceptable to both parties in interest

If the Equal Rights and Opportunity Officer is able to resolve the complaint to both parties  satisfaction  the Equal Rights and Opportunity Officer should provide the parties with a written statement reflecting the terms of the resolution and stating that the agreed-upon resolution will be undertaken  The written statement of informal resolution should be signed by the complaining party and the responding party  Upon the signing of the written statement of informal resolution  the matter will be deemed closed  and no party will be permitted to appeal  contest  re-open  or otherwise attempt to set aside or amend the terms of the informal resolution as long as the terms are adhered to

e False Complaints  Due to the nature of harassment  complaints of harassment cannot always be substantiated  Lack of

corroborating evidence should not discourage a complaining party from seeking relief through the procedures outlined above  However  complaints found to have been intentionally dishonest or made maliciously or without regard for the truth will subject the complaining party to disciplinary action in accordance with relevant University procedures

f  Interim Action  If  at any point after proceedings have been initiated under this complaint procedure  it is determined that the responding party s continuance in his or her position within the University community threatens immediate harm to the complaining party or others  the Equal Rights and Opportunity Officer or other responsible officials  including the Provost or a Vice President  may recommend to the President that the responding party be placed on leave with pay pending the outcome of the complaint procedure  After reviewing the current state of the evidence and consulting  as appropriate  with the individuals making the recommendation  the President may accept or reject the recommendation  The responding party s union will be notified if the President decides to suspend the responding party  The decision at this stage is preliminary in nature  is not a finding of fact  and any ultimate decision of the merits will be based solely on the hearing record  Prior to being placed on such leave  the responding party is entitled to submit a written statement to the President stating why he or she should not be placed on leave  This provision shall not restrict the President s authority with respect to administrative employees and is subject to any applicable collective bargaining agreement and disciplinary provisions with respect to union-represented employees

g  Reasonable Cause Determination  After the investigation has been conducted  the Equal Rights and Opportunity Officer shall render a written determination as to whether there is reasonable cause to believe that the harassment policy may have been violated

  1  No Reasonable Cause  Finding
    A finding of  no reasonable cause  means that the investigation has not revealed sufficient facts or circumstances indicating that the complaint may have merit  If the Equal Rights and Opportunity Officer makes a finding of no reasonable cause  he or she shall promptly notify the complaining party and the responding party in writing  The complaining party shall have five (5) calendar days from receipt of such notice in which to file a written appeal of the finding to the President  If the complaining party does not file an appeal of the no reasonable cause finding within the allotted time  the complaint will be dismissed  The President shall notify the responding party that an appeal has been filed and shall provide a copy of the appeal and supporting documents to the responding party  who shall have the right to file a written response thereto  The responding party s written response must be filed within five (5) calendar days after receiving notice of the appeal and copies of the supporting documents  Upon receipt of the respective parties  written appeals  the President shall appoint a senior administrator to review the merits of the appeal  This administrator  after reviewing the respective parties  written appeals  and any other evidence or information he or she may deem relevant  may either affirm or reverse the Equal Rights and Opportunity Officer s determination of no reasonable cause  The decision of this administrator is final and non-appealable  If the Equal Rights and Opportunity Officer s determination is affirmed  the harassment complaint will be dismissed  If the determination is reversed  the matter will be remanded to the Equal Rights and Opportunity Officer  who shall proceed as if a reasonable cause finding has been made

  2  Reasonable Cause  Finding
    A finding of  reasonable cause  means that the investigation has revealed facts or circumstances indicating that a violation of the harassment policy may have occurred  and  therefore  further proceedings are warranted  If the Equal Rights and Opportunity Officer makes a finding of reasonable cause  he or she shall promptly notify the complaining party and the responding party in writing  Upon making a reasonable cause finding  the Equal Rights and Opportunity Officer should attempt to reach an informal resolution  as discussed in Section II D 1 e  and  if necessary  proceed to Step Two in the complaint procedure

h  Instituting Step Two Proceedings
  If the Equal Rights and Opportunity Officer is unable to reach an informal resolution of the matter within ten (10) calendar days of the date the reasonable cause finding was made  the Equal Rights and Opportunity Officer shall so notify both the complaining party and the responding party in writing  and shall inform the parties that  if the complaining party chooses to proceed to Step Two  the case will be referred to the University Harassment Review Board for commencement of formal proceedings
  Timing  The complaining party has ten (10) calendar days from receipt of such notice to submit a written request to initiate

proceedings under Step Two of the University s harassment complaint procedure  as described below

2  Step Two

   a  Initiation of Proceedings  To initiate Step Two of the complaint procedure  the complaining party must file a written statement of intention to proceed to Step Two within the prescribed time period  The statement must be submitted to the Equal Rights and Opportunity Officer

   b  The University Harassment Review Board  The University Harassment Review Board (the  UHRB ) shall be responsible for processing Step Two harassment complaints within the University  The Equal Rights and Opportunity Officer will notify the University s General Counsel that Step Two proceedings have been initiated  and the General Counsel will see to the formation of the committee  The members will be appointed  as described in the next paragraph  for the duration of the case

In the event that the responding party is a full-time faculty bargaining unit member  the UHRB shall be constituted pursuant to the Faculty Procedures  attached at Appendix B  In all other cases  the UHRB shall consist of three (3) members  the Provost or the Provost s designee  as Chair  one representative from the constituency of the complaining party  and one representative from the constituency of the responding party  For purposes of this complaint procedure  the constituency for a faculty member shall be the faculty (excluding department chairs and except as otherwise provided in the Faculty Procedures for full-time faculty bargaining unit members)  the constituency for a student shall be the Dean of Students Office  the constituency for an administrative employee shall be the administration (excluding department chairs)  and the constituency for a union represented staff member (office  clerical  technical employee or maintenance employee) shall be the membership of the same collective bargaining unit  Except for proceedings pursuant to Appendix B  all faculty members shall be appointed by the Faculty Affairs Committee of the University Senate through the Senate Executive Committee  The Dean of Students shall be responsible for selecting a representative from the Dean of Students Office  All administrative employees shall be appointed by the President  All union-represented staff members shall be appointed by the appropriate union

Prior to the commencement of proceedings before the UHRB pursuant to Appendix A  members of the UHRB will be trained by the Equal Rights and Opportunity Officer with respect to harassment issues  current standards concerning what conduct may constitute harassment and any other specific issues necessary for determination of the complaint before them  The members of the UHRB in a proceeding pursuant to Appendix B will be trained annually by the Equal Rights and Opportunity Officer with respect to harassment issues and current standards concerning what conduct may constitute harassment  The AAUP has the right to attend these training sessions

Both the complaining party and the responding party shall be provided with a list identifying the members of the UHRB who will serve as the hearing committee  Any member of the UHRB with an interest in the matter  or who the complaining party or the responding party justifiably maintains has a conflict of interest  may be asked to disqualify himself or herself from participating in processing the complaint  Requests for disqualification should be made within five working days of receipt of the list  and should be submitted to the UHRB  which will provide a copy of such request to the other party  A UHRB member may request disqualification of himself or herself by submitting a statement to the parties and the UHRB setting forth the basis for disqualification  Any disputes concerning disqualification will be decided by the Provost or his/her designee  If a member of the UHRB is disqualified  another member shall be appointed as in the paragraph above or  where the responding party is a full-time faculty member  as in Appendix B

Formal Complaint Proceedings Before the University Harassment Review Board  The UHRB shall commence formal proceedings for determination of the complaint promptly but no later than fifteen (15) calendar days after Step Two proceedings are initiated  This process shall include hearings before the UHRB in which the complaining party  responding party and other relevant witnesses shall have the opportunity to provide testimony and documents  At the conclusion of the hearings  the UHRB will make written findings and recommend a penalty  if applicable

   c  Hearing before the UHRB  The UHRB shall conduct hearings  which shall be governed by this Policy and  as applicable  by (a) Formal Complaint Proceedings Before the University Harassment Review Board (which applies to all responding parties  including adjunct faculty members other than full-time faculty bargaining unit members)  attached at Appendix A  and (b) the Faculty Procedures where the responding party is a full-time faculty bargaining unit member  attached at Appendix B  The UHRB shall report its findings  which must be based on a preponderance of the evidence in the record considered as a whole  in writing to the President  with copies to the complaining and responding parties

3  Step Three

Within fifteen (15) calendar days after receiving a copy of the UHRB s written finding either party may submit written objections to the findings with the President of the University Such written objections should set forth  in detail  the reasons why the objecting party believes the UHRB s findings should not be affirmed  or why the recommended penalty should not be adopted by the President  A copy of the written objections will be provided to the other party in interest  who may file a written response within fifteen (15) calendar days after receipt of the objections

In addition to filing written objections  either party may request a hearing before the President  which the President may grant in his discretion  The hearing may be attended by the objecting party (with one advisor)  the other party (with one advisor)  the President  the Equal Rights and Opportunity Officer  and the UHRB  At the hearing  each party will be permitted to present his or her position orally (limited to thirty (30) minutes)  and the President may question each  These proceedings will be recorded  Within thirty (30) calendar days of the submission of written objections or the hearing  whichever is later  the President shall issue his final decision  in writing  If neither party files objections to the UHRB s findings within the prescribed time period  the President will issue a final decision within thirty (30) calendar days after receiving the findings and recommendations  After giving due consideration to the UHRB s findings and recommendations  the President may accept or reject the findings and recommendations  including any recommendation regarding penalty

Any penalty imposed by the UHRB or the President shall be consistent with any applicable collective bargaining agreement or disciplinary provisions with respect to union-represented employees  A copy of the decision will be provided to each party  The President s decision will be final and binding on all parties  Notwithstanding the foregoing  where the responding party is a full-time faculty bargaining unit member  the President s decision is subject to review as set forth in Appendix B

4  Informal Resolution of Complaint Permitted

At any time during the Step Two or Step Three process  the President  the UHRB or the Equal Rights and Opportunity Officer shall have authority to enter into an informal resolution of the complaint that is acceptable to both the complaining party and the responding party  As noted above  upon the informal resolution of a complaint  the matter will be deemed closed  and no party will be permitted to appeal  contest  re-open  or otherwise attempt to set aside or amend the terms of the informal resolution as long as the terms are adhered to

5  Extensions of Time

All of the time limits contained in the foregoing and in the attached Appendices may be extended by mutual written agreement of the party requesting the extension and the Equal Rights and Opportunity Officer (Step One)  the UHRB (Step Two) or the President (Step Three)

6  Harassment File

The Office of the Equal Rights and Opportunity Officer shall maintain a file of all harassment complaints and their outcomes including harassment complaints by students against students  The UHRB or the President may inquire of the Equal Rights and Opportunity Officer whether prior cases exist in which the responding party was involved where the case resulted in a finding by the UHRB against the responding party or where the case was informally resolved in conformance with FPS 43  Additionally the UHRB may consider for purposes of determining an appropriate penalty prior cases involving other parties that involve the same or similar conduct to that alleged in the complaint under consideration  The complainant and the responding party shall be given copies of all information provided to the UHRB in response to such a request

7  Independent Investigation

The University reserves the right to conduct an investigation of a complaint of harassment independent of or in addition to the procedure provided herein at any time

- **Policy Review**

The University Senate including representatives from the University and the AAUP shall be responsible for periodically reviewing this policy and its implementation to assess its effectiveness and make recommendations regarding possible changes  The Equal Rights and Opportunity Officer shall deliver an annual report on the activities of the Office of the Equal Rights and Opportunity Officer to the University s General Counsel

# APPENDIX A

**Formal Complaint Proceedings Before the University Harassment Review Board**

As soon as possible  but within fifteen (15) calendar days after Step Two proceedings are initiated  the UHRB shall commence formal proceedings for determination of the complaint  This process should include the following steps

1  The Equal Rights and Opportunity Officer shall forward to the UHRB  the complaining party  the responding party  and  if the responding party is a member of a union  the responding party s union 3 a copy of the Harassment Complaint Form ( Formal Complaint )  any written response of the responding party ( Written Response )  and this Appendix A

2  The UHRB should notify the responding party that it will  (a) conduct a full investigation of the complaint  (b) determine whether the alleged conduct occurred  (c) if the alleged conduct occurred  determine whether the conduct constitutes harassment in violation of the University policy  and (d) determine an appropriate penalty if warranted

3  The complaining party shall be provided with a full copy of the Written Response to the complaint  including any documents or other materials submitted by the responding party in support of the response

4  The UHRB shall commence formal proceedings for determination of the complaint promptly but no later than fifteen (15) calendar days after Step Two proceedings are initiated  Both the complaining party and the responding party shall be notified by the UHRB of their right to be represented by advice from an attorney or any other individual of their choice in hearings before the UHRB  There shall be no more than one (1) advisor per party present at any UHRB hearing  The parties or their advisors are not permitted to examine or cross-examine witnesses  such power being reserved exclusively to the UHRB  The parties or their advisors may submit to the UHRB suggested questions for the UHRB to ask a particular witness  and the UHRB  in its discretion  may ask or not ask any question so submitted  The parties or their advisors also are entitled to suggest  but not insist  that a particular witness or witnesses be called by the UHRB  The parties are permitted to raise objections to questions posed by the UHRB during the examination of a witness  or to any evidence offered for consideration by the UHRB during the course of the hearing  which objections will be considered and ruled upon by the UHRB  Further  the parties are permitted to make opening and closing remarks to the UHRB  subject to any time limitations imposed by the UHRB in its discretion

5  Hearing proceedings shall be recorded by stenographic or other means  and a written transcript of the proceedings shall be made  This transcript shall be held by the Office of the Equal Rights and Opportunity Officer  Such transcript shall be made available only to  the complaining party  the responding party  and  if the responding party is a member of a union  the responding party s union in conformance with footnote 1  and the members of the UHRB  The cost of the transcript shall be borne by the University  Access to transcripts of the proceedings shall be conditioned upon the signing of a confidentiality stipulation by the inspecting party

6  The hearing shall include to the extent possible

   a  Examination of the complaining party  the responding party  and any relevant witnesses who may be of assistance in resolving the complaint  The complaining party and the responding party and their advisors  if any  shall be informed of the identity of any relevant witness to be examined by the UHRB and shall have the right to be present during the UHRB s examination of any witness  The complaining and responding parties shall have the opportunity to rebut or otherwise comment on the witness s testimony should they so desire  Further  as provided above  either party may submit to the UHRB suggested questions for the UHRB to ask a particular witness  and the UHRB  in its discretion  may ask or not ask any question so submitted

   b  Careful review of any documents and other information submitted by the parties or witnesses  or any other documents and information the UHRB may deem relevant  The complaining party and the responding party should be provided copies of all documents and information considered by the UHRB during the course of the hearing  and shall be permitted to comment on such evidence should they so desire

7  The complaining party and the responding party shall have the right to submit to the UHRB  throughout the hearing process  any additional relevant documents  information or witnesses they believe necessary to support their position

8  At any time during the hearing process  either party may request from the UHRB documents or information in the possession or custody of the University that he or she believes is essential for prosecuting or defending the complaint  The request should be in writing and should specify with reasonable particularity the documents or information sought  The UHRB shall comply with the request unless it appears that the request is unduly burdensome  overly broad  or not relevant to determining the issues raised by the complaint  If the request involves confidential documents or information  the University shall have the right to require the parties to enter into a confidentiality stipulation agreeing not to disclose such documents or information outside the confines of the complaint process  prior to producing such confidential materials

9  UHRB hearings shall be closed  and may only be attended by the complaining party (and his or her advisor)  the responding party (and his or her advisor)  and  if the responding party is a member of a union  the responding party s union (which may include a union representative and/or the union s counsel) in conformance with footnote 1  the members of the UHRB  testifying witnesses  counsel for the UHRB  and

personnel necessary for administration of the hearing  The parties and their advisors have a right to be present throughout the hearing  However  testifying witnesses may only be present for their own testimony

10  The UHRB shall not be bound by technical rules of evidence  but may consider any relevant  material  and reliable evidence that it believes will contribute to an informed result  Further  the UHRB shall have discretion in deciding which evidence to accept and how much weight should be accorded particular documents or testimony  Subject to the procedures prescribed herein  the UHRB may establish its own rules regarding procedural matters  including but not limited to  the order of testimony and presentation  scheduling  adjournments  and communication with the UHRB

11  If the UHRB finds related misconduct that does not constitute harassment  the UHRB shall refer the matter to the University Administrator responsible for addressing such issues

12  The UHRB shall provide a copy of its written finding to the complaining party  the responding party and  if the responding party is a member of a union  the responding party s union  and the President  If applicable  the finding should include a recommended penalty  The UHRB may recommend any penalty that it deems appropriate under the circumstances  including  but not limited to  administrative actions such as a written warning  probationary status  suspension or dismissal  or expulsion

13  If the UHRB finds that the complaining party has been intentionally dishonest  malicious or frivolous in making the allegations  the UHRB shall  after consultation with the Equal Rights and Opportunity Officer  recommend an appropriate penalty

# APPENDIX B

FACULTY PROCEDURES FOR HARASSMENT COMPLAINT PROCEEDINGS BEFORE THE UNIVERSITY HARASSMENT REVIEW BOARD

The following procedures apply to all disciplinary actions brought against bargaining unit members for alleged violations of FPS 43 last revised September 23  2014

1  Adequate Cause Requirement  Bargaining unit members may not be disciplined without adequate cause relating  directly and substantially to the fitness of the member in his/her professional capacity as teachers  librarian or researcher  Discipline includes but is not limited to a written warning  suspension or termination  Discipline will not be used to restrain bargaining unit members in their exercise of academic freedom or other rights of American citizens

2  Service of Charge Statement  The Harassment Complaint Form (hereinafter referred to as  Formal Complaint )  as prepared by the complaining party  framed with reasonable particularity  will be served on the full-time faculty responding party (such full-faculty bargaining unit member hereinafter referred to as  responding party )  and the AAUP in conformance with footnote 1 below 4 The responding party will also be provided with copies of any other evidence collected during the initial investigation  The complaining party (if not the University) will also be provided with all evidence collected during the initial investigation  including any statements submitted by the responding party  Documents submitted in efforts to reach an informal settlement are not part of the hearing record

3  When Step Two proceedings are initiated in accordance with FPS 43  the responding party and the AAUP will be notified by the University  If the responding party did not submit a written response to the complaint at an earlier stage of the investigation or wishes to supplement his/her response s/he may do so within ten (10) days of notification of the initiation of Step Two

4  (a) The UHRB shall consist of five (5) members  The Provost or the Provost s designee  who shall serve as Chair  the Vice President for Student Affairs or a designee  two (2) tenured faculty members selected from a standing pool  as described below  and one (1) person selected from the joint administrative/tenured faculty pool  as described below  The Provost s designee shall have the title provost or dean and the designee of the Vice President for Student Affairs shall be from the Office of Student Affairs and have a title at the director level or above

(b) The tenured faculty pool shall consist of a standing group of six (6) tenured faculty members  with faculty in the standing group assigned in random rotating order  established after the standing group is selected  Unless the parties agree to an alternative method of joint selection  the standing group shall be selected through a mechanism whereby the University Administration and the AAUP each submit a list of proposed tenured faculty members in an agreed upon number to a neutral third party  any overlapping names shall constitute the standing group  and if the standing group is not then sufficient in number  the neutral party shall request that the University Administration and the AAUP each numerically rank the remaining names on the two lists  with each party having the right to veto any name on the other party s list  the faculty members with the highest combined rankings shall serve as the standing group of six (6) faculty  The neutral third party may ask each party to submit additional names until the standing group of six (6) is established

(c) The joint administrative/tenured faculty pool shall consist of three (3) administrators and three (3) tenured faculty  The pool shall be

selected in the same manner as for the tenured faculty pool  The designee to a particular UHRB panel shall alternate between an administrator and a faculty member on a case-by-case basis  so that every other hearing includes either an administrator or a faculty member  The designee in the first hearing will be selected randomly and panelists thereafter shall be assigned in random rotating order  The designees shall also rotate from within the same classification  i e  administrators serve in rotating order in every other UHRB panel and faculty serve in rotating order in every other panel  If a participant is disqualified or unable to serve  he or she shall be replaced by a member of the same constituency

(d) The details of the selection process whereby the UHRB is constituted shall be completely confidential  All appointees must commit to serve for one full academic year and may be reappointed

(e) When a UHRB panel is constituted  there shall be due regard for the diversity of the panel  ensuring that representatives from both genders serve on any given UHRB panel

5   Disqualification Procedures  Members of the UHRB who deem themselves disqualified for bias or interest will remove themselves from the case  either at the request of a party or on their own initiative as set forth in FPS 43  No individual who has been involved in the investigation of the charge may serve on the UHRB  No faculty member from the same department as the responding party shall serve on the UHRB

6   Pre-Hearing Meetings  The UHRB may  with the consent of the parties concerned  hold joint pre-hearing meetings with the parties in order to (i) simplify the issues  (ii) effect stipulations of facts  (iii) provide for the exchange of documentary or other information  and (iv) achieve such other appropriate pre-hearing objectives as will make the hearing fair  effective  and expeditious

7   Hearing Date and Notice  The hearing will be scheduled on a date that is mutually acceptable to all parties within the timeframe set forth in FPS 43  Service of notice of hearing with specific charges in writing will be made on the responding party  the complaining party (if not the University) and the AAUP in conformance with footnote 1 above  at least ten (10) days prior to the hearing  The parties may waive a hearing by mutual consent  If the parties waive the hearing  the UHRB will rest its recommendation upon the evidence in the record

8   Private Hearing  The hearing will be private  however the President or Grievance Officer of the AAUP and counsel to the AAUP will have the right to attend the hearing  unless the responding party objects  In the event that the AAUP does not represent the responding party in this proceeding  the responding party is entitled to have a representative at the hearing  The representative may be an attorney or any other individual of their choice  The complaining party is also entitled to have a representative at the hearing  The representative may be an attorney or any other individual of their choice  The University s counsel will serve as counsel to the UHRB

9   Transcript  Hearing proceedings shall be recorded by stenographic or other means  and a written transcript of the proceedings shall be made  Subject to the signing of a confidentiality stipulation  the transcript shall be made available only to  the complaining party  the responding party  their representatives  the AAUP in conformance with footnote 1 above  and any member of the UHRB  The cost of the transcript shall be borne by the University

10  Burden of Proof  The following burden of proof rests with the complaining party  The complaining party must establish that the responding party violated the University s Harassment Policy based on a preponderance of the evidence in the record considered as a whole

11  Adjournments  The UHRB will grant adjournments to enable either party to investigate evidence as to which a valid claim of surprise is made

12  Opportunity to Obtain Evidence  The parties will be afforded an equal opportunity to obtain necessary witnesses and documentary or other evidence  The Administration will cooperate with the UHRB in securing witnesses and making available documentary and other evidence

13  Examination  The parties will be afforded equal rights  through the UHRB to examine witnesses  cross-examine witnesses  and submit evidence  The parties may propose all of the questions that they wish to ask witnesses to the UHRB  including follow up questions  The Chair of the UHRB will pose those questions  Subject to the procedures prescribed herein  the UHRB may establish its own rules regarding procedural matters  including but not limited to  the order of testimony and presentation  scheduling  adjournments  and communication with the UHRB

14  Rules of Evidence  The UHRB will not be bound by strict rules of legal evidence  and may admit any evidence which is of probative value in determining the issues involved  Every possible effort will be made to obtain the most reliable evidence available

15  Findings Based on Record  The UHRB s findings of fact and decision will be based solely on the hearing record  Statements made by a party during settlement discussions or in efforts to informally resolve the matter are inadmissible in the UHRB proceeding and may not be shared with or considered by the UHRB

16  Confidentiality  It is the policy of ▮▮▮ University to protect the confidentiality of members of the University community who may be involved in harassment complaint procedures  insofar as that is reasonably practicable  Except for such simple announcements as may be required  covering the time of the hearing and similar matters  public statements and publicity about the case by any party or administrative

officers will be avoided so far as possible  The responding party and the complaining party (if not the University) and the AAUP will be notified of the decision in writing

17  Step Three  The determinations of the UHRB  of whether the harassment policy was violated and the recommended penalty  will be submitted to the President  Either party may submit written objections to the findings with the President pursuant to the procedures set forth in Step Three of FPS 43  In the event the President grants a hearing pursuant to FPS 43  the AAUP may attend in addition to those noted in FPS 43 unless the responding party objects  In the event that the President disagrees with the recommendation of the UHRB s/he will state the reasons for doing so in writing  The President s final decision shall be provided to both parties and the AAUP

18  Arbitration  If either party or the AAUP disagrees with the decision of the President  that party or the AAUP may appeal to arbitration  The standard for review by an Arbitrator will be that the President (a) acted in an arbitrary or capricious manner  (b) failed to apply the written criteria of the University  or that (c) the procedural due process to which either party was entitled under the Collective Bargaining Agreement or any other applicable policies or laws were violated  The demand for arbitration must be filed pursuant to the rules of the American Arbitration Association in accordance with its Voluntary Labor Rules then in effect  and by serving the other party with a copy of the demand for arbitration  The demand for arbitration must be filed and served no later than thirty (30) days after the issuance of the President s final decision  The costs of such arbitration shall be shared by the parties

19  The AAUP and the University reserve all rights and arguments with regard to the precedential value of any resolutions or determinations made pursuant to these procedures and FPS 43 in which the AAUP was not a participant

20  The paragraphs above apply only to FPS 43 proceedings brought against full-time AAUP members  Proceedings brought against adjunct faculty alleging violations of FPS 43 will be governed by FPS 43 and Appendix A to FPS 43  An adjunct may not be de-listed on the basis of alleged violations of FPS 43 until the Appendix A and FPS 43 procedures are completed

1 The Formal Complaint Proceedings Before the University Harassment Review Board for responding parties other than full-time faculty bargaining unit members and the Faculty Procedures for Formal Harassment Complaint Proceedings Before the University Harassment Review Board ( Faculty Procedures ) are attached hereto as Appendices A and B  respectively

2 In the event that the complaining party believes that the Equal Rights and Opportunity officer may have a conflict of interest  or for other compelling reasons  he or she may report the complaint to the Director of Human Resources  or  where the complaining party is a student  to the Dean of Students  This officer will then take the role of the Equal Rights and Opportunity Officer in the procedure

3 The responding party  if a union member  will be advised that absent his or her objection  his/her union will be notified only that a Formal Complaint has been filed  With the responding party s consent  copies of the Formal Complaint  Written Response  and all evidence collected will also be provided to the union

4 The responding party will be advised that absent his or her objection  the AAUP will be notified only that a Formal Complaint has been filed  With the responding party s consent  copies of the Formal Complaint and all evidence collected will also be provided to the AAUP

# Exhibit I



Exhibit J

████████████████

Alexandria, VA 22314

July 26, 2022

Judge █████████
████ University
Office of the Dean
██████████ School of Law
144 ███████ University
███████████

CONFIDENTIAL SETTLEMENT COMMUNICATIONS PURSUANT TO FRE 408

Dear ████████████

Despite my previously stated intention of not engaging in any further communication with Hofstra Law before filing my complaint in Federal Court, I have just discovered additional information which warrants disclosure to ██████ Below, I will draw your attention to facts, and identify rules and policies of ██████ Law (per its handbook), NY State Rules of the Court of Appeals for the Admission of Attorneys and Counselors at Law and the American Bar Association, which are contrary to ██████ Law's stated position regarding my complaints and my special needs.

I have demanded, a "graduation plan" which would not require my relocation to New York, but rather for my completion of the J.D. degree from Virginia. Such a plan would take into consideration the impact of my disability on my day-to-day life, the extraordinary benefit of the remote learning environment to people with my type of disability and allow me to meet my obligations to my family which are, obviously, generally more difficult due to my disability. To date, ██████ Law has refused to provide any such plan, or even inputs into such a plan, despite its knowledge of my disability, the benefit of remote learning for people with my disability, and my family constraints given the geographical realities. ██████ Law has shown no willingness to collaborate with me to develop any such plan despite its legal obligations, and in fact, has taken specific adverse actions against my interests.

Given that ██████ has consistently ignored my requests to produce such a "graduation plan," refusing to disclose details of how I can complete the J.D. program, I cannot reasonably expect that it will now provide anything of substance. However, this is being sent as part of my **LEGAL DEMAND** that ██████ honor its legal obligations to me. To the extent that ██████ refuses to provide a substantive response, its lack of response will serve as further evidence of the school's tortious intent.

First, as you know, the legal community has been given the responsibility of self-regulation. For that reason, it is critical that any conduct from within the industry, especially

from within the legal education sub-industry, of which ▮▮ Law is part, be examined for any impropriety in decision making or an abuse of power. ▮▮ Law's conduct in handling my issues raise serious questions as to whether it should retain any accreditation, and I expect that investigations from the ABA, DOE and NYS Bar following my complaint will be formidable.

· Dean ▮▮ email of July 21, 2022 at 3:30 p.m. not only announces ▮▮ Law's decision to discontinue all full-time remote learning opportunities, but it promulgates **new rules** which are contrary to those listed in the Student Handbook for 2021-22. These new rules are arbitrary and capricious, they target me in breach of the university's common law duties and further reveal, in fact, the university's fraudulent intent.  Specifically, nowhere in the ▮▮ Law Student Handbook for 2021-22 is any rule requiring, as Dean ▮▮ essentially states or implies:

   (1) that a student must complete all ▮▮ Law graduation requirements before visiting at another university, or
   (2) that all of ▮▮ Law graduation requirements must be completed at ▮▮ or
   (3) that students may only visit a law program at a school that doesn't have Covid vaccination requirements (Note: It is not the case that a visiting university must not have a vaccine policy), or
   (4) that all students must now get vaccines, or
   (5) that no more than 15 hours of distance learning classes can be taken after Spring 2022; and

      (a) to the extent that this arbitrary number of 15 hours is somehow loosely associated with NY State Rule 520.3, a more reasonable interpretation is that ▮▮ Law's Summer Session I is still part of 2021 and is therefore governed by Handbook for 2021-22; and therefore, any waiver for distance learning applies to the summer, i.e. no more than 15 hours remote classes beginning in Fall 2022; and furthermore, I should be allowed to take 15 hours remotely in the Fall and could if ▮▮ were not intent on discriminating and retaliating against me); and furthermore

      (b) the arbitrary 15 hours limit starting Summer 2022 that ▮▮ is now apparently imposing, ignores the possibility of a waiver per NY State Rule § 520.14 Application for Waiver of Rules which provides that:

         *The Court of Appeals, upon application, may in its discretion vary the application of or waive any provision of these rules where strict compliance will cause undue hardship to the applicant. Such application shall be in the form of a verified petition setting forth the applicant's name, age and residence address, the facts relied upon and a prayer for relief.*

and furthermore;

(c) ▮▮▮ Law is disregarding **its own rule** in its handbook which states "Students who do not wish to sit for the New York Bar Examination upon graduation from law school may petition the Dean of Academic Affairs to take distance education credits exceeding the number permitted by Section 520.3 of the Rules of the New York Court of Appeals. **Permission should be granted barring a compelling reason to deny it**." (emphasis added). See Student Handbook 2021-22, Distance Education Policy, pg. 50. Yet, each reply to my request for clarity about the options for graduating **failed even to disclose this rule**.

These facts are material to my allegation that ▮▮▮ is discriminating and retaliating against me for my criticism of ▮▮▮ handling of complaints regarding:

(1) accommodation requests,
(2) scheduling of my remote exams and the general treatment related to this,
(3) professors refusing transfer letters of recommendation for nonsensical reasons such as they are only writing letters for students "seeking jobs and scholarships" [not transfers] (incidentally, what if any repercussions have been imposed on a law professor who makes such false statements, and did the university pressure her (and other professors) to do this to thwart my plans to transfer? The evidence suggests 'YES'),
(4) concerns about grading improprieties considering the uncovered bias,
(5) concerns about other indications of ▮▮▮ interference with my ability to take exams at local schools,
(6) its lack of responses to **my request for a plan** for me to complete the J.D. program while at the same time meeting my family obligations here in Virginia.

It is evident that ▮▮▮ Law created and set a plan into motion, targeting me with its new rules, in an attempt to render it impossible, my completion of the J.D. program. Knowing my family constraints, and my special needs, ▮▮▮ Law enacted these "new" rules and then ignored and concealed those existing rules upon which any plan for my completion of the J.D. would rely.

When viewed in the context of the university's refusal to provide **any input** into a such a "graduation plan," input which it is under a legal duty of good faith and fair dealing to provide (along with other fiduciary duties implied in our contract for training in the law, and duties not to discriminate against persons with disabilities), these new rules demonstrate not only that **there are, in fact, ways for me to get the J.D. degree from Virginia by relying exclusively on** ▮▮▮ **Law's very own rules, but that** ▮▮▮ **crafted these new rules with the specific purpose of retaliating and discriminating against me with the goal of preventing me from completing the J.D. program.**

The following A.B.A Rules should have been considered and disclosed to me by the university when determining what options are available for me to complete the J.D. program from my home state of Virginia.

These rules are, in fact, inconsistent with Judge ███████ assertions that:
(1) "[████ Law has] done everything that can be done for [me] and all the other students similarly situated"
(2) "Every courtesy that could have been extended to [me] has been provided to you"

"ABA Standards and Rules of Procedure for Approval of Law Schools 2021-2022."

**Standard 306. DISTANCE EDUCATION - Reserved and Deleted August 2020**

*Comment/Question: Waivers are still being provided, has* ████ *requested them for me, and if not, why?* ████ *is under a fiduciary duty to perform on our contract.*

**Standard 307. STUDIES, ACTIVITIES, AND FIELD PLACEMENTS OUTSIDE THE UNITED STATES**

(c) A law school may grant up to two-thirds of the credits required for the J.D. degree for study outside the United States provided the credits are obtained in a program sponsored by an ABA- approved law school. Programs sponsored by an ABA-approved law school include programs held in accordance with the Criteria for Programs Offered by ABA-Approved Law Schools in a location Outside the United States and field placements outside the United States.

*Comment/Question: If two-thirds of the credits can be done outside the U.S., this much can certainly be done as a visiting student at another local ABA law school starting in the fall. Why has* ████ *law not put forth a plan or inputs into a plan?*

**Standard 308. ACADEMIC STANDARDS**

(a)  A law school **shall adopt, publish, and adhere to sound academic standards, including those for** regular class attendance, good standing, academic integrity, **graduation,** and dismissal. (emphasis added).

(b)  A law school **shall adopt, publish, and adhere to written due process policies with regard to taking any action that adversely affects the good standing or graduation of a student.** (emphasis added).

*Comment/Question: Publishing a change in any rule which directly impacts graduation, as* ████ *Law has just done, with less than one month before the start of the Fall semester, is a violation of this standard. Similarly, the "due process" required by* ████ *Law's accreditation, is undermined by the school unilaterally taking this adverse action affecting my graduation.*

**Standard 311. ACADEMIC PROGRAM AND ACADEMIC CALENDAR**

(a) A law school **shall require, as a condition for graduation, successful completion of a course of study of not fewer than 83 credit hours. At least 64 of these credit hours shall be in courses that require attendance in regularly scheduled classroom sessions or direct faculty instruction.** (emphasis added).

*Comment/Question: Why is ▇▇▇ requiring more credits than NYS requires?*
*"[C]lassroom sessions or direct faculty instruction" must include "direct faculty instruction" over zoom as it has since the beginning of COVID (which is the most reasonable interpretation). Even if the school arbitrarily excludes remote classes from those which provide "direct faculty instruction," which it shouldn't, all of my classes taken under the waiver should be excluded from the "64" leaving at most 25 remaining. As the school knows and has concealed, this could be accomplished with one semester as a visiting student elsewhere and in conjunction with non-classroom credits (writing requirements, independent studies, clinics, etc.)*

<u>Definitions:</u>

(8)  "Distance Education J.D. Program" means a program where a law school grants a student more than one third of the credit hours required for the J.D. degree for distance education courses.

*Comment: When calculating the one third of the credit hours, the total should exclude those credits gained while under the waiver, therefore up to 1/3 of my remaining 48 credits is 16. That's one semester as a visiting student and the remainder could be non-classroom work.*

With all that said, and without waiving my argument that I should be able to continue 100% remotely per the terms of our contract, given my disability and unique family situation, which constitutes extraordinary circumstances, I have completed 39 credits already, and I could conceivable take 30 credits of non-classroom, and either 16, 18, or 24 remaining in classroom (depending on which rules the school arbitrarily chooses to adopt) while visiting another local university, and while complying with all rules in the current ▇▇▇ Law handbook.

**<u>Why would the school not reveal these Rules in response to my repeated direct inquiries requesting a "graduation plan," if not simply to discriminate and retaliate for the reasons previously stated?</u>**

Isn't it true, ▇▇▇▇▇ that:

(1) I am authorized to take remote classes for at least another 15 credits in the Fall 2022 Semester (even assuming ABA or NYS will not grant another waiver) given the current waiver?

(2) ▮▮▮ law has a fiduciary duty to seek additional waivers for distance learning in support of its contractual obligation to its remote students (from ABA and NYS) as opposed to defrauding them by accepting tuition and then changing the rules mid-program, thereby denying any value?

(3) An individual waiver could be requested under Rule § 520.14 to allow a student to exceed the distance learning requirement for extraordinary circumstances and that ▮▮▮ Law hasn't even inquired into that possibility, and would, in fact, refuse to support me in such a waiver request?

(4) ▮▮▮ Law Handbook 2020-2021 allows a student not wishing to sit for the NYS Bar to take additional remote classes and that the handbook even states that such a request "should be granted barring a compelling reason to deny it?"

(5) With all these facts, when taken together, there are ways in which I may get the J.D. degree under the terms and conditions of our initial contract, which would provide the legally required accommodations for my disability (allowed under ABA and NYS Rules), and which would not require my relocating to NY?

The timing and the substance of ▮▮▮ Law's communications with me is the most damning evidence against the university of its tortious intent. Investigations by ABA, NYS Bar, and DOE, will ensue while I proceed with the litigation to enjoin ▮▮▮ Law from enacting its tortious plan against me, **absent any reasonable compromise put forth by** ▮▮▮ **Law**.

Thanks,

▮▮▮▮▮▮

CC: President ▮▮▮

Exhibit K



**DODINI**
BEHAVIORAL HEALTH

**Aaron Dodini, M.S., M.A., Ph.D, CGP**
*Licensed Clinical Psychologist*

8/5/2022

Academic Accommodation Recommendations for ███████████  DOB 3/10/1975

**Remote Attendance at Lectures**
Mr. ███████ will benefit from being able to participate in classes remotely to minimize distractions, to allow for student movement without distracting other students, to allow for his use of a customized workspace with multiple monitors to allow for visualization and organizational support, and to allow the student to maintain privacy and dignity with respect to his disability.  Maintaining privacy of the disability will minimize other negative psychological effects which would exacerbate the symptoms of the ███████████████ disabilities. The non-academic circumstances in the student's life should be considered when determining the necessity of any academic accommodation, specifically the student's work and family constraints. Failure to provide a necessary academic accommodation can disrupt habits and routines which have been developed by the student over years of experiences with his disabilities, not only to manage his learning experience but to perform necessary life functions and meet other family obligations.  Accommodations should be implemented to ensure minimal disruption of the student's life function, which includes minimizing the time away from home.

**Timely and Consistent Scheduling**
███████ should be provided with schedules for exams and assignments with sufficient advance notice for planning and minimize changes at the last minute. Unexpected last minute changes cause unnecessary disruptions in focus for students with ████ who often have a difficult time with transitions between activities. Last minute changes force the student to cope with unnecessary transitions which negatively impact the learning experience.

**Customized Workspace**
███████ will benefit from being able to access classes and lectures from his home where he has developed a custom workspace to maximize his ability to visualize, organize and manipulate information. For example, when watching lectures, he can have one screen viewing the lecture with another screen open on which to write notes and make edits within documents. When writing an essay, he can use one screen to access materials that need to be referenced while maintaining access to his other screen to write. As a proposed accommodation, the school should consider allowing the student to use his personal computer and multiple monitors.



**DODINI**
BEHAVIORAL HEALTH

**Aaron Dodini, M.S., M.A., Ph.D, CGP**
*Licensed Clinical Psychologist*

**Make Common Software Features Available for Information Organization and Manipulation**

It is my understanding that within the exam procedures at his law school, ▮▮▮▮▮ is required to use exam software called "Examplify" which has been configured to disable "cut and paste" features from within the application. This negatively impacts ▮▮▮▮▮ ability to organize information. The university should consider enabling the cut and paste software features during any exam, at least from within the essay writing software to allow the student to properly visualize, organize and manipulate information. People with ▮▮▮▮ often do not think and process information linearly and they will need the ability to manipulate the written word within documents.

**Extended Time for Exams and Breaks During Lengthy Exams:**

▮▮▮▮▮ may be eligible for double time to complete exams. He will benefit from breaks as a typical accommodation to allow for personal needs given the length of exams. These breaks also allow for breaks in concentration that commonly occur for folks with severe ▮▮▮▮.

**Distraction Free Environment**

▮▮▮▮▮ will be most able to demonstrate his academic ability when given the above accommodations and access to a distraction free environment for exams. This environment can be one in his personal office in which he is able to manage the environment or in a room without distractions or interruptions within the academic setting.

Please do not hesitate to reach out to me if you want any additional information. I am available by phone at 703-909-5101, ext.101 or by email at drdodini@dodini.com.

Sincerely,



Aaron Dodini, M.S., M.A., Ph.D., CGP

1501 Langston Blvd, Suite 110  *  Arlington, VA 22209
703-909-5101 x101  *  www.dodini.com