REDACTED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

Jane Doe,                          )
                                   )
Plaintiff,                         )
                                   )
v.                                 )
                                   )        Civil Action No.
                                   )
ABA Accredited University,         )        1:22CV947
American Bar Association,          )
Department of Education            )
                                   )
Defendants.                        )

**FILED**
AUG 19 2022
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION

COMES NOW the Plaintiff, Jane Doe, pro se, and hereby states the following in support

of their Motion for ~~Temporary Restraining Order against~~ Preliminary Injunction Defendants ABA Accredited

University, American Bar Association and Department of Education.

## INTRODUCTION

Plaintiff seeks a Temporary Restraining Order (TRO) against the defendants, to enjoin

them immediately, or no later than August 22, 2022, when classes are scheduled to start, as

follows:

(1) Defendant, ABA Accredited University, from breaching an implied contract, by

compelling it to repeal its policy cancelling distance learning announced on July 21,

2022, and compel it to continue distance learning format of delivery of law classes to

plaintiff, which has been the format in place for over two years; and

(2) Defendant, ABA Accredited University, to compel it to grant all reasonable

[Redacted] for plaintiff's [Redacted] as requested by their doctors;  and

(3) Defendant, ABA Accredited University, to compel it to seek and support any waivers from ABA Standards or from the Rules of the NY State Court of Appeals pertaining to the Education of Attorneys and that are necessary in order for it to fully perform under its contractual obligations to educate Plaintiff student via "distance learning"; and

(4) Defendant, ABA Accredited University, to refrain from any further [Redacted] and [Redacted]; and

(5) Defendant ABA Accredited University, to appoint professor or professors as necessary to provide oversight to plaintiff in pursuit of this case, and grant appropriate credit hours of learning experience for this case, consistent with its other stated policies for independent learning.

(6) Defendant, American Bar Association (ABA) from enforcing the newly adopted version of its Standard 306 and 311(e) which prohibits accredited law programs from allowing more than fifteen total credit hours or one third of all credit hours of classes delivered through distance learning as a condition of their accreditation; and

(7) Defendant, United States Department of Education from authorizing ABA to implement and enforce ABA Standard 306 and 311(e) or any standard, which restricts or would restrict the total credit hours of distance learning classes in any given law program, at least as it may pertain to ABA Accredited University's law program, and unlawfully restrict trade in the Commonwealth.

## RELEVENT FACTS

Plaintiff is a rising second year law student at the University of ABA Accredited University, Maurice A. Dean School of Law in [City Redacted], NY, and is regarded as having a

2

[Redacted] known by the university since prior to enrollment. The parties have an implied contract for the university to provide a legal education in exchange for consideration of tuition and fees. The university sent extensive communications to plaintiff at their residence in Virginia to recruit them to enroll in the law program. The school advertised that it provides legal education through distance learning to induce plaintiff to enroll in the program, and plaintiff relied on such statements and other representations by the university as a basis of decision to enroll in the program.

As soon as plaintiff enrolled and made a down payment, the university announced its intent to discontinue distance learning.  The university set out to accomplish this by mandating that all students take the COVID -19 vaccine despite any personal preferences.  They announced that they would accept requests for exemption to the policy only for religious and medical reasons.

The policy was unreasonable, overly burdensome, and intrusive into the medical and religious views of the students, but plaintiff put forth a religious objection and a medical exemption request despite their view that the school was obligated to provide distance learning based on its advertisements and past practices founded in contract law.  None-the-less, plaintiff supported their request with beliefs founded in their [Redacted] faith and facts of immunocompromised family members but made clear to the university that there were other reasons for needing to take class remotely including extraordinary family circumstances and as a [Redacted] [Redacted].

The school coerced plaintiff under threat of breaching the parties' contract (i.e. cancelling the distance learning option) to obtain a letter from a "religious leader" to verify the religious objection, and over plaintiff's objection, Doe conceded and provided one.  None-the less, the

exemption request was denied by the university. Confusingly, however, plaintiff was then granted an exemption from the vaccine for unspecified reasons from the law school.

To date, plaintiff has earned 39 credits towards an 87 credit Juris Doctor degree program offered by the university entirely through distance learning, using zoom meetings, to an endpoint into the State of Virginia, to wit: plaintiff's residence in Alexandria, VA. The plaintiff has forgone professional opportunities, spent thousands of hours attending classes and studying, invested over $118,000 in tuition and fees in the first year of the three-year program, and is relying on their continued enrollment for living expenses derived from Federal Student aid to support them and their family.

ABA Accredited University also advertised that it educates and provides [Redacted] to students with disabilities in conformance with federal and state law, and plaintiff relied on such statements and other representations by the university as a basis of their decision to enroll in the program. Plaintiff informed the university of their [Redacted] and unique family circumstances during the application process. Although plaintiff has provided the university with medical documentation to support their reasonable [Redacted] [Redacted] requests, the university has denied several of the requests without explanation. The school refuses to engage in interactive dialogue about several of the plaintiff's [Redacted] requests as required by law.

Defendant ABA Accredited University engaged in a discriminatory admissions process by denying plaintiff admission to the university until they indicated their intent to forgo any [Redacted] for their [Redacted]. Plaintiff, suspecting that the initial adverse admission decision was based on their [Redacted], was effectively coerced by said discriminatory process to disavow their entitlement to [Redacted]. Immediately following this disavowing communication to the university, the university granted their enrollment.

4

Plaintiff struggled during the first mid-term exam without [Redacted] and feared that they would not be able to succeed in the program without them. Plaintiff provided medical documentation to the university in which a doctor recommended specific [Redacted], yet, the university provided only a partial [Redacted].

One [Redacted] that the school refused to provide pertained to a specially configured essay writing software called "Examplify" through which the school disabled normal computer functionality of "cut and paste." This had a particularly debilitating effect on plaintiff during exams, given the nature of their [Redacted]. Another [Redacted] that the school refused to provide were multiple larger monitors, and this also had a particularly debilitating effect on plaintiff during exams. Plaintiff provided medical documentation to support these and other [Redacted] requests, and they were ignored at times, and at other times, met with consternation, even [Redacted] by ABA Accredited University.

The [Redacted] came in multiple methods. In one method, the Assistant Dean for Academics, Dean [Dean 1 Redacted], would often refuse to respond to emails from plaintiff pertaining to [Redacted] and other important program related matters (including distance learning), and when he did respond, he would provide partial responses, omitting critical information. A pattern of this conduct eventually provoked plaintiff to defend their rights more assertively resulting in a deterioration of the relationship. In another method, the Dean changed the method of exams, to target the plaintiff under the guise of "exam security," in ordering plaintiff to report to the university in New York to take the exams. In the first semester, students took exams online using remote proctoring/monitoring software. The Dean's new edict in Spring of 2022 was intended to force all students onto campus. Despite the vaccine waiver request, now the school has shifted its position and was set to allow anyone onto campus

5

regardless of vaccine status.    Only after plaintiff made a strong objection to the university

requiring them to travel to NY for exams unnecessarily did the Dean finally offer and arrange for

plaintiff to take their spring exams at a local university in Virginia. In another example of

[Redacted] for plaintiff requesting [Redacted] for their [Redacted], or for their religious beliefs,

or their complaining about either or both, the Dean refused to coordinate for the plaintiff to take

their summer exams at a local university, until prompted, despite knowing of plaintiff's

circumstances, once again, abusing their power to target plaintiff as the relationship further

deteriorated.  With less than five days prior to the commencement of summer final exams, for

which plaintiff was already approved to take 10 credits, 2 more than the school's purported

maximum, the Dean disrupted the plaintiff's exam preparation, even suggesting that plaintiff

might attempt to make these arrangements himself with another school.  Suddenly, that specific

university which previously agreed to host the final exams, [Redacted], was unavailable.

Surprisingly, when the plaintiff inquired directly with that school as to whether or not it could

host the exams if they were to be delayed, the school still was unable or unwilling to

accommodate.  Since the proctoring of a remote exam only takes 5 mins to set-up, essentially

turning on the cameras in the room recording, the unavailability of the university was extremely

alarming to plaintiff and was likely induced by ABA Accredited University.  Instead, the Dean

reluctantly made arrangements – only after plaintiff expressing a resistance to traveling to New

York - for plaintiff to take exams at another law school, refusing to reconsider the previously

used secure method of taking the exams from home.  This happened despite the fact that all

exams were "open book."  The school provided absurd reasons, for example, that "all exams

needed to be taken by paper copy".  The university even made it more difficult for itself to grade

the exams by disabling the multiple-choice features within the "Examplify" software, instead

6

requiring students to use scantrons, just so it could claim that the paper exams required everyone to be "in person."  In the 5 days during which the final exams were being scheduled for the summer session, the university further disrupted plaintiff's ability to prepare for the exams by forcing extensive dialogue about the exam scheduling, but also the requested [Redacted] mentioned above ("cut and paste", and large multiple monitors).  The university refused to engage in any dialogue about the [Redacted] requests or consider the negative effects on plaintiff due to the [Redacted].

On July 21, 2022, only thirty minutes before the end of the last final exam of the summer session, the university announced via email that it would no longer provide *any* students an opportunity to take all their classes remotely. In that communication, the university stated that remote students could transfer, take a semester leave of absence, or obtain credits as a visiting student at another university. The visiting student option was described in university literature and communications from Dean [Dean 1 Redacted] as an available option without any constraints, however, when the Dean announced this option via email, he added more requirements than even those which are stated in the other school communications.

Dean [Dean 1 Redacted] wrote, in pertinent part, targeting plaintiff's situation:

> "[Y]ou can apply to take classes at another ABA-accredited law school that does not have a vaccination requirement. You would remain enrolled at ABA Accredited University, but you would take your classes at another law school and you would receive transfer credit for classes (which would not count toward your GPA).  In order to qualify to visit at another law school, however, you must seek to demonstrate that your circumstances satisfy the "extraordinary circumstances" … **You must also demonstrate that you have already completed all of your ABA Accredited University Law graduation requirements … with the exception of Perspectives.** (emphasis added). If you have fulfilled all of your other graduation requirements, you may apply to visit if a class sufficiently similar to Perspectives is offered at the other law school."

7

This new requirement (emphasized above) obviously targets plaintiff, and the *ad hoc* rule is absurd because the graduation requirements from the school literature cannot be achieved by plaintiff or any student, for that matter, by visiting another university, leading to a reasonable inference that the Dean just made this up to prevent plaintiff from finishing the program. The literature states that there must be 87 credit hours obtained as part of the condition Dean [Dean 1 Redacted] now indicates must be satisfied in order to be eligible for the visiting student option. Among the other requirement are things such as, pass all first-year courses, pass Constitutional Law II, pass Evidence, complete the professional responsibility requirement by passing either Lawyers' Ethics or Ethics in Criminal Advocacy, successfully complete the Upper-Class Writing Requirements, and maintain a minimum cumulative GPA of 2.2., complete the 6-credit Experiential Requirement, pass Foundational Lawyering Skills, participate in a mandatory Professional Development program during a student's first year at ABA Accredited University Law School, pass Perspectives in Legal Analysis & Writing, among others.

Notably absent from the prior literature are the new rules that Dean [Dean 1 Redacted] puts forth in their email of July 21, 2022 targeting plaintiff's specific situation. By that time, the university would not even allow plaintiff to visit at another university, apparently, despite any extraordinary circumstances, unless plaintiff has "completed all of the ABA Accredited University Law Graduation Requirements," according to Dean [Dean 1 Redacted]. Again, despite the fact that one of those requirements listed is to complete all 87 credits of the degree program. This demonstrates the *ad hoc* nature of the law school's "new" rule, which targets plaintiff, and is evidence that not much thought was placed into it, but rather only enough to ensure that plaintiff not have the option to "visit." Nowhere does it say in the school's literature that a visiting student cannot complete the graduation requirements at another campus. Despite

8

plaintiff's numerous requests to the law school to clarify the implications of the "visiting student" option, it has refused to respond.

From this fact alone, it can be inferred that the school is making up new rules simply to retaliate against plaintiff, by withholding published options that should be available to plaintiff to complete the program, in order to coerce the plaintiff to transfer or drop out.

Another option potentially useful to plaintiff in completing the J.D. is stated in the university's literature that students enrolled in the Law School may take certain courses in other schools/departments of ABA Accredited University for credit toward the J.D. or LL.M. degree. "For a list of such courses that can be taken for Law School credit, please contact the Office of Academic Records," the literature states. It goes on to state that " Students wishing to take such courses for Law School credit must request permission from the Associate Dean for Academic Affairs, who will approve or deny these requests on a case-by-case basis. If approval is granted, it will be communicated by the Associate Dean for Academic Affairs to the student and the Law School's Office of Academic Records. At that point, the student will be permitted to enroll in the non-law course for Law School credit." To the extent that the expression "schools" and "departments of ABA Accredited University is ambiguous in the university's literature about options available to the plaintiff, plaintiff asserts that it should be interpreted against the drafting party, i.e. ABA Accredited University. In other words, plaintiff should be able to complete remaining classroom credits at any university having substantially similar classes which satisfy the ABA Accredited University Law requirement, yet, ABA Accredited University conceals this option from plaintiff demonstrating their [Redacted], [Redacted], bad faith, and breach of its duty to cooperate.

9

Plaintiff shares custody of their minor child and is under a court ordered custody arrangement which requires their presence in Virginia and ABA Accredited University knows that plaintiff cannot legally relocate to New York even if the university hadn't tortiously, and in breach of the parties' contract, given only a month's notice for plaintiff to plan alternative arrangements. This fact alone commands specific performance to allow plaintiff to continue remotely, because without such specific performance, plaintiff will have been irreparably harmed by ABA Accredited University's malicious conduct. Specifically, it was malicious, given the circumstances, and knowing what is at stake, for ABA Accredited University to give just 1 month notice, while refusing to clarify any options for plaintiff to graduate, and ABA Accredited University cannot be allowed to succeed in such conduct.

ABA Accredited University knew at the time that Plaintiff enrolled in the fall program, when he continued enrollment in the second semester, and again when he continued enrollment in the summer semester that it would never let Plaintiff complete the J.D. degree program by taking classes remotely from their residence in Virginia, despite plaintiff stating their expectations and constraints. Through the concealment or omission of this material fact, ABA Accredited University perpetrated a fraud. Further evidence of fraudulent intent is the university's refusal to provide a graduation plan, and all the aforementioned retaliatory and discriminatory conduct towards plaintiff, which occurred with the university's knowledge that it would not allow the J.D. program to be completed via distance learning. The plaintiff incorporates all statements from their declaration as if fully set-forth herein. These same operative facts support the claims for fraud, breach of contract, conversion, unjust enrichment, [Redacted], and [Redacted] as fully set-forth in the complaint.

10

## LEGAL ARGUMENT

For the reasons identified in this memorandum of law, the Court shall issue a Temporary Restraining Order to enjoin Defendants as follows:

(7)   Defendant, ABA Accredited University, from breaching an implied contract, by compelling it to continue distance learning format of delivery of law classes to Plaintiff, which has been the format in place for over two years; and

(8)   Defendant, ABA Accredited University, to compel it to grant all reasonable [Redacted] for Plaintiff's [Redacted] as requested by their doctors;  and

(9)   Defendant, ABA Accredited University, to compel it to seek and support any waivers from ABA Standards or from the Rules of the NY State Court of Appeals pertaining to the Education of Attorneys and that are necessary in order for it to fully perform under its contractual obligations to educate Plaintiff student via "distance learning"; and

(10)   Defendant, ABA Accredited University, to refrain from any further [Redacted] and [Redacted]; and

(11)   Defendant, American Bar Association (ABA) from enforcing the newly adopted version of its Standard 306 and 311(e) which prohibits accredited law programs from allowing more than fifteen total credit hours or one third of all credit hours of classes delivered through distance learning as a condition of their accreditation; and

(12)   Defendant, United States Department of Education from authorizing ABA to implement and enforce ABA Standard 306 and 311(e) or any standard, which restricts or would restrict the total credit hours of distance learning classes in any given law program, at least as it may pertain to ABA Accredited University's law program, and unlawfully restrict trade in the Commonwealth.

**This Court has Personal Jurisdiction over
Defendants ABA Accredited University,
Department of Education and the American Bar
Association.**

Determining whether a defendant is subject to personal jurisdiction requires a two-step analysis under Virginia law: the court must conclude (1) that jurisdiction is authorized by the state's long-arm statute, Va. Code § 8.01-328.1; and (2) that an exercise of personal jurisdiction is consistent with due process. *Mitrano v. Hawes*, 377 F.3d 402, 406 (4th Cir. 2004); *FBR Capital Markets & Co. v. Short*, 2009 WL 3254458, at * 2 (E.D. Va. Oct. 9, 2009). In practice, there is only one step, however, because Virginia's long-arm statute extends personal jurisdiction to the full extent permitted by due process. *Id.*

Due process requires that ABA Accredited University, DOE and ABA have established "certain minimum contacts with [Virginia] such that the maintenance of [this] suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The "minimum contacts" requirement is satisfied if the Defendants have purposefully availed themselves of the privilege of conducting activities in Virginia and if the United States' claims in this case arise out of those activities directed at Virginia. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Mitrano*, 377 F.3d at 407.[1] "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, . . . or of the unilateral activity of another party or a third person." *Burger King*, 471 U.S. at 475 (internal quotations and citations omitted).

---

[1] This is known as specific personal jurisdiction. Specific jurisdiction differs from general jurisdiction in that under general jurisdiction, a state exercises personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum. *Burger King*, 471 U.S. at 472-73 & n.15.

"Put differently, the test protects the defendant from having to defend himself in a forum where he should not have anticipated being sued." *Production Group Int'l, Inc. v. Goldman*, 337 F. Supp. 2d 788, 797 (E.D. Va. 2004). See also *Burger King*, 471 U.S. at 474; *Mitrano*, 377 F.3d at 407. As the Supreme Court has instructed, "where the defendant 'deliberately' has engaged in significant activities within a State or has created 'continuing obligations' between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there." *Burger King*, 471 U.S. at 475-76 (citations omitted). Therefore, "it is presumptively not unreasonable to require them to submit to the burdens of litigation in that forum as well." *Id.* at 476.

In the business context, the Fourth Circuit has considered the following nonexclusive factors to determine whether a defendant has purposefully availed himself of the privilege of conducting activities in the forum state: whether the defendant maintained offices or agents in the forum state; whether the defendant owns property in the forum state; whether the defendant reached into the forum state to solicit or initiate business; whether the defendant deliberately engaged in significant or long-term business activities in the forum state; whether the parties contractually agreed that the law of the forum state would govern disputes; whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship; the nature, quality, and extent of the parties' communications about the business being transacted; and whether the performance of contractual duties was to occur within the forum state. *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009).

To survive any personal jurisdiction challenge, the plaintiff "need only make a *prima facie* showing of a sufficient jurisdictional basis on the basis of the complaint and supporting

13

affidavits." *Rannoch, Inc. v. Rannoch Corp.*, 52 F. Supp. 2d 681, 684 (E.D. Va. 1999) (citing

*Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). In considering any challenge by

Defendants, the Court "must construe all relevant allegations in the light most favorable to the

plaintiff and draw the most favorable inferences for the existence of jurisdiction." *Id.*

Defendant ABA Accredited University's extensive contacts with the plaintiff in Virginia gave it

ample notice that it could be sued here and more than satisfy the test for personal jurisdiction.

Plaintiff admits that they were solicited extensively by ABA Accredited University via electronic

communications to induce them to apply for admission, and upon acceptance, and they enrolled

into the J.D. program. (Doe Decl. at ¶1). Plaintiff received distance learning education in

Virginia based on ABA Accredited University's intended use of the zoom meeting technology to

reach plaintiff and other students around the world (including as far as Canada and China) and in

the Country (students in Miami, Fl, *inter alia*. (Doe Decl. at ¶1). A search of plaintiff's email

records system revealed that Defendant ABA Accredited University authored over 500

communications that were sent to plaintiff in Virginia to induce plaintiff's enrollment and to

facilitate administration and provisioning of the J.D. program in which plaintiff is enrolled. (Doe

Decl. at ¶1). Defendant ABA Accredited University issued business cards to plaintiff at their

residence in Virginia and ABA Accredited University law professors regularly communicate

with plaintiff at their location to provide educational services (Doe Decl. at ¶1).

      Courts in this district have repeatedly found personal jurisdiction where the defendant

established a relationship with a Virginia resident and where the defendant had communications

with plaintiff in Virginia, just as ABA Accredited University did here. (Doe Decl. at ¶1); *FBR

Capital Markets*, 2009 WL 3254458, at * 3; *Goldman*, 337 F. Supp. 2d at 796-98. In *Goldman*,

for instance, the defendant was a Florida resident who worked as an event producer for six years

for a company headquartered in Virginia. The defendant worked out of the company's Orlando offices and was recruited in Orlando. The defendant's employment contract, which was signed in Orlando, prohibited them from soliciting any of the company's clients within a certain time frame after their employment ended and disclosing the company's confidential business information. The contract contained neither choice-of-law nor choice-of-forum provisions. During the defendant's six years of employment, he communicated frequently with the company's Virginia employees on business matters, and made three trips to the company's Virginia headquarters for business meetings. 337 F. Supp. 2d at 791-92. After the defendant went to work for a competitor and allegedly stole one of the company's clients, the company sued them for breach of the non-solicitation and confidentiality clauses of his contract.

The defendant in *Goldman* raised a challenge to the court's personal jurisdiction over him. The court rejected it, finding the defendant's acceptance of employment with a Virginia-based company, his regular communications with the company's Virginia employees in the course of performing his job, and his three trips to the company's Virginia headquarters also in the course of performing his job, to be sufficient contacts with Virginia. *Id.* at 796-98. See also *Reynolds*, 2010 WL 1225620, at * 3-4 (personal jurisdiction in Virginia satisfied where defendant accepted and maintained employment with a company headquartered in Virginia and traveled to Virginia on 103 days over the course of her employment); *FBR Capital Markets*, 2009 WL 3254458, at * 3 (defendant's accepting and maintaining employment with a Virginia-based company, interviewing for employment in Virginia, and traveling to Virginia for training purposes constituted sufficient contacts with state).

Additionally, the numerous contacts that ABA Accredited University had with the plaintiff in Virginia are related to plaintiff's claims against ABA Accredited University.

15

*Reynolds*, 2010 WL 1225620, at * 5; *FBR Capital Markets*, 2009 WL 3254458, at * 3. "When a claim is 'based on a contract which had substantial connections with that State,' then the Plaintiff's claims can be said to arise out of connections with that forum." *Reynolds*, 2010 WL 1225620, at * 5 (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220 , 223 (1957)). This case is a dispute over the terms and conditions of plaintiff's implied contract with ABA Accredited University and its tortious conduct into the State of Virginia and causing plaintiff harm in the State of Virginia. *FBR Capital Markets*, 2009 WL 3254458, at * 3. ABA Accredited University sent solicitations to plaintiff's residence in Virginia to entice them to enrollment in the J.D. program, it administered the program for them by communicating with them into the State of Virginia, and provisioned the educational services to them in the State of Virginia, pursuant to the implied contract whereby ABA Accredited University agreed to provide plaintiff with legal education sufficient to obtain a J.D. degree from its program, in exchange for plaintiff paying it tuition money. It is the breach of that agreement and its other tortious conduct into the state of Virginia, that form the basis of this action.

As noted above, ABA Accredited University repeatedly provided plaintiff with educational instructions into Virginia and emphasized the interactive nature of the online learning using zoom. Moreover, the injury caused by ABA Accredited University's breach of the parties' implied contract—specifically, the fraud, [Redacted], [Redacted], anticompetitive conduct, inter alia, (see Doe Decl. at ¶1) —is felt by the plaintiff in Virginia. See *Calder v. Jones*, 465 U.S. 783, 789-90 (1984) (personal jurisdiction existed in state in which brunt of harm was suffered); *FBR Capital Markets*, 2009 WL 3254458, at * 3.

The focus of the 'minimum contacts' analysis is not which contacts with the forum are absent, nor where the contacts predominate, but only 'whether enough minimum contacts [with

16

the forum] exist [such] that the district court's assumption of specific jurisdiction does not offend due process." *Goldman*, 337 F. Supp. 2d at 798 (quoting *English & Smith v. Metzger*, 901 F.2d 36, 39 (4th Cir. 1990)) (emphasis in *Goldman*). The mere fact that during the course of an approximately one year educational relationship with plaintiff, ABA Accredited University carried out certain employment related activities outside the boundaries of Virginia, as one would expect it would, particularly as an organization located in New York, does not negate the reasonable expectation that the plaintiff would sue them in Virginia to enforce their implied contract and to protect their rights and obtain relief from ABA Accredited University's tortious conduct.

In addition, the facts and supporting cases here supporting personal jurisdiction are easily distinguishable, from others involving inapposite claims and factual circumstances where sufficient minimum contacts for personal jurisdiction were lacking. *Rannoch*, a trademark and unfair competition case between two corporations, involved the question whether a company's placement of a website on the internet, with knowledge of the possibility that the site might be accessed in Virginia, could, by itself, satisfy the due process standard for personal jurisdiction. See *Rannoch*, 52 F. Supp. 2d at 683, 685-86. Similarly, *Young v. New Haven Advocate*, 315 F.3d 256 (4th Cir. 2002) (libel case), and *ALS Scan, Inc. v. Digital Service Consultants, Inc.*, 293 F.3d 707 (4th Cir. 2002) (copyright case), involved the issue of the extent to which a company's internet activities could subject it to personal jurisdiction in Virginia and did not arise in the employment context. There are also distinguishable commercial, nonemployment-related cases which are not analogous to the instant case. See *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 416-18 (1984) (holding that Columbian corporation was not subject to general personal jurisdiction, requiring continuous and systematic business contacts, in Texas in

wrongful death action arising out of crash of one of its helicopters, where Columbian

corporation's only contacts with Texas were sending its CEO to Texas for a contract- negotiation

session, purchasing goods and training services from a Texas company, sending personnel to

Texas for training; and accepting into its New York bank account checks drawn on a Texas

bank); *Chung v. Nana Development Corp.*, 783 F.2d 1124, 1126-28 (4th Cir. 1986) (holding that

Alaska corporation, which never solicited any business in Virginia, was not subject to personal

jurisdiction in Virginia in commercial breach of contract case, based upon a single sale in Alaska

to a Virginia resident, where part of the purchase was shipped to plaintiff in Virginia); *RZS*

*Holdings, AVV v. Commerzbank*, AG, 279 F. Supp. 2d 716, 722 (E.D. Va. 2003) (holding that

foreign bank, which agreed to confirm a letter of credit issued by another foreign bank for the

benefit of a resident of Virginia, did not purposefully avail itself of the laws, privileges, and

protections of Virginia); *Superfos Investments Ltd. v. FirstMiss Fertilizer, Inc.*, 774 F. Supp. 393,

398 (E.D. Va. 1991) (in breach of contract action between two corporations, finding lack of

personal jurisdiction over Mississippi corporation, where product that was the subject of the

breach of contract action never entered Virginia, no employees or representatives of Mississippi

corporation traveled to Virginia to negotiate or administer terms of the contract, and plaintiff

solicited the contract with the Mississippi corporation).

### Venue is Proper in the Eastern District of Virginia.

Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b)(2).

(See Doe Decl. at ¶1). That provision provides that in a civil action not based solely on diversity

jurisdiction, venue is proper in "a judicial district in which a substantial part of the events or

18

omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."[2]

When determining whether a substantial part of the events or omissions giving rise to the claim occurred in a district, a court should not look just to those events that directly underlie the claim at issue, but "should review 'the entire sequence of events underlying the claim.'" *Mitrano*, 377 F.3d at 405 (quoting *First Mich. Corp. v. Bramlet*, 141 F.3d 260, 264 (6th Cir. 1998). [3] Here, the events that most directly underlie the claims are ABA Accredited University Universities solicitation of business in Virginia, and its routine and continuous administration and provisioning of an educational service for a student in Virginia. (See Doe Decl. at ¶1); *Reynolds*, 2010 WL 1225620, at * 7 ("the event that most directly precipitated the claim was Defendant's breach of the tuition assistance agreement, but the series of events that gave rise to the claim more broadly include all of Defendant's employment related activities while affiliated with Reynolds.").

Courts in this district have uniformly found venue appropriate when a claim against a nonresident defendant is brought by a plaintiff where the defendant had communications with the

―――――――――――――――

[2] Such an action may also be brought in a judicial district where any defendant resides, if all defendants reside in the same state, or a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought. 28 U.S.C. § 1391(b)(1), (3). The United States does not contend that either of these venue provisions applies in this action in this district.

[3] Mitrano involved 28 U.S.C. § 1391(a), concerning venue in actions based on diversity of citizenship. The language used in § 1391(a)(2), however, making venue proper in any "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred," is exactly the same as the language used in § 1391(b)(2).

district. *Reynolds*, 2010 WL 1225620, at * 7. See also *Goldman*, 337 F. Supp. 2d at 798-99.

ABA Accredited University's communications, solicitation and provisioning of educational

services for plaintiff in the Eastern District of Virginia, as described in the personal jurisdiction

argument above, establish that venue is proper in this district.

      The two primary sources of the subject-matter jurisdiction of the federal courts are

diversity jurisdiction and federal question jurisdiction. Diversity jurisdiction generally permits

individuals to bring claims in federal court where the claim exceeds $75,000 and the parties are

citizens of different states. See 28 U.S.C. § 1332. So, if a citizen of Virginia sues a citizen of

New York for more than $75,000, a federal court would have subject-matter jurisdiction to hear

that claim. Under federal question jurisdiction, a litigant—regardless of the value of the claim—

may bring a claim in federal court if it arises under federal law, including the U.S. Constitution.

See 28 U.S.C. § 1331. Federal question jurisdiction requires that the federal element appears on

the face of a well-plead complaint, is a substantial component of the complainant's claim, and is

of significant federal interest. Federal question subject-matter jurisdiction is frequently derived

from federal statutes granting a cause of action to parties who have suffered a particular injury.

Furthermore, it is important to note that 28 U.S.C. § 1367 provides for supplemental jurisdiction

in federal courts. Supplemental jurisdiction allows a federal court to adjudicate a claim over

which it does not have independent subject-matter jurisdiction, on the basis that the claim is

related to a claim over which the federal court does have independent jurisdiction. This court has

subject-matter jurisdiction over the claims against Defendants DOE and ABA based on the fact

that the enjoy diversity of citizenship (DEO is headquartered in Washington, DC, ABA is

headquartered in Illinois, and plaintiff is a citizen and resident of Virginia), the amount of

controversy is in excess of $75,000, there is a federal question related to DOE (Higher Education

Act of 1965, § 496(f), as amended, 20 U.S.C.A. § 1099b(f), as giving it the authority to enact

such standards) along with ABA being appointed by DOE as the accreditation authority for legal

education and the ABA accreditation being, in turn, adopted by the vast majority of State Bar

Associations.  To the extent that 28 U.S.C. § 1331 or 28 U.S.C. § 1367 do not provide the court

with jurisdiction of DOE and ABA, then 28 U.S.C. § 1367 would allow the Court to exercise

supplemental jurisdiction over the allegations that the ABA Accredited University, DOE and

ABA have conspired to restrict commerce in Virginia. Similarly, Article I section 8 clause of the

U.S. Constitution, gives the Court authority to exercise jurisdiction over the claim that ABA

Accredited University, DOE and ABA conspired to restrict interstate commerce by adopting

unconstitutional standards.

### Choice of Law

In resolving conflict of laws, settled rule in Virginia is that substantive rights of parties in

multistate tort action are governed by law of place of wrong. *McMillan v. McMillan*, 219 Va.

1127, 253 S.E.2d 662 (1979).

Breach of Contract Claim Applies New York Law. Here, the breaches and threatened

breaches of contract occurred in New York, to wit: when the university advertised that all

students were engaged in distance learning, and when it made an offer of acceptance to plaintiff

for admission into the J.D. program, when plaintiff accepted admission into the program and

paid their deposit and tuition, for which he received exclusively, distance learning, for an entire

year, the parties are in contract.  Specific contract performance is sought from a New York entity

to preserve the rights of a Virginia Citizen against a foreign entity, the university, who has

established sufficient minimum contacts with the State of Virginia so that the Virginia Court

should exercise jurisdiction to protect the rights of its citizens. Therefore, New York Law

governs the implied contract between the university and the plaintiff student. Similarly, unjust

and enrichment and conversion can apply the substantially similar laws in New York.

.

All other claims apply Virginia Law. The fraud, [Redacted] and [Redacted], violations of

Virginia Consumer Protection Act, the effect of the unconstitutional standards (306 and 311(e))

authorized by DOE and adopted by ABA (on their face and as applied), violations of Section

59.1-9.5 of Virginia Code (unlawful restraint of trade), unjust enrichment, and conversion

occurred in Virginia and therefore Virginia Law should apply, where not superseded by Federal

law.

Commonly, it is said that the forum will apply its own local law to matters of procedure

and the otherwise applicable law to matters of substance. The Constitution of the United States

imposes some limitations upon the power of a State to characterize an issue as procedural and

then to determine the issue in accordance with its own local law. *John Hancock Mut. Life Ins.*

*Co. v. Yates*, 299 U.S. 178 (1936); *Home Insurance Co. v. Dick*, 281 U.S. 397 (1930).

In an auto accident case, the Virginia Supreme Court found that the trial court should

have applied New York contract law since the involved vehicle was rented under a contract

entered into in New York. New York imposes vicarious liability on a vehicle owner for injuries

caused by permissive user. The Virginia conflict of laws principle requires that New York law be

applied since the vehicle was rented there. *Dreher v. Budget Rent-A-Car Sys., Inc.*, 272 Va. 390,

634 S.E.2d 324 (2006). Here, the education was being delivered from New York, the University

sits in New York and New York State has an interest in governing the conduct of a University.

The contract was formed and primarily performed in New York, and therefore, New York

contract law should apply to the breach of contract claim. For purposes of contract law,

particularly where Virginia law is not well-developed in finding contracts between students and

22

Virginia universities, New York Law should apply.  The university literature refers to law 136 times, all of which either refer to New York State law, federal law, or generically, "applicable law." Similarly, policies published on the university's website reference New York State law. From these facts, the parties can be assumed to have consented to the application of New York law for the purposes of interpreting the rights and liabilities under their contractual relationship.

Law of place of injury will govern as to all matters going to basis of right of action itself, while law of forum controls all that is connected with remedy. In a wrongful death action where death occurred in State of Florida, court held that limitation period is as much part of statute creating wrongful death actions as if it was contained within that section itself, and as such limitation period will be deemed to be substantive. Therefore, two-year limitation period of Florida applies rather than one-year catchall of Virginia. *Jones v. R.S. Jones & Assocs.*, 246 Va. 3, 429 S.E.2d 875 (1993). There, New York State's six-year statute of limitation period for claims of breach of contract action shall apply. Again, the injuries sustained in Virginia shall apply Virginia law as described in the paragraph above as "<u>All other claims apply Virginia Law.</u>"

North Carolina uninsured motorist statute allowing direct action against insurer was substantive and would be applied to action in Virginia court alleging injury from accident in Virginia. *Willard v. Aetna Cas. & Sur. Co.*, 213 Va. 481, 193 S.E.2d 776 (1973). Similarly, as the injuries were sustained in Virginia, Virginia law governing the tortious conduct should be applied.  *Lex loci delicto*, or "law of the place" is conflicts rule for torts. *Atlantic Coast Line R. R. v. Withers*, 192 Va. 493, 65 S.E.2d 654 (1951). The claims described above as "<u>All other claims apply Virginia Law</u>" satisfy this rule for applying Virginia law. In action arising out of accident, rights and liabilities of parties are controlled by laws of state in which accident

occurred. *Taylor v. Taylor*, 189 Va. 753, 53 S.E.2d 820 (1949). Here, the injuries resulting from the ABA Accredited University, ABA and DOE's tortious and unconstitutional conduct occurred in Virginia and as to those claims, the Virginia law should be applied.

### Legal Standard

Rule 65 of Fed. R. Civ. P. authorizes federal courts to issue preliminary injunctions. "A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Dewhurst v. Century Aluminum* Co., 649 F.3d 287, 290 (4th Cir. 2011)(quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U. S. 7, 22 (2008)). "In order to receive a preliminary injunction, the movant must establish that (1) it is likely to succeed on the merits of its case; (2) it is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of the equities tips in its favor; and (4) an injunction would be in the public interest. *Winter*, 555 U.S. 7 at 22.

Section 8.01-620 of the Virginia Code provides that "[e]very circuit court shall have jurisdiction to award injunctions. " "[T]he granting of an injunction is an extraordinary remedy and rests on the sound judicial discretion to be exercised upon consideration of the nature and circumstances of a particular case." *CG Riverview, LLC v. 139 Riverview, LLC*, 2018 Va. Cir. 59 (2018). "Although the Virginia Supreme Court has not yet articulated a standard for awarding a temporary injunction, the United States Supreme Court has provided a four-part test in determining whether a temporary injunction is appropriate. *Id.* This test includes the following: (1) likelihood of success on the merits; (2) irreparable harm; (3) the balance of the equities; and (4) the public interest. *Id.* (citing *Winter*, 555 U.S. at 20)."Virginia Courts have applied this four-part test in their state preliminary injunction analyses. *Id.* at *8-9.

24

In the Fourth Circuit, courts relax evidentiary rules when faced with motions for preliminary injunctive relief, mostly due to practical considerations such as the exigent nature of the proceeding and the unavailability of a detailed factual record at the very outset of the case. There is some disagreement among federal circuit courts on this issue, but here in Virginia, "district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725 (4th Cir. 2016), vacated on other grounds, 137 S. Ct. 1239 (2017). Failure to consider hearsay evidence at preliminary injunction proceedings may even be deemed an abuse of discretion. *Id.* at 726.

## I. Plaintiff has a substantial likelihood of succeeding on the merits of their claims against Defendants.

The Court must first determine that Plaintiff is likely to success on the merits. The State Supreme Court has explained that "likelihood of success on the merits" does not actually equal "success on the merits":

> *"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove their case in full at a preliminary injunction hearing ... and the findings of fact and conclusions of law made by a court granting a preliminary injunction are :not binding at trial on the merits. Id. at 395."*

*University of Texas v. Camenisch*, 451 U.S. 390, 394 (1981).

In this case, Plaintiff states claims for fraud, breach of contract, [Redacted], [Redacted] against Defendant Hoftsra, and the Defendant ABA Accredited University's conduct giving rise to any of those claims entitle Plaintiff to the relief sought.  Separately, Plaintiff states a claim

against ABA and DOE to challenge the distance learning standards and its inherent and intended anticompetitive effects.

### A. Defendant Hoftsra University perpetrated a fraud and plaintiff has a substantial likelihood of succeeding on the merits of the fraud claim against that defendant.

Common law fraud liability is used to reach a wide range of tortfeasors.  See *Maturo v. Gerard*, 196 Conn. 584, 587, 494 A.2d 1199, 1201 (1985) ("Fraud . . . cannot be easily defined because [it] can be accomplished in so many different ways." (quoting *Hathaway v. Bornmann*, 137 Conn. 322, 324, 77 A.2d 91, 93 (1950))). To succeed on a claim of fraud in the United States, common law generally identifies nine elements needed to establish fraud: (1) a representation of fact; (2) its falsity; (3) its materiality; (4) the representer's knowledge of its falsity or ignorance of its truth; (5) the representer's intent that it should be acted upon by the person in the manner reasonably contemplated; (6) the injured party's ignorance of its falsity; (7) the injured party's reliance on its truth; (8) the injured party's right to rely thereon; and (9) the injured party's consequent and proximate injury. See, e.g., *Strategic Diversity, Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1210 n.3, 2012 U.S. App. LEXIS 1175, at *25 n.3 (9th Cir. 2012) (quoting *Staheli v. Kauffman*, 122 Ariz. 380, 383, 595 P.2d 172, 175 (1979)); *Rice v. McAlister*, 268 Ore. 125, 128, 519 P.2d 1263, 1265 (1975); *Heitman v. Brown Grp., Inc.*, 638 S.W.2d 316, 319, 1982 Mo. App. LEXIS 3159, at *4 (Mo. Ct. App. 1982); *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 41, 56 P.3d 524, 536-37 (Utah 2002).

To successfully allege a claim for common law fraud, a plaintiff must plead each element with specificity and particularity. See, e.g., *Baron v. Pfizer, Inc.*, 820 N.Y.S.2d 841, 12 Misc. 3d 1169(A) (N.Y. App. Div. 2006) (holding that New York law requires a cause of action for fraud be pled with greater specificity than other causes of action (citing *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 57, 720 N.E.2d 892, 898 (N.Y. 1999))); *Enyart v. Transamerica Ins. Co.*, 195

Ariz. 71, 77, 985 P.2d 556, 562 (Ariz. Ct. App. 1998) ("Each element [of fraud] must be supported by sufficient evidence. 'Fraud may never be established by doubtful, vague, speculative, or inconclusive evidence.'" (quoting *Echols v. Beauty Built Homes, Inc.*, 132 Ariz. 498, 500, 647 P.2d 629, 631 (1982))); *Liniger v. Sonenblick*, 532 P.2d 538, 539-40, 23 Ariz. App. 266, 267-68 (Ariz. Ct. App. 1975) ("Actionable fraud cannot exist without a concurrence of all essential elements." (citing *Nielson v. Flashberg*, 101 Ariz. 335, 339, 419 P.2d 514, 518 (1966))); but see *Zimmerman v. Loose*, 162 Colo. 80, 87-88, 425 P.2d 803, 807 (1967) (concluding that "fraud may be inferred from circumstantial evidence" and that direct proof of reliance is unnecessary to prevail on a common law fraud claim); but see *Denbo v. Badger*, 503 P.2d 384, 386, 18 Ariz. App. 426, 428 (Ariz. Ct. App. 1972) (reasoning that a party need not allege with particularity whether the party "had a right to rely on representations," because this element is "determined from the very facts alleged" (citing *Jamison v. S. States Life Ins. Co.*, 412 P.2d 306, 3 Ariz. App. 131 (1966))). Notably, "conclusory language" will not satisfy the specificity requirement of a common law fraud claim. *Small v. Fritz Cos., Inc.*, 30 Cal. 4th 167, 184, 65 P.3d 1255, 1265 (Cal. 2003); see *Armed Forces Ins. Exch. v. [Dean 2 Redacted]*, 2003 UT 14, 16, 70 P.3d 35, 40 (Utah 2003) (stressing that "mere conclusory allegations in a pleading, unsupported by a recitation of relevant surrounding facts, are insufficient to preclude summary judgment").

### i.  First Element of Common Law Fraud: A Representation of Fact

The first common law fraud element is the representation of a fact. "A representation within the meaning of the law of fraud is anything short of a warranty, which proceeds from the action or conduct of the party charged, and which is sufficient to create upon the mind a distinct impression of fact conducive to action." *St. Louis & S. F. R. Co. v. Reed,* 37 Okla. 350, 355, 132

P. 355, 357 (1913); see BLACK'S LAW DICTIONARY (9th ed. 2009) (defining

"representation" as "[a] presentation of fact – either by words or by conduct – made to induce

someone to act"); see *Nielson*, 101 Ariz. at 339, 419 P.2d at 518 (reasoning that a defendant's

issuance of a certificate purporting to state laden and unladen weight of scrap metal in plaintiff's

truck constituted a representation). To successfully plead this element, a plaintiff "must allege,

with specificity and particularity . . . what misrepresentations were made, when they were made,

who made the representations and to whom they were made." *Connick v. Suzuki Motor Co.*, 174

Ill. 2d 482, 496-97, 675 N.E.2d 584, 591 (1996) (citing *Board of Educ. v. A,C & S, Inc.*, 131 Ill.

2d 428, 457, 546 N.E. 2d 580, 594 (1989); see *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822

F.2d 1242, 1247, 1987 U.S. App. LEXIS 8319, at *15 (2d Cir. 1987) (noting that allegations of

fraud "ought to specify the time, place, speaker, and content of the alleged misrepresentations"

(citing *Luce v. Edelstein*, 802 F.2d 49, 54, 1986 U.S. App. LEXIS 31424, at *12 (2d Cir. 1986))).

For example, if a plaintiff baldly alleges that a company "made fraudulent representations

in magazine advertisements, sales brochures, new car manuals, and publicity," a court will hold

the complaint to be "inadequate" and dismiss the claim because it did not "state, which, if any, of

the plaintiffs heard these representations and relied on them." *Connick*, supra.

A representation also includes a party's failure to disclose certain facts. See *Sharp v.

Idaho Inv. Corp.*, 95 Idaho 113, 122, 504 P.2d 386, 395 (1972) (reasoning that "oral

representations, written false statements, and material omissions" could all sufficiently constitute

a representation"); see (*Schmeusser v. Schmeusser*, 559 A.2d 1294, 1297, 1989 Del. LEXIS 165,

at *7 (Del. Supr. 1989) ("Fraud may also occur through deliberate concealment of material facts,

or by silence in the face of a duty to speak."). Facts must be disclosed when they are "so vital

and material to a transaction that, if known by one party and not the other, the agreement would

be voidable." *Turner v. Enders*, 15 Wn. App. 875, 879, 552 P.2d 694, 697 (Wash. Ct. App. 1976).

However, as a general rule, "speculation and expressions of hope for the future do not constitute actionable representations of fact." *Albert Apt. Corp v. Corbo Co.*, 582 N.Y.S.2d 409, 410, 182 A.D.2d 500 (N.Y. App. Div. 1992) (citing *Quasha v. Am. Natural Beverage Corp.*, 171 A.D.2d 537, 567 N.Y.S.2d 257 (N.Y. App. Div. 1991). Thus, "a party does not make an actionable representation of fact when predicting a future event with no knowledge of whether or not the event may occur." *Id.* (citing *Lloyd I. Isler, P.C. v. Sutter*, 160 A.D.2d 609, 610, 554 N.Y.S.2d 253, 255 (N.Y. App. Div. 1990); see *Sharp*, supra (citing *Pocatello Security Trust Co. v. Henry*, 35 Idaho 321, 206 P. 175 (1922)) ("[T]here is a general rule in [the] law of deceit that a representation consisting of [a] promise or a statement as to a future event will not serve as basis for fraud, even though it was made under circumstances as to knowledge and belief which would give rise to an action for fraud had it related to an existing or past fact.").

There can be exceptions to the general rule. For example, Idaho recognizes the following two exceptions when analyzing representations in futuro: "(1) fraud may be predicated upon the nonperformance of a promise in certain cases where the promise is the device to accomplish the fraud; and (2) in cases where promises are blended or associated with misrepresentations of fact, there is fraud if a promise is accompanied with statements of existing facts showing the ability of the promisor to perform the promise without which it would not have been accepted or acted upon." *Sharp*, supra (citations omitted).

Here, defendant ABA Accredited University satisfies the first element of fraud when it stated that all students were "distance learning" in its published literature which it then removed from its website to conceal its fraudfully misrepresentation. The statement was sufficient to

29

create upon the mind a distinct impression of fact conducive to action, it knew plaintiff and other students would rely on this representation of fact. The representation of fact was made both with words, the published literature, and also, in action, when the school provided exclusive distance learning to the plaintiff and other students, without any specific statement confirming that it would discontinue that program, both before the parties' contract formed, and up until July 21, 2022 when it made its final announcement.  The representations were made by ABA Accredited University to the plaintiff and general public, and plaintiff read and relied upon the representation, both the universities' words and conduct. Plaintiff did not speculate or merely express hope for the future, as defendant ABA Accredited University made the representation, and prior to the contract formation, gave plaintiff no reason to believe that it would discontinue the program which it created from the investment of students' financial resources, and the investment of those resources into equipment and training of the professors, and to support the implementation and operation of the necessary technology upon which the distance learning service relied. ABA Accredited University universities' failure to disclose to plaintiff prior to the contract formation that it had no intent to allow plaintiff to finish the program using distance learning is a representation by omission upon which the plaintiff reasonably relied.  It was reasonable for plaintiff to believe this because, equity principles demand that if the university can benefit from the revenue raised in attracting plaintiff during a pandemic under a certain mode of educational content delivery, as it did, then it is also reasonable to expect that the university would continue to offer that mode to plaintiff, who relied on it, if for no other reason than it is fair and just. However, when ABA Accredited University concealed its true intent, it made a representation by omission. (Doe Decl. at ¶¶ 199, 205, 213, 215, 219, 272, 234, 237, *inter alia*).

30

Despite the general rule in the law of deceit that a representation consisting of a promise or a statement as to a future event will not serve as basis for fraud, even though it was made under circumstances as to knowledge and belief which would give rise to an action for fraud had it related to an existing or past fact, the exceptions apply to ABA Accredited University's conduct. As is the case here, ABA Accredited University's fraud is predicated upon the nonperformance of a promise, to offer distance education, because that false promise was the device to accomplish the fraud. In this case, the future promise was blended or associated with misrepresentations by omissions of fact, specifically, the fact that ABA Accredited University did not intend to allow plaintiff to complete the program by distance learning and failed to state that unequivocally during the time prior to plaintiff's enrollment, and even when plaintiff was taking classes and investing additional money. One critical misrepresentation by omission which bolsters the assertion that ABA Accredited University did not intend to allow plaintiff to complete the degree program is the fact that the university failed and even refused to provide plaintiff any reasons for it wanting to discontinue distance learning until after it did at the last minute on July 21, 2022, and even ABA Accredited University just offering one among apparently many reasons, despite plaintiff's excessive efforts to obtain assurances from the university throughout the year. Concealing this information until after plaintiff invested $118,000 is a material misrepresentation upon which the fraud was perpetrated. Without ABA Accredited University providing plaintiff with "Why" it would consider discontinuing distance learning, plaintiff was without necessary information to evaluate the strength of its intent or merits of any reasons. When viewed in conjunction with the fact that the university would go on to conceal any available options for plaintiff to complete the program, including details as to how its published "visiting student" program could be used by plaintiff to complete the degree

program, the intent to misrepresent by ABA Accredited University is evident. The

misrepresentations include but are not limited to ABA Accredited University stating things such

as "we've provided all [Redacted] which can be provided," and also its silence in response to

requests for information as to how plaintiff might finish the degree, including the published

visiting student option, and by cancelling the vaccine exemption for no stated reason

whatsoever, and concealing the reason, *inter alia*. (Doe Decl. at ¶¶ 199, 205, 213, 215, 219, 272,

234, 237, *inter alia*).

### ii. Second Element of Common Law Fraud: Falsity of the Representation

The second common law fraud element is the falsity of the representation. "A false

representation is the cornerstone to an action in fraud." *Sharp*, supra. A representer's "state of

mind or intent" can demonstrate the falsity of the representation. *Heitman*, 638 S.W.2d at 319,

1982 Mo. App. LEXIS 3159 at *5 (reasoning that a representation was true at the time it was

made after the speaker acted in conformity with the representation for over eight years); see

*Nielson*, supra (reasoning that "uncontradicted evidence" showing plaintiff's truck was not

weighed on some occasions after unloading demonstrated that defendant's representations to the

contrary were "false").

For example, if an employee of a bank represents he will modify an individual's

mortgage payment schedule and not report any late payments made pursuant to the modified plan

to credit reporting agencies but then neglects to modify the schedule, the representation was

false. *Blau v. Am. 's Servicing Co.*, No. CV-08-773-PHX-MHM, 2009 U.S. Dist. LEXIS 90632

(D. Ariz. Sept. 28, 2009).

ABA Accredited University knew that its representation to educate plaintiff via distance

learning to entice plaintiff to enroll was false, and also to cause plaintiff to continue in the

program, even beyond the total number of transferrable credit hours, both before the contract was

formed, and up until it finally revealed its intent to cancel distance learning on July 21, 2022. It

also knew that its representation that students, which include plaintiff, can obtain credits at a

visiting university was false when it decided to conceal options for plaintiff to rely upon the

visiting student representation. Each of plaintiff's communications with the university which

sought information about this option, and assurances from the university about this option, to

which the university was silent and unresponsive, representation by omission, of a fact it knew to

be false, that plaintiff, like other students in extraordinary circumstances, could obtain credits

visiting other universities. (Doe Decl. at ¶¶ 199, 205, 213, 215, 219, 272, 234, 237, 239, 245,

*inter alia*).

### iii.   Third Element of Common Law Fraud: Materiality of the Representation

The third common law fraud element is the materiality of the representation. "A

representation or concealment of a fact is material if it operates as an inducement to the [other

party] to enter into the contract, where, except for such inducement, it would not have done so."

*[Redacted]al Ins. Co. v. Anaya*, 78 N.M. 101, 105, 428 P.2d 640, 644 (1967) (quoting *Modisette

v. Found. Reserve Ins. Co.*, 77 N.M. 661, 667-68, 427 P.2d 21, 26 (1967); see *Colaizzi v. Beck*,

2006 Pa. Super 41, ¶ 9, 895 A.2d 36, 40 (Pa. Super. Ct. 2006) ("A misrepresentation is material

if it is of such character that if it had not been misrepresented, the transaction would not have

been consummated." (citing *Sevin v. Kelshaw*, 417 Pa. Super. 1, 10, 611 A.2d 1232, 1237 (Pa.

Super. Ct. 1992))). The materiality of a representation cannot be inferred from the pleadings,

rather, it must be plead with specificity. *Benson v. Geller*, 619 S.W.2d 947, 949, 1981 Mo. App.

LEXIS 2954, at *5-6 (Mo. Ct. App. 1981).

For example, "[t]o be material, the false statement does not have to actually contribute to a loss under the [contract]," instead, it just needs to induce the other party to act. *[Redacted]al Ins. Co.*, 78 N.M. at 104-05, 428 P.2d at 643-44. Accordingly, the proper test for materiality is "whether the plaintiff, as a reasonably prudent [person] would have rejected the [contract] if it had known the true facts concerning the [false representation]." *Id.* ; see BLACK'S LAW DICTIONARY (9th ed. 2009) (defining "material representation" as "[a] representation to which a reasonable person would attach importance in deciding his or her course of action in a transaction").

For example, if an employee of a bank represents he will modify an individual's mortgage payment schedule and not report any late payments made pursuant to the modified plan to credit reporting agencies but then neglects to modify the schedule, the representation was false. *Blau v. Am.'s Servicing Co.*, No. CV-08-773-PHX-MHM, 2009 U.S. Dist. LEXIS 90632 (D. Ariz. Sept. 28, 2009).

ABA Accredited University's advertisement to plaintiff and the general public that all students were taking classes via "distance learning" and its general representations that it would educate students in a cooperative and reasonable manner were material to induce plaintiff into enrolling in ABA Accredited University, and continuing at ABA Accredited University, for a considerable investment of time and money. (Doe Decl. at ¶¶ 1-246)

### iv.   Fourth Element of Common Law Fraud: Representer's Knowledge of the Representation's Falsity or Ignorance of the Truth

The fourth common law fraud element requires the representer to either have knowledge of the representation's falsity or else be reckless in his ignorance of its truth. "False representations made recklessly and without regard for their truth in order to induce action by

another are the equivalent of misrepresentations knowingly and intentionally uttered." *Engalla v. Permanente Med. Grp.*, Inc., 15 Cal. 4th 951, 974, 938 P.2d 903, 917 (1997) (quoting *Yellow Creek Logging Corp. v. Dare*, 216 Cal. App. 2d 50, 55, 30 Cal. Rptr. 629, 632 (Cal. Ct. App. 1963); see *Anderson v. Knox*, 297 F.2d 702, 720-21, 1961 U.S. App. LEXIS 3058, at *55-56 (9th Cir. 1961) (reasoning that the "knowledge" requirement is satisfied if it is shown that the representations were made with reckless disregard for their truth or falsity); see Nielson, supra (reasoning that a representation purporting to show laden and unladen weight of plaintiff's truck was fraudulent when defendant knew the truck had not been weighed).

"Knowledge of falsity can be adequately pleaded by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness which lead to an inference that the defendants knew of the falsity." *Adelphia Recovery Trust v. Bank of Am.*, 624 F. Supp. 2d 292, 329, 2009 U.S. Dist. LEXIS 3834, at *109 (S.D.N.Y. 2009) (citing *Lerner v. Fleet Bank*, F.3d 273, 293, 2006 U.S. App. LEXIS 20326, at *47 (2d Cir. 2006)).

For example, "a definite statement of a material fact made by a party who does not know the statement to be true, and has no reasonable grounds for believing it to be true, will, if false, have the same legal effect as a statement of what the party positively knows to be untrue." *State ex. Rel. Redden v. Disc. Fabrics, Inc.*, 289 Or. 375, 385, 615 P.2d 1034, 1039 (1980) (quoting *Amort v. Tupper*, 204 Or. 279, 287, 282 P.2d 660, 663-64 (1955).

ABA Accredited University knew that it would never allow plaintiff to complete the J.D. program by taking classes remotely when it made its representation via statements and omissions. It also knew that it would not allow plaintiff to rely on the "visiting student" representations when it withheld assurances sought by plaintiff about the same.  It knew that it would not act in good faith and fair dealing or  with cooperation, when it breached those duties.

35

ABA Accredited University knew that it would not fulfil its obligations under the contract. ABA Accredited University's fraudulent intent and knowledge of the falsity of its representation can be inferred by examining its conduct through its agent officers. Dean [Redacted], by cancelling distance learning, by cancelling the waiver for the vaccine, by refusing to allow plaintiff to take open book exams using, by failing to timely schedule local exams in Virginia, by claiming theta they had done "all that can be done," while at the same time, refusing to cooperate or offer any alternative means, by refusing to provide [Redacted], by falsely implying without explicitly stating that providing [Redacted] would somehow change the nature of the program, are all examples from which a fact finder can infer the knowledge of the false representations by statement and omission, and the overall fraudulent intent. (Doe Decl. at ¶¶ 1-246)

   v.   **Fifth Element of Common Law Fraud: Represeter's Intent to Induce the Other Party to Act on the Representation**

   The fifth common law fraud element is the represeter's intent to induce the other party to act in accordance with the representation. "[T]he fundamental character of fraud is the communication of a misimpression to induce another to rely on it." *Estate of Schwarz v. Philip Morris, Inc.*, 206 Or. App. 20, 39, 135 P.3d 409, 422 (Or. Ct. App. 2006). "An unperformed promise does not give rise to a presumption that the promisor intended not to perform when the promise was made." *Bash v. Bell Tel. Co.*, 411 Pa. Super. 347, 361, 601 A.2d 825, 832 (Pa. Super. Ct. 1992) (quoting *Fidurski v. Hammill*, 328 Pa. 1, 3, 195 A. 3, 4 (1937)). However, "[a] defendant who acts with knowledge that a result will follow is considered to intend the result." *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 578, 2001 Tex. LEXIS 61, at *16 (2001); *Elizaga v. Kaiser Found. Hospitals*, 259 Ore. 542, 548, 487 P.2d 870, 874 (1971).

   This element of fraud does not require a direct relationship between the alleged fraudfeasor and a specific known person; it is sufficient if the fraudfeasor has "reason to expect"

the person to act or to refrain from action in reliance upon the misrepresentation, "in the type of transaction in which he intends or has reason to expect the person's conduct to be influenced." *Ernst & Young, L.L.P.*, supra. Thus, to prove reason to expect reliance, "the maker of the misrepresentation must have information that would lead a reasonable man to conclude that there is an especial likelihood that it will reach those persons and will influence their conduct. There must be something in the situation known to the maker that would lead a reasonable man to govern his conduct on the assumption that this will occur." *Id.* at 581, 2001 Tex. LEXIS 61 at *21 (citing RESTATEMENT (SECOND) OF TORTS § 531 (1977)).

For example, if a third-party to the representation alleges fraud, her "reliance must be especially likely and justifiable" in order for the false representation to become actionable. *Id.* Accordingly, "if the false representations be made with a view of reaching the third person to whom it is repeated, and for the purpose of influencing him," a cause of action for common law fraud exists. *Id.* at 578, 2001 Tex. LEXIS 61 at *5.

ABA Accredited University, in falsely representing that the students were engaging in distance learning, and inferring that this would continue, and by advertising to markets outside of the New York area, and accepting enrollment from students, like plaintiff, who resides in Virginia, and like other would-be students in China and Canada, it sought to induce enrollment in the university. By falsely concealing its intent to cancel the distance learning, it sought to continue to induce the existing students to register for subsequent semesters, until they exceeded the number of credits which they can transfer to other ABA accredited law school. ABA Accredited University ,in false representing that it is now necessary for it to cancel its waiver to its vaccine policy, and using that mechanism to coerce students into getting vaccines, which it cares nothing about except to the extent that it wishes to use it as a tool to drive all students back

37

to campus for primarily revenue motives, seeks to induce plaintiff to disenroll or transfer, before

plaintiff can receive the full expected value, the J.D. degree, from the pursuit. (Doe Decl. at ¶¶ 1-

246)

### vi.   Sixth Element of Common Law Fraud: Injured Party's Ignorance of the Representation's Falsity

The sixth common law fraud element is the injured party's ignorance of the

representation's falsity. If a plaintiff knows a representation is false, a cause of action for

common law fraud will not exist. *Lettunich v. Key Bank Nat'l Ass'n*, 141 Idaho 362, 368, 109

P.3d 1104, 1110 (2005) (holding that a plaintiff was not ignorant of the falsity of oral

representations because he signed documents outlining state laws in direct contrast to the

representations on the same day).

If a plaintiff only knows the falsity of some of the elements of a representation, that

knowledge will not prevent a finding of fraud based on the concealment of other elements. See

*Burris v. Burris*, 904 S.W.2d 564, 568, 1995 Mo. App. LEXIS 1398, at *9-10 (Mo. Ct. App.

1995) (reasoning that a plaintiff's knowledge of some of the concealed items would not prevent a

finding of fraud based on the concealment of others).

However, if, under the circumstances, the injured party should have reasonably

researched more into the representation, a court will not consider the party to be ignorant. See

*Fields v. Mitch Crawford's Holiday Motors Co.*, 947 S.W.2d 818, 821, 1997 Mo. App. LEXIS

1125, at *7-8 (Mo. Ct. App. 1997) (reasoning that a common law fraud claim based on a material

representation about a car's mileage odometer was not fraudulent because the plaintiff's

"background and knowledge, sufficiently placed [the plaintiff] on notice of the odometer

discrepancy" because the plaintiff "was forty years-old at the time of trial," "an experienced car

38

buyer," "[held] a paralegal degree," "knew the odometer had been replaced," and "noticed that the odometer discrepancy box had been checked on the retail buyers order").

Plaintiff did not know that ABA Accredited University's representation that it would educate students via distance learning was false.  Plaintiff did not know that ABA Accredited University would falsely lead plaintiff into believing that it would offer plaintiff a reasonable opportunity to finish the J.D. program. Plaintiff did not know that ABA Accredited University would refuse to cooperate and exercise good faith and fair dealing in its interactions with plaintiff before and during the course of their contract, including denying plaintiff the opportunity to finish the classroom work at a local university based on its advertised "distance learning" program, among other things.

### vii.   Seventh Element of Common Law Fraud: Injured Party's Actual Reliance on the Truth of the Representation

The seventh common law fraud element is the injured party's actual reliance on the truth of the representation. "Actual reliance occurs when a misrepresentation is 'an immediate cause of a plaintiff's conduct, which alters his legal relations,' and when, absent such representation, 'he would not, in all reasonable probability, have entered into the contract or other transaction.'" *Engalla*, 15 Cal. 4th at 976, 938 P.2d at 919 (quoting *Spinks v. Clark*, 147 Cal. 439, 444, 82 P. 45, 47 (1905). Markedly, "it is not logically impossible to prove reliance on an omission." *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093, 858 P.2d 568, 574 (1993). Indeed, a plaintiff "need only prove that, had the omitted information been disclosed, one would have been aware of it and behaved differently." *Id.*

An injured party's actual reliance on a representation is often the most difficult element of common law fraud to prove. Indeed, many states have rejected the "fraud on the market" doctrine which made it unnecessary for buyers or sellers of stock to prove they relied on a

defendant's misrepresentations. *Id.* Instead, "the plaintiff must allege, with specificity, actions, as distinguished from unspoken and unrecorded thoughts and decisions, that indicate the plaintiff actually relied on the misrepresentations." *Fritz Cos., Inc.*, 30 Cal. 4th at 184, 65 P.3d at 1266; but see Zimmerman, supra (holding that direct proof of reliance is unnecessary to prevail on a common law fraud claim because "fraud may be inferred from circumstantial evidence").

For example, if a plaintiff never "actually read[s] or hear[s] the alleged misrepresentations," but instead "relies on the integrity of the securities market and the securities offering process, and the fidelity, integrity and superior knowledge of defendants," the plaintiff did not allege "actual reliance." *Mirkin*, 5 Cal. 4th at 1089, 858 P.2d at 571; see *Sharp*, 95 *Idaho* at 124, 504 P.2d at 397 ("To be actionable the representation must have been relied on at the time of the transaction.").

In most states, the injured party's reliance must have been reasonable or justifiable. See, e.g., *Meader v. Francis Ford, Inc.*, 286 Ore. 451, 456, 595 P.2d 480, 482 (1979) (to prove fraud, "[t]he representation must be justifiably relied upon by plaintiff in taking action or in refraining from it to his damage"); *Kaufman v. I-Stat. Corp.*, 165 N.J. 94, 109, 754 A.2d 1188, 1195 (2000) (reasoning that plaintiff must have "justifiably relied" on defendant's representation); *Smith v. Brutger Cos.*, 569 N.W.2d 408, 413, 1997 Minn. LEXIS 781, at *15 (Minn. 1997) (reasoning that one element of fraud is plaintiff's "reasonable reliance on the misrepresentation"). The Oregon Supreme Court applied the following subjective and objective standard when determining reasonable reliance:

If he is a person of normal intelligence, experience and education, he may not put faith in representations which any such normal person would recognize at once as preposterous or which are shown by facts within his observation to be so patently and obviously false that he must have

closed his eyes to avoid discovery of the truth, and still compel the defendant to be responsible for his loss. The matter seems to turn upon an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case.

*Cocchiara v. Lithia Motors, Inc.*, 353 Ore. 282, 298, 297 P.3d 1277 (2013) (quoting Keeton, Prosser and Keeton on the Law of Torts § 108 at 750-51 (5th ed. 1984); see *Martin v. Miller*, 24 Wash. App. 306, 309-10, 600 P.2d 698, 701 (Wash. Ct. App. 1979) (reasoning that reliance is "reasonable and justifiable" if the plaintiffs have no prior knowledge or experience in a field, but instead rely upon the representations of plaintiff's superior knowledge and experience).

Accordingly, "[r]eliance is 'justifiable' only when 'circumstances [are] such to make it reasonable for plaintiff to accept defendant's statements without an independent inquiry or investigation.'" *Philipson & Simon v. Gulsvig*, 154 Cal. App. 4th 347, 364, 64 Cal. Rptr. 3d 504, 517 (Cal. Ct. App. 2007) (quoting *Wilhelm v. Pray*, 186 Cal. App. 3d 1324, 1332, 231 Cal. Rptr. 355, 358 (1986)); see *Mother Earth, Ltd. v. Strawberry Camel, Ltd.*, 72 Ill. App. 3d 37, 51-52, 390 N.E.2d 393, 405 (Ill. App. Ct. 1979) (reasoning that reliance after limited inquiry may also be justifiable if a defendant's actions have lulled the plaintiff into a "false sense of security").

If ABA Accredited University disclosed to plaintiff prior to the parties entering into their contract that it would not educate  plaintiff via distance learning, or would cease to do so before plaintiff could earn the J.D., or would not cooperate with plaintiff in alternative methods of earning the necessary credits, such as learning at another university as a visiting student, or via independent studies, etc, plaintiff would not have entered into the program and invested approximately $118,000. (Doe Decl. at ¶¶ 1-246)

41

### viii.   Eighth Element of Common Law Fraud: Injured Party's Right to Rely on the Representation

The eighth common law fraud element is the injured party's right to rely on the representation. A party does not have a right to rely on a representation if she is aware the representation is false, not enforceable, or not made to her. See *Lininger*, 23 Ariz. App. at 268, 532 P.2d at 540 (holding that a party did not have the right to rely on a representation because he "was aware that the instrument had to be approved by counsel for one of the parties, reduced to writing to comply with the Statute of Frauds and signed by the parties").

For example, "[a] person making a representation is only accountable for its truth or honesty to the very person or persons whom he seeks to influence; no one else has a right to rely on the representation and to allege its falsity as a wrong to him under a claim of fraud." *Hall v. Douglas*, 380 S.W.3d 860, 869, 2012 Tex. App. LEXIS 7281, at *14 (Tx. App. 2012) (citing *Westcliff Co. Inc. v. Wall*, 153 Tex. 271, 267 S.W.2d 544, 546 (1954); see *Nielson*, supra (reasoning that a scrap metal buyer who paid fees for defendant's services of weighing seller's truck when laden and unladen had the right to rely on defendant's representation that he performed the weighing).

Essentially, "[a] party is not justified in relying on representations when he or she had ample opportunity to ascertain the truth of the representations before acting." *Capiccioni v. Brennan Naperville, Inc.*, 339 Ill. App. 3d 927, 939, 791 N.E.2d 553, 563 (Ill. App. Ct. 2003) (citing *Salisbury v. Chapman Realty*, 124 Ill. App. 3d 1057, 1063, 465 N.E.2d 127, 132 (Ill. App. Ct. 1984)). Therefore, the question of whether a party had a right to rely on a defendant's representation "must be answered in light of all of the facts of which the plaintiff[] had actual knowledge as well as those which [she] might have discovered by the exercise of ordinary

42

prudence." *Salisbury*, supra (citing *Soules v. General Motors Corp.*, 79 Ill. 2d 282, 286-87, 402 N.E.2d 599, 601 (1980)).

Plaintiff had a right to rely on ABA Accredited University's representation that it would provide distance learning education because plaintiff had no reason to believe the aforementioned representations were false, including its website advertisement which was deceptively removed, indicating that all students were learning via distance learning; that plaintiff had an option to finish the degree as a visiting student; that ABA Accredited University would support plaintiff's efforts to transfer; that ABA Accredited University would act in good faith and fair dealings, and cooperate as required by their contract, that ABA Accredited University would fail to follow its anti-[Redacted] and other policies, etc. (Doe Decl. at ¶¶ 1-246)

### ix. Ninth Element of Common Law Fraud: Injured Party Suffered Consequent and Proximate Injury

The ninth and final common law fraud element is proof of the injured party's consequent and proximate injury. "It is of the very essence of an action of fraud and deceit that the same shall be accompanied by damage, and neither *damnum absque injuria* nor *injuria absque damnum* by themselves constitute a good cause of action." *George Hunt, Inc. v. Wash-Bowl, Inc.*, 348 So. 2d 910, 912, 1977 Fla. App. LEXIS 15920, at *5 (Fla. Dist. Ct. App. 1977) (quoting *Stokes v. Victory Land Co.*, 99 Fla. 795, 802, 128 So. 408, 410 (1930)); *Cocchiara*, 353 Or. at 299 ("Most notably, a plaintiff will have to prove damages to bring a successful [fraud] claim."); *Larsen v. Pacesetter Sys., Inc.*, 74 Haw. 1, 29, 837 P.2d 1273, 1288 amended on reh'g in part, 74 Haw. 650, 843 P.2d 144 (1992) ("An action based on fraud will not lie where plaintiff has suffered no injury or damage." (citing *Hawaii's Thousand Friends v. Anderson*, 70 Haw. 276, 286, 768 P.2d 1293, 1301 (1989))). The plaintiff must have incurred the loss "in the type of

transaction in which the maker of the representation intends or has reason to expect his or her conduct to be influenced." *Ernst & Young, L.L.P.*, 51 S.W.3d at 577, 2001 Tex. LEXIS 61 at *8-9 (citing RESTATEMENT (SECOND) OF TORTS § 531 (1977)). "It may differ in matters of detail or in extent, unless these differences are so great as to amount to a change in the essential character of the transaction." *Id.*

In the common law fraud context, "to be actionable the alleged misrepresentation must not only have induced the recipient's reliance, but must also have caused the recipient's loss." *Clayton v. Heartland Res.*, Inc., 754 F. Supp. 2d 884, 899, 2010 U.S. Dist. LEXIS 143996, at *41 (W.D. Ky. 2010) (quoting *Flegles, Inc. v. Truserv Corp.*, 289 S.W.3d 544, 553, 2009 Ky. LEXIS 23, at *18 (2009)). Importantly, the term "cause" means "legal or proximate cause, which consists of a finding of causation in fact." *Id.* (quoting *Flegles, Inc.*, supra); see also *Glaser v. Enzo Biochem, Inc.*, 464 F.3d 474, 477, 2006 U.S. App. LEXIS 23968, at *5-6 (4th Cir. 2006) (affirming dismissal of a common law fraud claim due to insufficient pleading of loss causation); *Lincoln Nat. Life Ins. Co. v. Snyder*, 722 F.Supp.2d 546, 559-60, 2010 U.S. Dist. LEXIS 71127, at *31-33 (D. Del. 2010) (finding loss causation required for common law fraud claim under Delaware state law); *Kosovich v. Metro Homes*, LLC, 2009 U.S. Dist. LEXIS 121390, at *19-21 (S.D.N.Y. 2009) (finding the common law fraud claim deficient for failure to establish loss causation).

"Generally speaking, to be actionable, harm must constitute something more than 'nominal damages, speculative harm, or the threat of future harm.'" *Philipson & Simon*, 154 Cal. App. 4th at 364, 64 Cal. Rptr. 3d at 517 (quoting *Buttram v. Owens-Corning Fiberglas Corp.*, 16 Cal. 4th 520, 531 n. 4, 941 P.2d 71, 77 n. 4 (1997). Accordingly, "damage claims are not ripe or recoverable" until the plaintiff "is actually exposed to liability toward a third party." *Id.*

44

For example, a plaintiff is not harmed if she is "in exactly the same situation" before and after the representation. *Rice*, 268 Ore. at 128-29, 519 P.2d at 1265. Thus, even if the "plaintiff[] ha[s] established all the other elements necessary to maintain an action for fraud," she will not successfully plead common law fraud if she does not establish that a judgment will affect her current situation. *Id.*

The plaintiff has suffered extensive damage from the fraud, in what will be the loss of $118,00 tuition, the loss of professional opportunities reasonably expected from the J.D., the lost opportunities from time diverted from other professional endeavors to studying and preparing to pass the exams required to have earned the 39 credit hours in the program, to date. ABA Accredited University has both intentionally and negligently engaged in conduct which caused phycological injury which has manifested in physical symptoms such as [Redacted], [Redacted], sleepless nights, PTSD-like symptoms, heart palpitations, and pressure in the chest, and ABA Accredited University's conduct is the direct and proximate cause of these injuries, because "but for" their conduct, the harm by plaintiff would not have been sustained. (Doe Decl. at ¶¶ 1-246)

**B. Defendant ABA Accredited University materially breached the parties implied contract and plaintiff has a substantial likelihood of succeeding on the merits of the breach of contract claim against that defendant.**

The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation. *Brown v. Harms*, 251 Va. 301, 306, 467 S.E.2d 805, 807 (1996); *Fried v. Smith*, 244 Va. 355, 358, 421 S.E.2d 437, 439 (1992); *Westminster Investing Corp. v. Lamps Unlimited, Inc.,* 237 Va. 543, 546, 379 S.E.2d 316, 317 (1989). *Filak v. George*, 267 Va. 612, 619, 594 S.E.2d 610, 614 (2004).

Parties may agree to an express contract, whether orally or written, to govern their course

of dealing. See *Virginia Iron, Coal & Coke Co. v. Odle*, 128 Va. 280, 285, 105 S.E. 107, 108

(1920).  In the absence of an express contract, an implied contract may exist. *City of Norfolk v.*

*Norfolk Cnty.*, 120 Va. 356, 363, 91 S.E. 820, 822 (1917). Two types of implied contracts are

recognized in Virginia: implied-in-fact contracts and implied-in-law contracts. *Id*. Implied-in-

fact contracts are no different from express contracts except that, instead of "all of the terms and

conditions [being] expressed between the parties, ... some of the terms and conditions are implied

in law from the conduct of the parties." *Hendrickson v. Meredith*, 161 Va. 193, 200, 170 S.E.

602, 605 (1933). Implied-in-law contracts, or "quasi contracts," establish liability "from an

implication of law that arises from the facts and circumstances, independent  of agreement or

presumed intention." Spectra-4, LLP v. Uniwest Com. Realty, Inc., 290 Va. 36, 43, 772 S.E.2d

290, 293–94 (2015)(quoting *Hendrickson v. Meredith*, 161 Va. 193, 200, 170 S.E. 602, 605

(1933). "In such cases, the promise is implied from the consideration received, [and] the legal

duty imposed upon the defendant defines the contract." *Id*.

In the absence of an express contract between the parties governing a particular subject

matter, an implied contract may exist. *County of Campbell v. Howard*, 133 Va. 19, 54–55, 112

S.E. 876, 886 (1922); *Ellis & Myers Lumber Co. v. Hubbard*, 123 Va. 481, 502, 96 S.E. 754, 760

(1918). Like an express contract, an implied-in-fact contract is created only when the typical

requirements to form a contract are present, such as consideration and mutuality of assent. *City*

*of Norfolk*, 120 Va. at 361–62, 91 S.E. at 821–22. However, an implied-in-fact contract "is

arrived at by a consideration of [the parties'] acts and conduct." *Id*. at 362, 91 S.E. at 821.

Here, plaintiff and ABA Accredited University do not have an express contract.  Rather,

plaintiff attended the ABA Accredited University law program, earned 39 credits through

46

distance learning provided by ABA Accredited University, in the bargained for exchange of consideration of approximately $118,000 tuition paid by Federal Student Aid on behalf of plaintiff to the ABA Accredited University. These actions establish that an implied-in-fact contract existed between plaintiff and ABA Accredited University, and that implied-in-fact contract governs the relationship. (Doe Decl. at ¶¶ 1-246)

A meeting of the minds cannot exist simply because the parties independently believe the exact same thing. Instead, mutuality of assent exists by an interaction between the parties, in the form of offer and acceptance, manifesting "by word, act[,] or conduct which evince the intention of the parties to contract." *Green v. Smith*, 146 Va. 442, 452, 131 S.E. 846, 848 (1926). In other words, the parties' belief of what the agreement is must coincide with written or spoken words, if an express contract is to be formed; or must coincide with the parties' conduct, if an implied-in-fact contract is to be formed. *Id.*; see also Joseph M. Perillo, 1 Corbin on Contracts § 1.19, at 55–58 (rev. ed.1993) (making the point that the only difference between an express and implied-in-fact contract is the manner in which mutuality of assent is established). *Spectra-4, LLP v. Uniwest Com. Realty, Inc.*, 290 Va. 36, 46, 772 S.E.2d 290, 295 (2015).

A contract is not valid and it is unenforceable if the terms of the contract are not established with reasonable certainty. *Dodge v. Trustees of Randolph-Macon Woman's Coll.*, 276 Va. 1, 661 S.E.2d 801 (2008). In Dodge, Female college students failed to state actionable breach of contract claim against college based upon college's decision to allow male student enrollment; students could point to no language in any admissions or enrollment document that could be said to have constituted the necessary clear, definite, and specific promise to operate a college predominantly for women during the duration of the students' academic careers. *Id.*

47

Whereas here, ABA Accredited University posted on its law school website (which has since been changed), that all students were taking classes remotely via distance learning, without any caveats in terms of duration or any other conditions, such as COVID-19. [4] It cannot in good faith change those terms after having accepted students attending from other states, and after offering exclusively distance learning in the past, consistent with its advertisement.

Under New York law, the relationship between an institution of higher education and its students is contractual in nature; the rights and obligations of the parties as contained in the university's bulletins, circulars, and regulations made available to the student become a part of this contract. In re Columbia Tuition Refund Action, 523 F. Supp. 3d 414 (S.D.N.Y. 2021).

To make out an implied contract claim against a university under New York law, a student must identify specific language in the school's bulletins, circulars, catalogues, and other literature which establishes the particular contractual right or obligation alleged by the student. *Id.*

In a breach of contract action against a university under New York law, the interpretation of a university's catalogue, like the interpretation of any contract, is a matter of law for the Court.

In general, to sustain a contract claim against a university under New York law, a student must point to a provision that guarantees certain specified services, not merely to a general statement of policy, or to statements of opinion or puffery. To state a valid claim for a breach of

---

[4] Plaintiff issued a notice to preserve evidence to the University and expects that the web site advertisement on the law school web page which promised distance learning, and which enticed plaintiff to enroll, will be discoverable or plaintiff will be afforded sanctions against ABA Accredited University from which the fact finder can infer the evidence existed if ABA Accredited University is found to have not preserved evidence in accordance with its legal duty to do so (subject to law and court's discretion).

contract against a university under New York law, a student must state when and how the university breached the specific contractual promise. A contract claim that is, at bottom, a claim for educational malpractice is not cognizable under New York law. Under New York law, a contract claim against a university must be dismissed if its essence is that the school breached its agreement by failing to provide an effective education. Private university did not specifically promise to provide exclusively in-person instruction, and thus university was not liable for breach of contract under New York law for adoption of online instruction due to COVID-19 pandemic, to the extent claims were premised on alleged contractual entitlement to live, in-person instruction in a physical classroom, notwithstanding pre-pandemic advertisements for certain fully online academic programs; fact that university provided in-person instruction in courses prior to pandemic did not imply a contractual entitlement to continued in-person instruction, and references to classroom locations and physical attendance requirements in university's syllabi, departmental policies and university literature, and course registration portal, did not offer indefinite guarantee. In a contract claim against a university under New York law, a university's academic and administrative prerogatives may not be impliedly limited by custom. References in university's marketing materials to "the on-campus experience" were mere opinion or puffery that were too vague to be enforced as a contract, and thus references were not sufficient to support a breach of contract claim under New York law against private university for moving from in-person instruction to online instruction due to COVID-19 pandemic.

Students failed to allege that private university fell short of six to one student to faculty ratio in connection with shift to online instruction, as required to state breach of contract claim against university after university decided to move to online instruction due to COVID-19 pandemic, assuming that university was contractually obligated to maintain six to one student to

49

faculty ratio that university allegedly touted on its website. References to private university's physical location in New York City in university publications and marketing materials did not support students' contract claim under New York law concerning university's decision to move to online instruction in response to COVID-19 pandemic, to the extent claims were premised on alleged contractual entitlement to live, in-person instruction in a physical classroom, since there was no claim that university's actual location had changed.

Student plausibly alleged that private university breached promise to provide specific services when it adopted online instruction in response to COVID-19 pandemic, and thus student stated a breach of contract action against private university under New York law, by alleging that course registration portal on university's website stated that on-campus courses would be taught with only traditional in-person, on-campus class meetings; university's disclaimer in university catalog was ambiguous as to whether it covered change in instructional format from in-person to online. A specific disclaimer in university catalogue may excuse the university from a specific promise that would otherwise be a contractual obligation under New York law. Students' allegations adequately stated a breach of contract claim against private university under New York law with regard to contract to provide access to certain campus facilities and activities in exchange for mandatory student fees, by alleging that university closed certain campus facilities and cancelled activities due to COVID-19 pandemic, and that, although university had refunded some fees collected from students, refunds were inadequate to account for closures and cancellations.

Students were not required to allege bad faith or arbitrariness to adequately state a breach of contract claim against private university regarding university's decision during COVID-19 pandemic to close campus facilities and cancel activities, which the university had expressly

promised in its publications. University decisions regarding academic standards are entitled to judicial deference for the same reason that courts refuse to entertain claims of educational malpractice: because decisions surrounding the issuance of academic credentials must be left to the sound judgment of the professional educators who monitor the progress of their students on a regular basis. There is no call for deference when a court is called upon to determine if a university breached a contract to provide specified, non-academic services; if anything, such claims are even more readily susceptible to judicial review than claims arising from students' dismissals for non-academic reasons because breach of contract claims for specific university services are not based on essentially fictional contracts that must generally be assumed rather than proved, and instead, they are based on provisions of universities' publications that courts are well-equipped to interpret according to established contractual interpretation principles.

A university must act in good faith in dealing with its students, even in the absence of any specific promise. Student who had paid mandatory fees for facilities and activities at private university plausibly alleged that university breached contract to provide access to some on-campus facilities and activities during COVID-19 pandemic in exchange for fees paid, by alleging that university closed most campus buildings and cancelled most student activities in response to pandemic, without refunding any fees.

### C. Defendant ABA Accredited University engaged in unlawful [Redacted] against the plaintiff who has a substantial likelihood of succeeding on the merits of the [Redacted] claim against that defendant. [5]

Access to higher education is important because of its significance as a means of access to participation in other aspects of life. Beginning in the mid-1980's, the numbers of students

---

[5] § 3:1. Rehabilitation Act, [Redacted], and [Redacted] Act: general application to Higher Education, Rothstein, Disabilities and the Law § 3:1 (4th ed.)

with disabilities on college campuses began increasing dramatically.[6] This was probably the

result of a number of factors. First, it is probable that because of the special education mandate in

the public school setting, students had been identified as having disabilities and as having

---

[6] Data from 2015-2016 indicate that approximately 20 percent of undergraduates in Higher
Education had disabilities. This is based on self-reporting.
https://nces.ed.gov/fastfacts/display.asp?id=60. Earlier data shows that six percent of all first
time full time students at four year institutions self reported a [Redacted] in fall 2000. Of those,
40% reported a learning [Redacted], and 16% reported a sight impairment. *See*
www.heath.gwu.edu/pdfs/collegefreshmen.pdf. There are some probable inaccuracies in this
information because visual impairments may be overreported by students who wear glasses, and
health impairments may be underreported because of concerns about confidentiality, such as by
students with HIV. The data still provides a general idea of the incidence of students with
disabilities within the college population. It is likely that difficulties in determining the number
of students with alcohol and other drug problems, those with mental and emotional problems,
and those with learning disabilities will make it impossible to obtain completely accurate data. In
addition, the prohibition on preadmissions inquiry makes identification difficult. *See* § 3:5. *See
also* Rothstein, The [Redacted] Act and Higher Education25 Years Later: An Update on the
History and Current [Redacted] [Redacted] Issues for Higher Education, 41 J.C. & U.L. 531
(2015); Rothstein, *Forty Years of [Redacted] Policy in Legal Education and the Legal
Profession: What Has Changed and What Are the New Issues?*, 22 Am. U. J. Gender Soc. Pol'y
& L. 519 (2014).
Rothstein, Higher Education and [Redacted] [Redacted]: A Fifty Year Retrospective, 36 J.C. &
U.L. 843 (2010); Rothstein, [Redacted] Law and Higher Education: A Road Map for Where
We've Been and Where We May Be Heading, 63 Md. L. Rev. 122 (2004); Rothstein, Higher
Education *and the Future of [Redacted] Policy*, 52 Alabama L. Rev. 375 (2000);
Rothstein, *Millennials and [Redacted] Law: Revisiting Southeastern Community College v.
Davis*, 34 J. Coll. & U.L. 169 (2007).

 For an international comparison of highereducation and disabilities, *see* Riddell, et
al, *Managerialism and Equalities: Tensions Within Widening Access Policy and Practice for
Disabled Students in UK* Universities, 54 Higher Education 615 (2007) (published online by
Springer Science + Business Media B.V. 2006).
Although college students have been protected from [Redacted] since 1973, there is still a need
for awareness of how they should prepare for this in transition from K-12. The Department of
Education published a guide in 2017 to address these issues. *See* Office of Special Education and
Rehabilitative Services, "A Transition Guide to Postsecondary Education and Employment for
Students and Youth with Disabilities," Jan. 2017, available at
https://www2.ed.gov/about/offices/list/osers/transition/products/postsecondary-transition-guide-
2017.pdf.

received special education at an earlier age. Those students began reaching college age in the mid-1980's. Second, there was an increasing awareness of [Redacted] issues. The result of this was that students who may not have been previously identified, such as students with learning disabilities, were being evaluated to identify possible disabilities. Third, there was an increase in the awareness of legal rights for students with disabilities, and this may have resulted in more students being willing to self-identify or to seek higher education when they might not have done so previously.

In addition to the increase in the number of students with disabilities on college campuses, in the late 1980's and early 1990's there was a significant increase in the amount of litigation involving the legal rights of students with disabilities. The major law applicable to issues involving students with disabilities is [Redacted] of the Rehabilitation Act of 1973.[7] The purpose of the predecessor to the Rehabilitation Act of 1973 was to provide rehabilitation services to enhance employability[8], and [Redacted] extended applicability of the Rehabilitation Act to other areas of life by prohibiting [Redacted] on the basis of [Redacted] by recipients of federal financial assistance. Because virtually all colleges and universities receive federal financial assistance, [Redacted] has a major impact on colleges and universities.

While [Redacted] already provides comprehensive coverage of most issues of [Redacted] that would arise in a higher education setting, the [Redacted] Act of 1990 ([Redacted])[9] provides

---

[7] 29 U.S.C.A. § 794.
**Texts:** 1 Americans With Disabilities: Practice and Compliance Manual §§ 1:143 to 1:160.

[8] To see the change in definition, *compare* 29 U.S.C.A. § 706 *with* 47 C.F.R. § 84.3(j).

[9] 42 U.S.C.A. §§ 12101 et seq. Hill, *[Redacted] Act of 1990: Significant Overlap with [Redacted] for Colleges and* Universities, 18 J. Coll. & U.L. 389 (1992).

additional coverage by virtue of its application to public services (state agencies and programs such as state universities) and public [Redacted] (which would include most private colleges). The [Redacted] has major provisions relating to employment, public services, and public [Redacted].[10] It also has a section on testing and examinations that is significant for higher education.[11]

Under [Redacted] an individual with a [Redacted] is one who has a physical or mental impairment that substantially limits one or more major life activities, has a record of such an impairment, or who is regarded as having such an impairment.[12] Major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. A major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell

---

[10] 42 U.S.C.A. § 12101, Titles I, II, III.

[11] 42 U.S.C.A. § 12189.
**Texts:** 1 Americans With Disabilities: Practice and Compliance Manual §§ 4:114 to 4:123.

[12] 29 U.S.C.A. § 706(8)(D). *See also* Marlon v. Western New England College, 124 Fed. Appx. 15, 196 Ed. Law Rep. 471 (1st Cir. 2005) (evidence that college provided student with certain [Redacted] for condition, standing alone, insufficient to prove that college regarded student as disabled); Letter to Crouse Hospital School of Nursing, 35 Nat'l [Redacted] Law Rep. ¶ 125 (OCR 2006) (record did not support that university dismissed nursing school student with [Redacted] because she was perceived as being impaired; student dismissed because she performed unsafely).

**Texts:** 1 Americans With Disabilities: Practice and Compliance Manual §§ 1:21 to 1:52.

growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.[13]

Under the [Redacted] an individual is disabled if that individual has a physical or mental impairment that substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment. [14]

---

[13] 42 U.S.C.A. § 12102(2). *See also* Alexiadis v. New York College of Health Professions, 891 F. Supp. 2d 418, 289 Ed. Law Rep. 755 (E.D. N.Y. 2012) (HIV positive college student dismissed for stealing bag of hand sanitizer brought [Redacted] [Redacted] claim; fact issue about whether he was disabled; causal relationship at issue).

[14] 42 U.S.C.A. § 12102(1). Widomski v. State University of New York (SUNY) at Orange, 748 F.3d 471, 29 A.D. Cas. (BNA) 980, 304 Ed. Law Rep. 48 (2d Cir. 2014) (student whose hands shook too much to draw blood from patients not perceived to have an impairment limiting a major life activity; he was still employable for medical technician jobs not requiring phlebotomy); Swanson v. University of Cincinnati, 268 F.3d 307, 12 A.D. Cas. (BNA) 417, 158 Ed. Law Rep. 60, 2001 FED App. 0331P (6th Cir. 2001) (surgical resident with major [Redacted] not substantially limited in ability to perform major life activities; difficulty with concentrating was temporary and alleviated by medication; communications problems were short-term, caused by medication, and consisted of only a few episodes); Knapp v. Northwestern University, 101 F.3d 473, 19 A.D.D. 355, 114 Ed. Law Rep. 460 (7th Cir. 1996) (student with cardiovascular defect not disabled; student's ability to learn not substantially limited by university's refusal to allow him to play intercollegiate basketball); Witbeck v. Embry Riddle Aeronautical University, Inc., 219 F.R.D. 540, 184 Ed. Law Rep. 853 (M.D. Fla. 2004) (student failed to demonstrate that he had central auditory processing disorder while attending university). *See also* Strujan v. Lehman College, 363 Fed. Appx. 84, 257 Ed. Law Rep. 72 (2d Cir. 2010) (inability to perform in one college course not a [Redacted]); Alexiadis v. New York College of Health Professions, 891 F. Supp. 2d 418, 289 Ed. Law Rep. 755 (E.D. N.Y. 2012) (college student who was HIV positive arrested for stealing bag of hand sanitizer; dismissed from college; allowing claim to go forward regarding whether he was disabled; whether dismissal was because of [Redacted]; and whether explanation was a pretext); Manickavasagar v. Virginia Commonwealth University School of Medicine, 667 F. Supp. 2d 635, 253 Ed. Law Rep. 228 (E.D. Va. 2009) (applicant to medical school rejected based on perception of [Redacted] of bipolar disorder; deference given to academic institution); Brief v. Albert Einstein College of Medicine, 41 Nat'l [Redacted] Law Rep. ¶ 93, 2010 WL 2271438 (S.D. N.Y. 2010), judgment aff'd in part, vacated in part, 423 Fed. Appx. 88, 269 Ed. Law Rep. 491 (2d Cir. 2011) (medical school student's [REDACTED] was  not substantially limiting to learning; claim was condition was not considered when he was dismissed).

The [Redacted] Amendments Act of 2008 amends the definition of [Redacted]. The Amendments specifically provide that concentrating, thinking, and communicating are major life activities. This amendment may make it more likely that an individual with a learning [Redacted] will fall under the definition. Learning disabilities are referred to as one of several impairments that are included in the coverage of regulations under [Redacted] of the Rehabilitation Act.

The individual claiming the [Redacted] has the obligation to provide appropriate documentation of the existence of the learning [Redacted] when placing it at issue. College applicants who seek special consideration in the admissions process, modifications in the academic program, or auxiliary services have the obligation to demonstrate that the impairment is one that justifies special treatment.

To be useful, the evaluation should describe how the abilities of that individual relate to the specific program in question and how any deficiencies can be compensated for. For example, a student applying to a program that requires a great deal of math, such as an engineering or accounting program, might need to have a more detailed description of deficiencies in mathematical computation skills and whether such deficiencies can be accommodated by allowing additional time or the use of a calculator. The college would then have to evaluate whether such an [Redacted] would be a fundamental alteration to its program.

The documentation should include testing procedures, instruments, results, and interpretations. It should reflect the individual's present achievement level and the results of testing for intelligence, vocabulary, reading rate, reading comprehension, spelling, mathematical comprehension, memory, and processing skills. It should be appropriately recent.9 For a graduate program, a test done as an adult might be sufficient, but for an undergraduate program,

more recent testing might be needed. An evaluation of an applicant done in elementary school would, thus, probably be inadequate.

Applicants and students not only must prove that they are disabled within [Redacted] or the [Redacted], but they also must demonstrate that they are otherwise qualified.14 With respect to learning disabilities, some programs may have concerns about the safety of others. For example, if an applicant frequently transposes numbers, this could create a safety risk if that individual were prescribing medication as a medical school student or entering information on a chart as a nursing student. It must be demonstrated that reasonable [Redacted], such as permitting dictation, would not eliminate the risk.

Colleges are only required to provide [Redacted] that are not unduly burdensome, administratively or financially, and that do not require a fundamental alteration of the program. Courts have traditionally given colleges a great deal of deference on these issues. § 3:22. Students with learning disabilities, Rothstein, Disabilities and the Law § 3:22 (4th ed.)[15]

---

[15] *See* § 3:9. The leading case on this issue is <u>Wynne v. Tufts University School of Medicine, 932 F.2d 19, 67 Ed. Law Rep. 497 (1st Cir. 1991)</u> (university must demonstrate that alternative means and their feasibility, cost, and effect were considered in refusing to provide an examination in other than multiple choice format). *See also* <u>Stern v. University of Osteopathic Medicine and Health Sciences, 220 F.3d 906, 146 Ed. Law Rep. 108 (8th Cir. 2000)</u> (upholding denial of dyslexic medical school student's request that multiple-choice test answers be supplemented with oral or essay responses; other [Redacted] had been provided); <u>Lipton v. New York University College of Dentistry, 865 F. Supp. 2d 403, 285 Ed. Law Rep. 339 (S.D. N.Y. 2012)</u>, aff'd, <u>507 Fed. Appx. 10, 27 A.D. Cas. (BNA) 684 (2d Cir. 2013)</u> ([Redacted]/504 claim by dental student with reading disorder; requested [Redacted] of being allowed to retake a national exam an unlimited number of times without paying re-matriculation fee not reasonable; student had been granted additional time on exams); <u>Johnson v. Washington County Career Center, 982 F. Supp. 2d 779, 29 A.D. Cas. (BNA) 125, 304 Ed. Law Rep. 1028 (S.D. Ohio 2013)</u> (reasonable issues remained regarding reasonable [Redacted] that should have been provided to student with dyslexia; student requested reading device for tests; scanning course materials into device and word bank; student sometimes received graded assignments back later than other students).

The procedures and remedies under [Redacted] of the Rehabilitation Act [16] and the
[Redacted] Act[17] require certain procedures and remedies. One of the early major issues involved
program specificity, which was a major issue on college campuses. Before the Civil Rights
Restoration Act of 1987 amended [Redacted][18], there was a question as to whether an entire
college would be subject to [Redacted] if only one program received federal financial assistance.
That issue has now been clearly resolved and "all operations of a college, university, or other
postsecondary institution, or public system of higher education" are covered if one aspect
receives federal financial assistance.[19]

---

[16] 29 U.S.C.A. § 794. *See also* McInerney v. Rensselaer Polytechnic Institute, 505 F.3d 135, 19
A.D. Cas. (BNA) 1415, 226 Ed. Law Rep. 647 (2d Cir. 2007) (no requirement to exhaust
administrative remedies under Title III; failure to appoint doctoral student adequate thesis
advisor may violate [Redacted]); Untermyer v. College of Lake County, 35 Nat'l [Redacted] Law
Rep. ¶ 96, 2007 WL 2591184 (N.D. Ill. 2007) (student with hearing impairment with claims
regarding interpreter service must bring Rehabilitation case in federal court rather that using state
court under breach of contract theory); Long v. Howard University, 512 F. Supp. 2d 1, 19 A.D.
Cas. (BNA) 1380, 225 Ed. Law Rep. 607 (D.D.C. 2007), judgment aff'd, 550 F.3d 21, 21 A.D.
Cas. (BNA) 686, 239 Ed. Law Rep. 867 (D.C. Cir. 2008) (former doctoral student who took
leave due to pulmonary fibrosis barred by statute of limitations under both [Redacted] and
Rehabilitation Act; statute runs from date student received notice that request for [Redacted] had
been denied).

[17] 42 U.S.C.A. §§ 12101 et seq. *See also* Bowers v. National Collegiate Athletic Ass'n, 346 F.3d
402, 14 A.D. Cas. (BNA) 1312, 181 Ed. Law Rep. 377, 56 Fed. R. Serv. 3d 1048 (3d Cir.
2003) (a third-party university had no right of contribution under either the [Redacted] or the
Rehabilitation Act against two third-party defendant universities, in an action by an athlete with
a learning [Redacted] alleging that the denial of a scholarship violated the Acts; neither Act
created an express right of contribution, and such right could not be inferred, since the other
provisions of the Acts which were closest in structure, purpose, and intent to the provisions
recognizing private causes of action did not suggest that Congress would have created explicit
private rights of action for violations of the Acts); Long v. Howard University, 561 F. Supp. 2d
85 (D.D.C. 2008) (holding that university was entitled to costs as the prevailing party).

[18] 29 U.S.C.A. § 794(a)(2)(A).

[19] 29 U.S.C.A. § 794(a)(2)(A).

One other issue deserves attention in this section, that being the burden of proof. In light of the decision in *Wynne v. Tufts University School of Medicine*[20], it would seem that, at least when denial of [Redacted] is involved, the college has the burden of demonstrating that it considered the feasibility, cost, and effects of alternative means in refusing the [Redacted] before such denial can be valid. The college must show that this consideration resulted in a determination that there would be an undue burden (either financial or administrative) in providing the [Redacted] or that it would lower academic standards to provide the [Redacted].

The standard set in this decision, which has been applied in other jurisdictions, requires colleges to evaluate the feasibility of various alternatives in a variety of situations. While this is arguably quite burdensome on the colleges, it is probable that the courts will still give colleges a great deal of deference in their final determinations.

The case of *Zukle v. Regents of University of California*[21] provides an extensive discussion of the degree of deference to be accorded to academic decision making. It is particularly important because it discusses the specific context of a medical school program. The

---

[20] Wynne v. Tufts University School of Medicine, 932 F.2d 19, 67 Ed. Law Rep. 497 (1st Cir. 1991).

[21] Zukle v. Regents of University of California, 166 F.3d 1041, 1046–1048, 9 A.D. Cas. (BNA) 80, 132 Ed. Law Rep. 81 (9th Cir. 1999). *See also* Kaltenberger v. Ohio College of Podiatric Medicine, 162 F.3d 432, 8 A.D. Cas. (BNA) 1625, 131 Ed. Law Rep. 48, 1998 FED App. 0356P (6th Cir. 1998) (deference to academic administrators highlighted); McGuinness v. University of New Mexico School of Medicine, 170 F.3d 974, 9 A.D. Cas. (BNA) 297, 133 Ed. Law Rep. 349 (10th Cir. 1998) (educational institution entitled to substantial deference); Ferrell v. Howard Univ., 10 A.D. Cas. (BNA) 47, 1999 WL 1290834 (D.D.C. 1999)(no [Redacted] in refusing to allow student diagnosed with [REDACTED] to retake a medical exam; school entitled to judicial deference on academic standards). For a discussion of the issue of academic deference in Higher Education, *see* Dupre, *[Redacted], Deference, and the Integrity of the Academic Enterprise*, 32 Georgia L. Rev. 393, 398–419 (1998).

court holds that the initial burden of production is on the plaintiff to demonstrate qualification. The burden then shifts to the institution to produce evidence that the [Redacted] is a fundamental or substantial modification of its program or standards. The institution may also meet its burden if it demonstrates that the student would not meet the academic standards even with the requested [Redacted]. This case can be contrasted with the decision in *Wong v. Regents of University of California*[22] involving similar facts but where the result was different. In *Wong*, the court cited *Zukle and Wynne v. Tufts University* in noting that the institution has an obligation to "submit a factual record indicating that it conscientiously carried out" its statutory obligation and finding that the university's record in Wong fell short of that obligation.

Few cases have addressed the liability of administrators for discriminatory policies and practices.[23]

---

[22] Wong v. Regents of University of California, 192 F.3d 807, 9 A.D. Cas. (BNA) 1227, 138 Ed. Law Rep. 698 (9th Cir. 1999), as amended, (Nov. 19, 1999).

[23] Emerson v. Thiel College, 296 F.3d 184, 13 A.D. Cas. (BNA) 493, 167 Ed. Law Rep. 107, 53 Fed. R. Serv. 3d 473 (3d Cir. 2002) (administrators, faculty, staff, and outside legal counsel not liable under Title III of [Redacted] as controlling affairs of college); Guckenberger v. Boston University, 957 F. Supp. 306, 21 A.D.D. 243, 6 A.D. Cas. (BNA) 746, 117 Ed. Law Rep. 500, 37 Fed. R. Serv. 3d 874 (D. Mass. 1997) (in claim by class of students with learning disabilities, individual administrators may be liable under [Redacted] law but not under breach of contract law); Coddington v. Adelphi University, 45 F. Supp. 2d 211, 135 Ed. Law Rep. 110 (E.D. N.Y. 1999) (no individual liability against employee of private university for [Redacted] against student); Shepard v. Irving, 204 F. Supp. 2d 902, 166 Ed. Law Rep. 171 (E.D. Va. 2002), aff'd in part, rev'd in part on other grounds, 77 Fed. Appx. 615, 182 Ed. Law Rep. 92 (4th Cir. 2003) (university officials immune as individuals; claim must be in official capacity); Stevens v. Board of Trustees, 26 A.D. Cas. (BNA) 1882, 2012 WL 3929896 (S.D. Ill. 2012) (university professor responsible for maintaining and repairing nuclear magnetic resonance instruments had back problems affecting performance; needed more graduate assistance; claims allowed to go forward regarding engagement in interactive process under [Redacted]/[Redacted] and FMLA [Redacted] claim); Bracey v. Buchanan, 55 F. Supp. 2d 416, 137 Ed. Law Rep. 528 (E.D. Va. 1999) (provost not individually liable for student's claim against university); Rivera-Concepcion v. Puerto Rico, 786 F. Supp. 2d 489, 272 Ed. Law Rep. 201 (D.P.R. 2011) (expulsion of student with bipolar disorder from an internship program was made by officials of the state institution,

Even in cases where the individual is not disabled and there is a finding that the

institution did not discriminate on the basis of [Redacted], there have been findings that the

institution may be liable for retaliatory treatment.[24]

In Board of Trustees of University of Alabama v. Garrett[25] the Supreme Court held that

private individuals may not recover money damages against the States under Title I of the

_____

but was made by employees of the non-profit organization with the co-op agreement to operate
the program; officials were unaware of bipolar disorder until after the expulsion).

[24] Pacella v. Tufts University School of Dental Medicine, 66 F. Supp. 2d 234, 9 A.D. Cas.
(BNA) 1682, 139 Ed. Law Rep. 425 (D. Mass. 1999) (leaving open the claim of [Redacted]
because the university did not seek summary judgment on that count); Bertolotti v. Prunty, 23
A.D. Cas. (BNA) 1915, 2010 WL 3743866 (S.D. W. Va. 2010) (dismissing claim of [Redacted],
but denying dismissal of the [Redacted] claim, by student with hearing impairment who
informed professor that she could not read his lips and claimed she was ridiculed and questioned
because of the request); Di Lella v. University of Dist. of Columbia David A. Clarke School of
Law, 570 F. Supp. 2d 1, 237 Ed. Law Rep. 182 (D.D.C. 2008) (motion to dismiss denied in
claim by student that professor had reported student for academic dishonesty in [Redacted] for
complaint about professor's behavior in class); McInerney v. Rensselaer Polytechnic Institute,
505 F.3d 135, 19 A.D. Cas. (BNA) 1415, 226 Ed. Law Rep. 647 (2d Cir. 2007) (doctoral student
and employee with brain damage alleged [Redacted]; exhaustion of administrative remedies not
required; student's case based on student not employee status); Sherman v. Black, 510 F. Supp.
2d 193, 225 Ed. Law Rep. 484 (E.D. N.Y. 2007), judgment aff'd, 315 Fed. Appx. 347 (2d Cir.
2009) (student with [Redacted] and academic deficiencies dismissed from medical school; court
addressing procedural issues with respect to [Redacted]); National Federation of Blind v.
Arizona Bd. of Regents, 40 Nat'l [Redacted] Law Rep. ¶ 21, 2009 WL 3352332 (D. Ariz.
2009)(blind student not in class where Kindle electronic reading device was being used; no
standing to challenge it as discriminatory); Bayon v. State University of New York at Buffalo, 32
Nat'l [Redacted] Law Rep. ¶ 169, 2006 WL 1007616 (W.D. N.Y. 2006) (graduate student
awarded $100,000 in case claiming [Redacted] for bringing [Redacted] complaint); Illinois
Wesleyan University, 34 Nat'l [Redacted] Law Rep. ¶ 51 (OCR 2006) (evidence did not support
[Redacted] claim); Letter to Washburn University, 32 Nat'l [Redacted] Law Rep. ¶ 197 (OCR
2005) (student demonstrated some, but not all elements of claim of [Redacted], in claim by law
student that law school advisor had breached confidentiality by providing information to other
university officials); Letter to Otterbein College, 30 Nat'l [Redacted] Law Rep. ¶ 206 (OCRXII,
Cleveland (OH) 2004) (evidence did not support nursing student's claim that lowering grade after
filing complaint was retaliatory).

[25] Rose v. Springfield-Greene County Health Dept., 668 F. Supp. 2d 1206, 253 Ed. Law Rep.
330 (W.D. Mo. 2009), aff'd, 377 Fed. Appx. 573 (8th Cir. 2010).

[Redacted]. Employees of state colleges are not protected under Title I as a result. Reliance on [Redacted] of the Rehabilitation Act and/or the Equal Protection Clause of the Constitution will therefore be necessary for an employee with a [Redacted] to challenge discriminatory conduct. The status of challenge under Title II was not addressed, but it seems questionable in light of the Court's reasoning.  As a result of that ruling, higher education agencies have increasingly begun

to raise the immunity defense in [Redacted] [Redacted] cases.[26] Some courts have barred the

claims based on immunity.[27] Others have not allowed immunity to apply.[28]

---

[26] For a discussion of that issue, *see* Hartley, *Enforcing Federal Civil Rights Against Public Entities After Garrett*, 28 J. Coll. & U.L. 41 (2001). *See also* Shaboon v. Duncan, 252 F.3d 722, 12 A.D. Cas. (BNA) 548, 154 Ed. Law Rep. 757 (5th Cir. 2001) (leaving open issue of immunity under Title II of [Redacted] in state medical student's claim that severe [Redacted] was basis for denial of clinical and residency privileges); Robinson v. University of Akron School of Law, 307 F.3d 409, 13 A.D. Cas. (BNA) 1098, 170 Ed. Law Rep. 117, 2002 FED App. 0349P (6th Cir. 2002) (states' immunity has not been abrogated as to equal protection, barring claim by law student for failure to reasonably accommodate his learning [Redacted]); Constantine v. Rectors and Visitors of [Redacted] University, 411 F.3d 474, 16 A.D. Cas. (BNA) 1445, 199 Ed. Law Rep. 35 (4th Cir. 2005) (no Title II immunity for public Higher Education); Costello v. University of North Carolina at Greensboro, 394 F. Supp. 2d 752, 204 Ed. Law Rep. 220 (M.D. N.C. 2005) (right to play collegiate sports and receive sports scholarship not fundamental rights, Eleventh Amendment immunity applies to Title II claim in that context).

[27] Sullivan v. Texas A&M University System, 986 F.3d 593, 2021 A.D. Cas. (BNA) 36033, 387 Ed. Law Rep. 43 (5th Cir. 2021) (no waiver of Eleventh Amendment immunity under Title I of [Redacted]); Johnson v. State of Louisiana, 22 Nat'l [Redacted] Law Rep. ¶ 172, 2002 WL 83645 (E.D. La. 2002), on reconsideration in part, 2002 WL 1398659 (E.D. La. 2002) and vacated, 330 F.3d 362, 14 A.D. Cas. (BNA) 678, 176 Ed. Law Rep. 587 (5th Cir. 2003), reh'g en banc granted, order vacated, 343 F.3d 732, 14 A.D. Cas. (BNA) 1472 (5th Cir. 2003) and on reh'g en banc, 421 F.3d 342, 17 A.D. Cas. (BNA) 47 (5th Cir. 2005) (immunity barred student from recovering from university, but not president; Fifth Circuit vacated, holding that state entities did not knowingly waive their Eleventh Amendment sovereign immunity from claims under § 504 of Rehabilitation Act); Carten v. Kent State University, 282 F.3d 391, 12 A.D. Cas. (BNA) 1438, 162 Ed. Law Rep. 39, 2002 FED App. 0068P (6th Cir. 2002) (dismissed graduate student's claim under Title II of the [Redacted] barred by Eleventh Amendment); Association for Disabled Americans, Inc. v. Florida International University, 178 F. Supp. 2d 1291, 161 Ed. Law Rep. 260 (S.D. Fla. 2001), rev'd and remanded, 405 F.3d 954, 16 A.D. Cas. (BNA) 1130, 197 Ed. Law Rep. 36 (11th Cir. 2005) (suit on behalf of hearing impaired students barred by Eleventh Amendment; claims against state officers for prospective injunctive relief could be allowed; the Eleventh Circuit reversed, holding that Title II of the [Redacted], as applied to access to public education, constitutes a valid exercise of Congress's enforcement power under the Fourteenth Amendment); Stewart v. Mountainland Technical College, 63 Nat'l [Redacted] Law Rep. ¶ 12, 2021 WL 794488 (D. Utah 2021)(granting immunity from money damages under the [Redacted]; charge of failure to accommodate and impermissible termination by program director with blepharospasm); Hamilton v. City College of City University of New York, 173 F. Supp. 2d 181, 159 Ed. Law Rep. 610 (S.D. N.Y. 2001) (Eleventh Amendment bars Rehabilitation Act and Title II [Redacted] claim by student for damages); Costello v. University of North Carolina at Greensboro, 394 F. Supp. 2d 752, 204 Ed. Law Rep. 220 (M.D. N.C. 2005) (student dismissed from college golf team who lost athletic scholarship could not bring

damage action under Title II because of immunity); Press v. State University of New York at Stony Brook, 388 F. Supp. 2d 127, 17 A.D. Cas. (BNA) 555, 203 Ed. Law Rep. 547 (E.D. N.Y. 2005) (education access not a fundamental right, Eleventh Amendment immunity applies); Brettler v. Purdue University, 408 F. Supp. 2d 640, 17 A.D. Cas. (BNA) 893, 206 Ed. Law Rep. 293 (N.D. Ind. 2006) (Title II does not apply to employment; state university immune from Title I claim); Doe v. Board of Trustees of University of Illinois, 429 F. Supp. 2d 930, 210 Ed. Law Rep. 238 (N.D. Ill. 2006) (university and officials immune from [Redacted] suits); Press v. State University of New York at Stony Brook, 388 F. Supp. 2d 127, 17 A.D. Cas. (BNA) 555, 203 Ed. Law Rep. 547 (E.D. N.Y. 2005) (immunity from Title II action for money damages); Feldman v. Oakland University Bd. of Trustees, 41 Nat'l [Redacted] Law Rep. ¶ 141, 2010 WL 2572768 (E.D. Mich. 2010) (determining appropriate attorney's fees in case where student received permanent injunction requiring university to allow him to live on campus). For a case denying jurisdiction for a state law claim, *see* Grutman v. Regents of University of California, 807 F. Supp. 2d 861, 275 Ed. Law Rep. 851 (N.D. Cal. 2011) declining supplemental jurisdiction over claim involving college student's case that each day her [Redacted] affected ability to open dorm door was a new violation of state law; university contended a continuing violation that should cap damages.

[28] Bowers v. National Collegiate Athletic Ass'n, 475 F.3d 524, 216 Ed. Law Rep. 37 (3d Cir. 2007), amended on reh'g, (Mar. 8, 2007) (Eleventh Amendment did not protect university from student athlete's claim under Title II); Toledo v. Sanchez, 454 F.3d 24, 18 A.D. Cas. (BNA) 208, 211 Ed. Law Rep. 25 (1st Cir. 2006) (Eleventh Amendment does not prevent Title II action); Bennett-Nelson v. Louisiana Bd. of Regents, 431 F.3d 448, 17 A.D. Cas. (BNA) 581, 204 Ed. Law Rep. 476 (5th Cir. 2005)(university waived Eleventh Amendment immunity under Rehabilitation Act; immunity in context of public education under Title II of [Redacted] undecided); Toledo v. Sanchez, 454 F.3d 24, 18 A.D. Cas. (BNA) 208, 211 Ed. Law Rep. 25 (1st Cir. 2006) (university not immune from Title II action by student requesting attendance [Redacted] for his mental health conditions); Constantine v. Rectors and Visitors of [Redacted] University, 411 F.3d 474, 16 A.D. Cas. (BNA) 1445, 199 Ed. Law Rep. 35 (4th Cir. 2005) (no immunity under Title II and § 504 in context of public Higher Education); Dugger v. Stephen F. Austin State University, 232 F. Supp. 3d 938, 2017 A.D. Cas. (BNA) 34881 (E.D. Tex. 2017)(no 11th Amendment immunity from case by state university policy officer with back injury seeking work [Redacted]; triable issue about whether condition was a [Redacted]; seeking light duty assignment); Covington v. McNeese State University, 996 So. 2d 667, 240 Ed. Law Rep. 476 (La. Ct. App. 3d Cir. 2008), writ denied, 3 So. 3d 491 (La. 2009) (university did not have Eleventh Amendment immunity under Title II of the [Redacted]). *See also* Frank v. University of Toledo, 621 F. Supp. 2d 475, 246 Ed. Law Rep. 164 (N.D. Ohio 2007) (no immunity from Title II in context of Higher Education; student who used cane and had nerve problems seeking parking [Redacted] and exam [Redacted]; student did not make sufficiently specific requests for [Redacted] before exam; program not required to be restructured in entirety).

One of the most common issues raised by the Office for Civil Rights when investigating complaints of [Redacted] on college campuses is the lack of appropriate policies and procedures to receive [Redacted].[29] To minimize litigation, institutions may want to ensure there are alternative dispute resolution mechanisms.[30]

Occasionally, issues regarding the statute of limitations arise.[31] There are also a number of cases that have held that the 2008 Amendments to the definition of [Redacted] and do not

---

[29] *See e.g.*, Loyola University Chicago, 33 Nat'l [Redacted] Law Rep. ¶ 256 (OCR 2006) (university agreed to develop an effective grievance procedure to ensure prompt equitable resolution of [Redacted] [Redacted] complaints); Letter to Southern University and A&M College, 31 Nat'l [Redacted] Law Rep. ¶ 177 (OCR 2005) (university did not provide student with decision on grievance; new procedures to be implemented); Letter to Southern California University of Health Sciences, 30 Nat'l [Redacted] Law Rep. ¶ 210 (OCR 2004) (while university did not discriminate by not accommodating student absences, OCR provided technical assistance to address policies and procedures to improve informal procedures); Letter to Brown Mackie College, 30 Nat'l [Redacted] Law Rep. ¶ 2007 (OCRIII, Philadelphia (KY) 2004) (while student failed to request adjustments, college did not have grievance procedure for prompt and fair resolution of [Redacted] complaints); Letter to Harvard University, 34 Nat'l [Redacted] Law Rep. ¶ 200 (OCR 2006) (OCR praised Harvard for proactive and responsive approach after student complaint; complaint resolution process and other concerns addressed).

[30] *See e.g.*, Schneider v. Shah, 45 Nat'l [Redacted] Law Rep. ¶ 47, 2012 WL 1161584 (D.N.J. 2012), judgment aff'd, 507 Fed. Appx. 132, 292 Ed. Law Rep. 626 (3d Cir. 2012) (obligation to engage in interactive process in [Redacted] ends on day student sues university; student in paralegal program had excess absences); Letter to Newman University, 33 Nat'l [Redacted] Law Rep. ¶ 123 (OCR 2006) (early complaint resolution procedure resolved issue); Letter to Kent State University, 33 Nat'l [Redacted] Law Rep. ¶ 125 (OCR 2005) (discussing interactive process to identifying appropriate academic adjustments).

[31] *See e.g.*, Long v. Howard University, 550 F.3d 21, 21 A.D. Cas. (BNA) 686, 239 Ed. Law Rep. 867 (D.C. Cir. 2008) (university did not waive statute of limitations defense; had included defense in its answer and during pretrial proceedings); Cordova v. University of Notre Dame Du Lac, 936 F. Supp. 2d 1003, 297 Ed. Law Rep. 231 (N.D. Ind. 2013) (student claiming learning [Redacted] and psychological [Redacted] claimed numerous denials of requested [Redacted]; dismissal due to statute of limitations for [Redacted], Rehab Act and state tort law; isolated bouts of [Redacted] did not constitute disabilities under the pre-2008 interpretation of the [Redacted] when the complained of actions occurred).

apply retroactively.[32] At least one court has expressed concern about how the university counsel handled a case in determining the remedy.[33]

ABA Accredited University engaged in unlawful [Redacted] by refusing to admit plaintiff into program to which they were otherwise qualified but for their [Redacted] until plaintiff disavowed their legally entitled [Redacted]. ABA Accredited University engaged in unlawful [Redacted] by refusing to provide reasonable [Redacted], such as larger and multiple monitors (even during open book tests), and basic software features relied upon by the disabled, by refusing to provide the amount of extra time medically recommended, and distance learning, and refusing to engage in interactive dialogue about such reasonable [Redacted] requests. None of the [Redacted] requested by plaintiff would fundamentally change the nature of the program, nor did ABA Accredited University provide any explanation as to why it would not provide the requested reasonable [Redacted] nor did it explain why or how it might believe the requested [Redacted] would be unreasonable or fundamentally change the nature of the program. Such conduct is

---

[32] Singh v. George Washington University School of Medicine and Health Sciences, 667 F.3d 1, 25 A.D. Cas. (BNA) 1449, 276 Ed. Law Rep. 587 (D.C. Cir. 2011) (causes other than learning disabilities related to academic deficiencies, including extracurricular activities, [Redacted], and poor study habits); 667 F.3d 1 (D.C. Cir. 2011) (amendments to the [Redacted] do not apply retroactively to student's claim; student failed to establish relationship of impairment to her performance).

[33] Covington v. McNeese State University, 118 So. 3d 343 (La. 2013) (reversing some of the attorney fee awards and holding that district court decisions on the amounts was not an abuse of discretion); Covington v. McNeese State University, 98 So. 3d 414, 285 Ed. Law Rep. 697 (La. Ct. App. 3d Cir. 2012), writ granted, 104 So. 3d 427 (La. 2012) and rev'd, 118 So. 3d 343 (La. 2013) and writ denied, 130 So. 3d 338 (La. 2014) (awarding approximately $1.8 million in attorneys' fees in case involving student using wheelchair who brought action for lack of accessible restrooms in student union and lack of transition plan; case took 10 years to resolve).

violative of the requirement to engage in interactive dialogue per [Redacted], and in itself violated [Redacted] of the [Redacted].

As a result of the [Redacted], plaintiff was unable to perform sufficiently, was placed under unbearable stress, well beyond the normal stress of the legal education, endured physical symptoms of severe [Redacted], as documented by medical professions,  including heart palpitations and pressure in chest. As such, defendant should be ordered to cease discriminatory conduct, provide reasonable [Redacted],  and pay damages for the harm it caused plaintiff.

### D. Defendant ABA Accredited University engaged in unlawful [Redacted] against the plaintiff who has a substantial likelihood of succeeding on the merits of the [Redacted] claim against that defendant.

[Redacted] is a harmful act against a person that is made in response to that person's grievance or participation in an activity that is protected by law. Anti-[Redacted] provisions in the law are generally tied to constitutional or statutory rights. The purpose of these provisions is to ensure that those who complain about [Redacted] or a violation of rights are not deterred for fear of [Redacted]. They seek to "prevent . . . interference with 'unfettered access'" to statutory rights. *Burlington v. White*, 548 U.S. 53, 68 (2006).

[Redacted] of the Rehabilitation Act prohibits anyone from interfering with the exercise of rights granted by the law to individuals with disabilities. [Redacted] incorporates the anti-[Redacted] provision of Title VI of the Civil Rights Act of 1964, which "prohibits recipients from intimidating, threatening, coercing, or discriminating against any individual for the purpose of interfering with any right or privilege . . . or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part." 34 C.F.R. §104.61 and 34 C.F.R. §100.7(e). The [Redacted] Act ([Redacted]) provides, "no person shall discriminate against any individual because such individual has opposed any act

or practice made unlawful by" the [Redacted]. 42 U.S.C. § 12203(a). Because section 504 uses

an anti-[Redacted] clause that is functionally identical to the [Redacted], they are generally

analyzed together. Retaliatory action is defined broadly. "The law deliberately does not take a

'laundry list' approach to [Redacted], because unfortunately its forms are as varied as the human

imagination will permit." *Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996).

[Redacted] claims that involve a subjective interpretation of events are difficult to prove.

For example, in a complaint to the Office for Civil Rights (OCR) of the Department of

Education, the parent and student alleged that after they sent emails to the teacher about the

student's need for classroom-based [Redacted], the teacher [Redacted] by subjecting the student

to a series of questions in math class, causing the student to shut down due to feeling frustrated

and embarrassed. *Seminole Cty. (FL) Sch. Dist.*, No. 68 IDELR 257 (OCR 2016). The OCR

found that this constituted an adverse action because, even if the challenged action did not

objectively or substantially restrict an individual's educational opportunities, "the action could be

considered 'adverse' if it could reasonably be considered to have acted as a deterrent to further

protected activity or if the individual was, because of the challenged action, precluded from

pursuing his [Redacted] claims." *Id*. However, because the teacher articulated that her actions

constituted a legitimate teaching methodology she regularly applied to all students, the OCR

found no [Redacted], even though a few months after the incident, the school wrote into the IEP

an [Redacted] to specify that the teaching technique at issue would not be used on the student.

To state a *prima facie* case of [Redacted] under the [Redacted] and section 504, an

individual must show that (1) they engaged in a protected activity, (2) they suffered an adverse

action, and (3) there was a causal link between the two. *T.B. v. San Diego Unified Sch. Dist.*, 806

F.3d 451, 472 (9th Cir. 2015) (adopting the burden-shifting framework established by the

Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to [Redacted] claims under the [Redacted]).

Protected activity in the school environment comes in many forms, including pursuing one's rights under the IDEA. Advocating for disabled students regarding issues related to their federal and state educational rights is a protected activity under those statutes. *Lee v. Natomas Unified Sch. Dist.*, 93 F. Supp. 3d 1160, 1168 (E.D. Cal. 2015) (sending emails to school officials regarding noncompliance with the IEP and filing a complaint with the state department of education were protected). Similarly, requests for [Redacted] by parents are protected acts under section 504 and the [Redacted]. *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013).

An "adverse action" is one that "is reasonably likely to deter the charging party or others from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1242–43 (9th Cir. 2000). The adverse action must be material. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). It need not involve a tangible action, but any action that is likely to deter the individual from accessing remedial actions provided by the statute would be considered material. *Id.* For example, in a recent case brought by this author, a court denied a school district's motion to dismiss a [Redacted] claim, even where the parents' actions had already been found to have violated the state's anti-harassment statute. *Silva v. Palmdale Sch. Dist.*, No. LA CV17-03138 JAK (AGRx) (C.D. Cal. 2017) (unpublished). Silva involved a teacher who filed for and obtained a restraining order against the parents of a disabled student. The defendant school district argued that the actions that resulted in a restraining order could not be protected activity because those very same actions had been found to violate state law. The district court disagreed, finding that because the act of seeking a restraining order "is an act that would likely have

dissuaded a person from making a complaint," the plaintiffs had stated a plausible claim. *Silva*, slip op. at 7–8 (citing Lee, 93 F. Supp. 3d at 1168).

The adverse action must be causally related to the protected activity. The Ninth Circuit's standard for a causal link is "but-for" causation. T.B., 806 F.3d at 472–73 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339 (2013)). In Nassar, the U.S. Supreme Court made the causation standard more rigorous than the previous "motivating factor" test. Legal commentators have said that this case constituted a "backlash" and a dramatic departure from a general trend in the federal courts in favoring [Redacted] claims. Alex B. Long, "[Redacted] Backlash," 93 Wash. L. Rev. 715 (2018). Following Nassar, courts have held that, in the employment [Redacted] context, the "but-for" causation standard for [Redacted] requires the plaintiff to establish proof "that the unlawful [Redacted] would not have occurred in the absence of the alleged wrongful action or actions." T.B., 806 F.3d at 735 (citing Nassar). Courts are currently split on whether the Nassar but-for standard applies to [Redacted] [Redacted] claims. The Third Circuit has held that a lesser burden would apply at the prima facie stage, where the plaintiff must produce evidence "sufficient to raise the inference that her protected activity was the likely reason for the adverse . . . action." *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017).

Temporal proximity can help establish causation where the adverse action comes closely after the protected activity. *A.C.*, 711 F.3d at 699. In A.C., the Sixth Circuit found that parents met their *prima facie* burden at summary judgment (1) when they engaged in protected activity by making several requests for [Redacted] by email and meeting with the assistant principal; (2) when the principal engaged in an adverse action by making a child abuse report of medical abuse, an act that would dissuade any reasonable parent from requesting [Redacted] because of

70

the investigation and consequences involve; and (3) when they produced evidence that the report was made immediately after the parents' meeting with school officials, and that many of the statements made by the principal and teachers in their report were false, resulting in an inference of causation. *Id.* at 700.

Demonstrating that the rationale provided for the retaliatory action is a pretext is the most difficult aspect of a [Redacted] claim. If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to show a legitimate, nonretaliatory purpose for its acts. *Alex G. v. Davis Joint Unified Sch. Dist.*, 387 F. Supp. 2d 1119, 1128 (E.D. Cal. 2005) (citations omitted). To overcome defendants' legitimate, nondiscriminatory reason, plaintiffs must "show that the articulated reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the [school district] or indirectly by showing that the [school district's] proffered explanation is unworthy of credence.'" *Id.* (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002)).

Thus, in A.C., the Sixth Circuit found that while the school district's rationale about fluctuating glucose levels at school carried the burden of articulating a nonretaliatory reason for filing a medical neglect claim with the state, the parents provided significant proof of pretext: They showed why the allegations of medical abuse were unfounded, showed evidence that some of the incidents in the report did not occur, and pointed to emails in which school officials expressed concern about parent advocacy and liability issues. *A.C.*, 711 F.3d at 700.

Evidence of pretext is the most critical and difficult aspect of a [Redacted] claim. A review of a sample of complaints filed by parents in 2018 with the OCR reveals the following allegations of retaliatory action: making disciplinary referrals of the child, restricting parents' communication with staff, removing provisions in the IEP, filing truancy charges, denying the

71

student the ability to participate in prom, and failing to provide IEP-related services, among other things. In an overwhelming majority of these cases, while the OCR found that adverse action occurred, it ultimately also found a legitimate nonretaliatory reason for the actions with insufficient proof of pretext.

In a case that is currently being reviewed by the Ninth Circuit, the parent was unsuccessful before the lower court in arguing pretext when she claimed her behavior at school was not sufficiently "disruptive" to restrict her access to the school campus. *Camfield v. Bd. of Redondo Beach Unified Sch. Dist.*, 2017 WL 3037780, at *5 (C.D. Cal. July 17, 2017) (currently under appeal). The district court held that there was no "right" of parents to unfettered access to the school, and therefore the argument that the restriction was unwarranted was not sufficient to establish a pretext.

In a recent decision from the Sixth Circuit, the parents raised three theories to establish pretext: (1) the basis for the adverse action was factually false, (2) others were not subject to the adverse action even though they engaged in substantially identical conduct, and (3) the adverse action was not actually motivated by the proffered reason but that the sheer weight of circumstantial evidence showed a pretext or cover-up. *M.L. v. Williamson Cty. Bd. of Educ.*, 2019 WL 2244720 (6th Cir. May 24, 2019) (finding that that arguments of pretext were unsubstantiated by the evidence).

An excellent presentation on the ABA's website reviews case authority and presents the following methods and evidence that have been used to prove pretext:

- A departure from usual business procedures or a suspect practice or procedure;

- The lack of fixed or reasonably objective standards for evaluation and/or discipline;

- Best or better practices that may have avoided [Redacted];

72

- Implausible or fantastic justifications;

- Whether the version of events as related by one party is internally consistent and plausible, or whether numerous inconsistencies and conflicting documentary evidence render the story unreliable;

- Evidence of a general atmosphere of [Redacted] may also be considered: proof of historically-limiting opportunity, policies or past practices with respect to minority employment or harassment;

- Responses to the plaintiff's "legitimate civil rights activities";

- Statistical proof even if it is not dispositive of the claim in and of itself;

- Instances in which persons outside the protected class were treated better.

John Beasley Jr., Proof of Pretext: A Review of Case Authority and Strategy from a Plaintiff's Perspective (May 31, 2018), at 8.

Alleging pretext requires an understanding of the various theories that have been entertained by courts, a review of what type of evidence was considered sufficient in those contexts, and careful, evidentiary analysis to support the claims. Most complaints of [Redacted] brought before the OCR in 2018 failed even though there were findings of adverse action and an inference of a causal connection, because the parent failed to bring forth sufficient evidence to prove that the adverse action was pretextual.

Here, ABA Accredited University has engaged in [Redacted] against plaintiff for the protected acts of requesting a religious [Redacted] and [Redacted] for [Redacted], when (a) the university improperly sought information about students' (including plaintiff's) religious beliefs, when (b) it refused the religiously motivated vaccine exemption request of plaintiff for prejudicial reasons, when it (c) granted the vaccine exception request for undisclosed reasons

when the religious reason was sufficient and should have been stated so, when it (d) took adverse actions such as refusing the reasonable [Redacted] requests without explanation, (e) by cancelling distance learning when it did and without any explanation knowing that it would result in plaintiff transferring from, or dropping out of the J.D Program, (f) by refusing to cooperate or provide any clarification as to how the student might obtain the degree remotely or with minimal time in person in New York, and (g) by intentionally interfering with plaintiffs transfers by refusing to write letters of recommendation causing delays, and sending transcripts too late which resulted in denial so admission or refusal of the university to review plaintiff's application.

The concealment of the true reasons and the temporal proximity of the adverse actions to the requests for religious exemptions and [Redacted], and the university inexplicably refusing to cooperate or clarify the ambiguous published options available for plaintiff to complete the degree program, allows for an inference of discriminatory intent.

      **E. Defendant ABA Accredited University Violated the Virginia Consumer Protection Act by (1) misrepresenting that its legal education services would have certain qualities (including distance learning), which they did not, in violation of Section 49.1-200(5) of the Virginia Code, and (2) by advertising legal education services with the intent not to sell them as advertised or intent not to sell upon the terms advertised (distance learning) in violation of Section 49.1-200(8) of the Virginia Code and (3) by using other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction in violation of Section 49.1-200(14) of the Virginia Code, or in the alternative Under New York's Deceptive acts and practices statutes, the plaintiff has a substantial likelihood of succeeding on the merits of the claim.**

To state a claim under the Virginia Consumer Protection Act (VCPA), a plaintiff must allege: (1) a fraudulent act (2) by a supplier (3) in a consumer transaction. *Student A v. Liberty University, Inc.*, 2022, 2022 WL 1423617.

A claim under the Virginia Consumer Protection Act (VCPA) is distinct from and in addition to common law fraud. *Student A v. Liberty University, Inc.*, 2022, 2022 WL 1423617.

Students' complaint against university was not so vague or ambiguous that university could not have been reasonably required to answer, and, thus, denial of motion for more definite statement was appropriate, in students' action for violation of Virginia Consumer Protection Act (VCPA), breach of contract, unjust enrichment, and conversion; students' claims met complaint requirements and proceeded beyond university's motion to dismiss for failure to state claim, and, to extent that students might have pleaded more, that was simple want of detail rather than unintelligibility. *Student A v. Liberty University, Inc.*, 2022, 2022 WL 1423617.

Allegations that management company for gated community acted as a partner and co-developer to property developer, that community representative was acting on behalf of both parties, and that both parties profited from the sale of the property, were sufficient to state a claim that management company was a supplier within meaning of Virginia Consumer Protection Act (VCPA). *Nahigian v. Juno Loudoun, LLC*, 2010, 684 F.Supp.2d 731.

Allegations that representatives for gated community repeatedly affirmed to potential purchasers that there was a long-term and fully binding agreement between real estate developer and property management company that would impact and benefit all aspects of the community experience, and that such statements were false and knowingly made with intent to induce potential purchasers to purchase a property in the community, were sufficiently particular to state a claim under the Virginia Consumer Protection Act (VCPA); purchasers were not required to allege full name of each specific representative, the exact date and time of each of the numerous visits made to the community, or when the misrepresentations were made. *Nahigian v. Juno Loudoun, LLC*, 2010, 684 F.Supp.2d 731.

Students were able to proceed under pseudonyms in their action against university for violation of Virginia Consumer Protection Act (VCPA), breach of contract, unjust enrichment, and conversion, although nature of case, reimbursement of various fees, was not of sensitive and highly personal nature, students were college students, and university was private party; students argued and provided evidence of more than general fear of [Redacted] or embarrassment, including providing names and other discovery so that university could prepare its defense. *Student A v. Liberty University, Inc.*, 2022, 2022 WL 1423617.

Students' allegations that university's confusing and misleading guidance regarding status of university and nature of danger posed by COVID-19 pandemic did not support claim of violation of Virginia Consumer Protection Act (VCPA); extent that allegations concerned university's improper retention of fees already collected was matter for student's claims for breach of contract or unjust enrichment, there were no allegations that university initially collected fees at issue in bad faith or with knowledge that it did not at that time intend to fulfill its provision of services for those fees, and students did not allege that they relied on university's guidance and thereby suffered further economic losses or damages as result of that reliance. *Student A v. Liberty University, Inc.*, 2022, 2022 WL 1423617.

Claim for violation of the Virginia Consumer Protection Act (VCPA) would be governed by the heightened pleading standards of the Federal Rules of Civil Procedure for fraud, meaning that plaintiffs are required to state with particularity the circumstances constituting fraud or mistake, including the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. *Student A v. Liberty University, Inc.*, 2022, 2022 WL 1423617.

76

Because claims under the Virginia Consumer Protection Act (VCPA) and Maryland Consumer Protection Act (MCPA) involve allegations of fraud, they must be pled with heightened particularity.   *Brown v. Transurban USA, Inc.*, 2015, 144 F.Supp.3d 809.

To properly state a cause of action under the Virginia Consumer Protection Act (VCPA), plaintiff must allege (1) fraud, (2) by a supplier, (3) in a consumer transaction.   *Brown v. Transurban USA, Inc.*, 2015, 144 F.Supp.3d 809.

A plaintiff must prove a violation of the Virginia Consumer Protection Act (VCPA) by a preponderance of the evidence, the default standard of proof for statutory causes of action, rather than by clear and convincing evidence as required by common law fraud.   *Ballagh v. Fauber Enterprises, Inc.*, 2015, 773 S.E.2d 366, 290 Va. 120.

Motorist pled with sufficient particularity time, place, and contents of false representations, as well as identity of person making such misrepresentation, in her action against automobile manufacturer alleging violation of Virginia Consumer Protection Act (VCPA), where complaint alleged that manufacturer failed to disclose that vehicles equipped with electronic throttle control (ETC) system had propensity to experience unintended acceleration, and provided date and location that vehicle was purchased.   Fravel v. Ford Motor Co., 2013, 973 F.Supp.2d 651.

Motorist's failure to plead any facts indicating her reliance on any misrepresentation or omission on automobile manufacturer's part barred her claim that manufacturer violated Virginia Consumer Protection Act (VCPA) by failing to disclose that vehicles equipped with electronic throttle control (ETC) system had propensity to experience unintended acceleration.   *Fravel v. Ford Motor Co.*, 2013, 973 F.Supp.2d 651.

The Virginia Consumer Protection Act (VCPA) requires a plaintiff to allege a fraudulent misrepresentation of fact. *Hamilton v. Boddie-Noell Enterprises, Inc.*, 2015, 2015 WL 751492.

Car buyer, who had been sold a used car that allegedly had been represented as new, was not required to elect between verdicts with multiple damage awards that jury returned on causes of action against car dealer for common law fraud and violation of the Virginia Consumer Protection Act (VCPA), given that case did not present irreconcilable causes of action but, rather, involved causes of action with different elements of proof and potentially duplicative damage awards; buyer conceded that he was only entitled to one award of compensatory damages, one award of exemplary damages, and one award of attorney fees, and all that was required of the trial court was supervision of the damage awards to avoid double recovery. *Wilkins v. Peninsula Motor Cars, Inc.*, 2003, 587 S.E.2d 581, 266 Va. 558, on remand 2004 WL 2848504.

To state a claim under New York's deceptive acts and practices statutes, a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) the plaintiff suffered injury as a result of the allegedly deceptive act or practice. N.Y. General Business Law §§ 349(a), 350. *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414 (S.D.N.Y. 2021).

Material omissions may give rise to a claim under New York's deceptive acts and practices statutes where the business alone possesses material information that is relevant to the consumer and fails to provide this information. N.Y. General Business Law §§ 349(a), 350. *Id.*

Private university students failed to state claims under New York's deceptive acts and practices statutes against private universities regarding universities' decisions due COVID-19 pandemic to adopt online rather than in-person learning, to close facilities, and to cancel

activities; students did not allege that universities' representations regarding services that they would offer during pandemic were materially misleading, and did not suggest that either university knew in advance that a pandemic would necessitate fundamental changes to services and operations but failed to disclose this information to students. N.Y. General Business Law §§ 349(a), 350.

Here, plaintiff satisfies claims under both New York and Virginia law.  Under the Virginia Consumer Protection Act (VCPA), plaintiff alleges (1) fraud (as described herein), (2) by a supplier (ABA Accredited University), (3) in a consumer transaction (educational services). *Brown v. Transurban USA, Inc.*, 2015, 144 F.Supp.3d 809.

Also, under New York's deceptive acts and practices statutes, plaintiff alleges that a defendant ABA Accredited University has engaged in consumer-oriented conduct of selling education services to students, that was (2) materially misleading in that it advertised distance learning without caveat, and other program details including anti-harassment, anti-[Redacted], and visiting student options, which it had no intent to deliver to plaintiff, and (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice. N.Y. General Business Law §§ 349(a), 350. *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414 (S.D.N.Y. 2021).

**F. Defendant DOE ratified through inaction the unconstitutional distance learning limits adopted by ABA and plaintiff has a substantial likelihood of succeeding in the action to strike the standard as unconstitutional.**

The DOE failure to regulate the ABA which it anointed as the accreditation authority for American law schools, in prohibiting it from implementing irrational distance learning standards, violates the equal protection clause of the Fourteenth Amendment. Government action that discriminates against a fundamental right by placing a burden or a penalty on the exercise of that

right is subject to strict scrutiny; it violates the equal protection unless found to be necessary to a compelling state interest.

Restrictions on the freedom of association will be judged by strict scrutiny.

The government action to prevent a law student from associating with a university not collated with their residence violates their right to associate with organizations of their choosing, to wit, law schools, in meaningful ways. By not prohibiting an arbitrary and unnecessary restriction on the distance learning credit hours which can be earned as part of an ABA accredited degree program, the DOE fails to regulate the ABA allowing for a violation of plaintiff's fundament of freedom to associate. Plaintiff has written to DOE to complain and no response has been received, therefore, any administrative remedy can be deemed exhausted. Therefore, plaintiff has standing to challenge the unconstitutionality of the DOE's failure to prohibit an unlawful ABA accreditation standard.

The fifth and fourteenth amendments protect against deprivation of life, liberty, or property without due process of law. Due process can be classified as substantial and procedural. Substantive due process is applied to economic and social regulations. Procedural due process protects liberty and property interests from being burdened without some form of notice from an unbiased decision-maker. To the extent that the ABA standard is considered permissive under legislative judgement as pertaining to social or economic regulations, they are arbitrary and irrational and shall not be upheld because they are not rationally related to a legitimate state interest. The ABA, in discontinuing the standard during COVID, shall be estopped from now declaring that it is rationally related to a governmental interest, as such a declaration would be effectively an admission that it has been allowing lawyers to be produced during COVID of

insufficient quality.  Notwithstanding that absurdity, changes in technology allow law schools to sufficiently train lawyers over zoom.

Doe plans to present expert testimony that will demonstrate that the distance learning restriction results in no substantial benefit in training lawyers.

### G. Defendant ABA adopted unconstitutional standards (i.e. Standard 306 and 311(e)) imposing distance learning credit hour limitations and plaintiff has a substantial likelihood of succeeding in the action to strike the standard as unconstitutional.

The same arguments apply as in the section above, as related to ABA adoption of the standards. To the extent that ABA is required to enforce its standards, and has the authority to require ABA Accredited University to continue providing the distance learning program, as an [Redacted] for plaintiff's [Redacted], plaintiff is harmed by ABA when it chooses not to compel the university to do so under threat of losing its accreditation. Plaintiff has appealed to ABA for action, and they have not intervened.  To the extent that ABA chooses not to act, plaintiff has exhausted their administrative remedies, and has standing to bring this action in this Court.

### H. Defendants DOE and ABA and ABA Accredited University violate § 59.1-9.5. by unlawfully combining and conspiring to contract in a manner designed to restrain trade or commerce of this Commonwealth.

Plaintiff is pressed for time, due to the intentional delay of ABA Accredited University in announcing its intent to discontinue the distance learning program.  If the TRO and preliminary Injunction is not granted, plaintiff intends to file amended complaints to include more thorough allegations that the defendants conspire to unlawfully restrain trade.

### I.   Unjust Enrichment

To state a claim for unjust enrichment under New York law, a plaintiff must allege (1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.

Under New York law, the theory of unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties.

Unjust enrichment claims are available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff, such as when the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled.

Here, to the extent that there is not a breach of contract, ABA Accredited University has unjustly enriched itself at the plaintiff's expense by accepting tuition money and refusing to offer the promised distance education services.

### J.   Conversion

To state a claim for conversion under New York law, a plaintiff must allege that someone, intentionally and without authority, assumed or exercised control over personal property belonging to someone else, interfering with that person's right of possession.

Money may be the subject of a conversion action under New York law only if it is specifically identifiable and segregated and there exists an obligation to return or otherwise treat in a particular manner the specific fund in question.

Here, the university would be obligated to return the plaintiff's money if it refuses to provide the distance learning.  Plaintiff supports their claim for conversion with the fact that ABA Accredited University indicated its intent not to continue distance education on July 21, and has not even returned the tuition or fee money, or any portion which may be allocated and

82

returned pro rata based on its refusal to grant plaintiff a reasonable opportunity to earn the J.D. degree.

## II.   Plaintiff will suffer irreparable harm absent immediate injunctive relief from this court.

Plaintiff will suffer irreparable harm absent injunctive relief because Defendants will be free to continue their tortious conduct, because a price cannot be put on Plaintiff's career or legal education. The Defendants do not have infinite or even exorbitant means of compensating Plaintiff for the harm they have caused and will continue to cause absent a protective order or injunction. Courts have held that "[i]rreparable injury" must be "both certain and great; it must be actual and not theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). When a plaintiff faces "certain and imminent" injury with no way to recover the loss, it weighs in favor of finding "irreparable injury." Plaintiff will sustain an immediate and irreparable injury if not allowed to start the semester on August 22, 2022. Plaintiff has no other income source and is relying on the student loans predicated on the continued enrollment in the program.  Furthermore, there is no way to estimate the amount of loss that plaintiff will incur in lost opportunity caused by ABA Accredited University, or other defendants' refusal to intervene, and the defendants do not have infinite funds available to compensate plaintiff. No amount of money would provide plaintiff an equitable solution and the court intervention is required to prevent the immediate harm.

## III.   There is no possible harm to Defendant ABA Accredited University if the court issues the temporary restraining order compelling it to continue to provide the distance education it has now been providing for nearly two years.

Because ABA Accredited University does not enjoy a right to commit fraud, breach the

contract, discriminate, retaliate or unlawfully restrict competition, there is no possible harm if the

court issues the temporary restraining order or preliminary injunction.

### IV.   Public interest supports Plaintiff's request that the court issue a temporary restraining order.

The public interest promotes any professionals, being permitted to practice in their

chosen field free from unwarranted interference from third parties.


Only where a right created by Congress has been obliterated may a court of equity

intervene to protect the rights of individuals or the public.   *Order of R.R. Telegraphers v. New*

*Orleans, T. & M. Ry. Co.*, C.C.A.8 (Mo.) 1946, 156 F.2d 1, certiorari denied 67 S.Ct. 112, 329

U.S. 758, 91 L.Ed. 654, rehearing denied 67 S.Ct. 201, 329 U.S. 829, 91 L.Ed. 703.

Purpose of preliminary injunction is merely to preserve relative positions of parties until

trial on merits can be held, and thus party is not required to prove their case in full at preliminary

injunction hearing, and findings of fact and conclusions of law made by court granting

preliminary injunction are not binding at trial on the merits.   *University of Texas v. Camenisch*,

U.S.Tex.1981, 101 S.Ct. 1830, 451 U.S. 390, 68 L.Ed.2d 175.

Temporary injunction did not necessarily reflect what ultimate disposition of suit would

be.   *Beverage Distributors, Inc. v. Olympia Brewing Co.*, C.A.9 (Cal.) 1968, 395 F.2d 850.

Grant or denial of a preliminary injunction is not an adjudication of ultimate rights and

does not foreclose further consideration at a trial on the merits of any question presented.

*Surber v. U.S.*, S.D.Ohio 1968, 285 F.Supp. 775.

Granting or denying of preliminary injunction is not an adjudication of ultimate rights of

parties.   *American Granwood Flooring Co. v. McIntyre Veneers, Inc.*, E.D.La.1967, 264 F.Supp.

4.  See, also, *Duckworth v. James*, C.A.Va.1959, 267 F.2d 224, certiorari denied 80 S.Ct. 88, 361 U.S. 835, 4 L.Ed.2d 76;  *Hunter v. Atchison*, T. & S.F. Ry. Co., C.A.Ill.1951, 188 F.2d 294, certiorari denied 72 S.Ct. 36, 342 U.S. 819, 96 L.Ed. 619, rehearing denied 72 S.Ct. 172, 342 U.S. 889, 96 L.Ed. 667.

Grant or denial of temporary injunction does not conclude parties on merits of case. *S.E.C. v. North Am. Research & Development Corp.*, S.D.N.Y.1972, 59 F.R.D. 111.

Rights which are entitled to protection by injunction fall within a very broad definition of property or contract rights;  and included within category of property rights is any civil right of a pecuniary nature.  *Beacon Theatres, Inc. v. Westover*, C.A.9 (Cal.) 1958, 252 F.2d 864, certiorari granted 78 S.Ct. 996, 356 U.S. 956, 2 L.Ed.2d 1064, reversed on other grounds 79 S.Ct. 948, 359 U.S. 500, 3 L.Ed.2d 988.

Generally, one has right freely to contract, and this right or privilege may not be destroyed by force or illegal means, and any unjustifiable inference by third party with contract which results in irreparable injury to complaining party for which law furnishes no adequate or complete remedy may be enjoined, provided contract is not in violation of other law or public policy.  *Hallmark Productions v. Mosley*, C.A.8 (Mo.) 1951, 190 F.2d 904.

Injunctive relief may be had to restrain third persons from unlawfully inducing breach of a lawful contract by one of the parties thereto when it will result in irreparable injury to the other. *Sunbeam Corp. v. Payless Drug Stores*, N.D.Cal.1953, 113 F.Supp. 31, 97 U.S.P.Q. 373.

## SPECIFIC PERFORMANCE IS WARRANTED

To obtain an order granting specific performance under Virginia law, a plaintiff must show by clear and convincing evidence that:

- A valid and enforceable contract exists.
- The contract is:
- reasonable, meaning the contract is free from hardship, fraud, and oppression;
- just;
- certain as to its terms;
- legal;
- mutual; and
- based upon valuable consideration.
- The plaintiff is ready, willing, and able to perform its remaining contractual obligations.
- There is no other adequate remedy at law.

(*Pennybacker v. Maupin*, 31 S.E. 607, 608 (Va. 1898); see *City of Manassas v. Bd. of Cty.*

*Supervisors*, 458 S.E.2d 568, 571 (Va. 1995).

Here, plaintiff has demonstrated each of those elements. The parties have a valid and

enforceable contract,  the contract is reasonable, meaning the contract is free from hardship,

fraud, and oppression, it is just, certain as to its terms, legal, mutual; and  based upon valuable

consideration of at least $118,000. The plaintiff is ready, willing, and able to perform its

remaining contractual obligations. There is no other adequate remedy at law.

Specific performance is an alternative to a claim for money damages under Virginia law.

It seeks an order from the court compelling a party to perform its contractual obligations rather

than pay money damages for a breach.

Although a party typically cannot obtain specific performance and recover money

damages for breach of the same contractual provisions, the plaintiff should always plead a claim

for money damages in the alternative to a specific performance claim (see *City of Manassas*, 458

S.E.2d at 569). In this action plaintiff pleads for money damages in the alternative, though it will

be insufficient to compensate plaintiff for all damages.

Pleading a breach of contract claim ensures that the claim is preserved and money

damages remain an option if the court determines that the elements of specific performance have

not been met. Counsel should be prepared to answer questions from the court as to whether its

claim for specific performance is undermined by an alternative breach of contract claim that seeks money damages, as such a claim may suggest that damages are adequate to make the plaintiff whole, thereby rendering the claim for specific performance unavailable. (See City of Manassas, 458 S.E.2d at 571)

Under Virginia law, the primary relief available to a party seeking specific performance is either:

- Compelling the performance of a contract in the precise terms that the parties agreed on.

A substantial performance that will do justice between the opposing parties under the circumstances of the case.

(*Rison v. Newberry*, 18 S.E. 916, 919 (Va. 1894); see *Atkins v. A.H. Elec. Contractors, LLC*, 2017 WL 4681945, at *2 (Va. Oct. 19, 2017). Specific performance of a contract frequently is enforced by either the court issuing a direct decree or by the issuance of an injunction restraining a party from doing what the party agreed not to do (see *Grubb Bros. v. Moore, Clemens & Co.*, 60 S.E. 757, 761 (Va. 1908).

Under Virginia law, in certain instances, a party may obtain ancillary money damages in addition to specific performance. The Supreme Court of Virginia has found that, for example, in situations involving a contract for the sale of land, courts are able to specifically enforce the contract and then award damages in order to afford complete relief. The authority of the court to award these additional damages is "ancillary or auxiliary" to the jurisdiction specifically to enforce the performance of the contract. (*Ewing v. Litchfield*, 22 S.E. 362, 363 (Va. 1895); *Grubb v. Sharkey*, 20 S.E. 784, 785 (Va. 1894)

The plaintiff has satisfied all conditions precedent or subsequent to enforcement of contractual obligations (*Flippo v. F & L Land Co.*, 400 S.E.2d 156, 160 (Va. 1991); *Cushman v. Fitz-Hugh*, 98 S.E.2d 706, 709 (Va. 1957)

The specific performance order would be inequitable under the circumstances (CPM Virginia, L.L.C. v. MJM Golf, L.L.C., 2017 WL 10966303, at *3 (Va. Cir. Ct. July 14, 2017)).

The defendant would not suffer hardship or injustice that is out of proportion to the relief sought (*Norfolk S. Ry. Co.*, 756 S.E.2d at 425).

Specific performance is not impossible (*Perel v. Brannan*, 594 S.E.2d 899, 904-05 (Va. 2004). All ABA Accredited University must do is turn on the Zoom function.

Specific performance would not be unusually difficult for the court to enforce or would require extended court supervision (*Perel*, 594 S.E.2d at 904-05). Either ABA Accredited University will or will not turn on the Zoom distance learning feature. It is that simple.

The party seeking relief has clean hands (*Musselman*, 267 S.E.2d at 166-67). Plaintiff has played no part in the breach or threatened breach, the [Redacted], the [Redacted], the fraud, etc.

The Virginia Code provides that the statute of limitations periods apply to all civil proceedings, whether at a law or equity (Va. Code Ann. §§ 8.01-2(1), 8.01-243, and 8.01-246. While courts historically have applied the doctrine of laches to specific performance claims, as of the date of the merger of legal and equitable pleadings in Virginia, this is no longer the proper practice.

The statute of limitations periods for actions founded on contracts are:

- Five years for a written contract.
- Three years for an oral contract.
- Four years for a contract under the Commercial Code.

(Va. Code Ann. §§ 8.01-2(1), 8.01-246, and 8.2-725)

The statute of limitations begins to run on the date the breach occurs (Arrington, 458 S.E.2d at 291). The date of the breach is as late as July 21, 2020 when ABA Accredited University finalized its plan to cancel distance learning and has not rescinded its new policy or cooperated in any fashion despite extensive requests by plaintiff.

## CONCLUSION

For the reasons set forth above, Plaintiff requests that this Court issue a Temporary Order enjoining Defendants as stated above.

I affirm under penalty of perjury that the forgoing document is true and accurate to the best of my belief.

Dated: August 18, 2022                    Respectfully submitted,

                                          /s/ Jane Doe

## *PRO SE* LITIGANT CERTIFICATION

**PURSUANT TO LOCAL RULE 83.1(M)**

**Each document filed with the court by a *pro se* litigant shall bear the following certification:**
**CERTIFICATION**

I declare under penalty of perjury that, notwithstanding my objection to the requirement, that no attorney has prepared, or assisted in the preparation of this pleading.

## CERTIFICATE OF SERVICE

I certify that on August 19th, 2021, I have filed the foregoing document, **PLAINTIFF'S MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION** with the clerk of the U.S. District Court, Eastern District of Virginia, for filing and for preparation of the summons to be picked up and served on Defendants via private process server.

Additionally, I certify that on August 19th, 2022, I have served a true copy of this Complaint via email on defendant's agents, officers or counsel as follows:

To ABA Accredited University, President Susan [Redacted] at Susan.[Redacted]@ABA Accredited University.edu, and Dean of the ABA Accredited University, ABA Accredited University School of Law, Dean [First Name Redacted] [Redacted], at [First Name Redacted].[Redacted]@ABA Accredited University.edu., and/or to their address at ABA Accredited University, ABA Accredited University School of Law, 1000 [City Redacted] Tpke, [City Redacted], NY 11549.

To Defendant American Bar Association, Accreditation Counsel, Section of Legal Education and Admissions to the Bar, Ms. Kirsten M. Winek, J.D., Ph.D. at kirsten.winek@americanbar.org, and/or to her mailing address, American Bar Association, 321 North Clark Street, Chicago, IL 60654

To Defendant, United States Department of Education, Office of Higher Education, Mr. Herman Bounds at herman.bounds@ed.gov, and/or at the main mailing address, US Department of Education, Office of General Counsel, 400 Maryland Avenue, S.W. Room 6E300, Washington, DC 20202-2111, and/or also to the United States Attorney General, Main Justice Building, 10th & Constitution Ave, NW Washington, DC 20530, and the local US Attorneys Office, United States Attorney for the Eastern District of Virginia, 2100 Jamieson Avenue, Alexandria VA 22314.

Service will be made to or at the addresses once a stamped copy is received from the court with the summons.

By: /s/ Jane Doe